## IN THE UNITED STATES DISTRICT COURT
## FOR THE EASTERN DISTRICT OF VIRGINIA
### Alexandria Division

|  |  |
|---|---|
| ALI ABDALLA HAMZA | ) |
| | ) |
| and | ) |
| | ) CIVIL ACTION NO. 20-cv-01038 LMB-JFA |
| NEHMA ABDALLA AL-MAHDI HAMZA | ) |
| | ) **FIRST AMENDED COMPLAINT** |
| and | ) **FOR EXTRAJUDICIAL KILLING;** |
| | ) **DEGRADING TREATMENT;** |
| ABDELHALIM ABDALLA MAHDI HAMZA | ) **CRIMES AGAINST HUMANITY;** |
| | ) **AND WAR CRIMES** |
| and | ) |
| | ) **JURY TRIAL DEMANDED** |
| SALIMAH ABDULLAH | ) |
| ABRAHEEM JIBREEL | ) |
| | ) |
| Plaintiffs, | ) |
| | ) |
| v. | ) |
| | ) |
| KHALIFA HIFTER, | ) |
| | ) |
| Defendant. | ) |

## I. PRELIMINARY STATEMENT

1.      This is an action for compensatory and punitive damages for torts in violation of international and domestic law.

2.      Defendant Khalifa Hifter ("Defendant Hifter"), a U.S. citizen, is the self-described leader of the Libyan National Army ("LNA") since 2014, when he declared a coup against the Libyan government.  Since that time, he has waged a campaign of illegal siege warfare in Libya in an effort to completely overthrow the recognized government of the State of Libya, the Government of National Accord ("GNA").

1

3.     Defendant Hifter is personally liable for, or exercised command responsibility over or conspired with or aided and abetted subordinates of the LNA, or groups acting in coordination with the LNA, or under their control, to commit, acts of extrajudicial killing, torture, crimes against humanity, war crimes, cruel, inhuman or degrading treatment or punishment and arbitrary detention.  Defendant Hifter is liable under domestic and international law for the injuries, pain, and suffering suffered by countless people, including those related to the Plaintiffs, who have been unlawfully killed.

## II. JURISDICTION AND VENUE

4.     This civil action arises under the Constitution and the laws of the United States. This Court has subject-matter jurisdiction over this action pursuant to 28 U.S.C. § 1331 (federal question), 28 U.S.C. § 1332 (diversity), and 28 U.S.C. § 1350 (Alien Tort Statute).  The Court also possesses supplemental jurisdiction over "all other claims that are so related to claims in the action within such original jurisdiction that they form part of the same case or controversy under Article III of the United States Constitution" pursuant to 28 U.S.C. § 1367(a).

5.     Additionally, this Court has universal jurisdiction in respect of those claims arising from breaches of the Law of Nations, including the Geneva Conventions pursuant to Art.1 Sec.8 of the U.S. Constitution.

6.     Defendant Hifter is subject to personal jurisdiction within the Commonwealth of Virginia for purposes of the Constitution's Due Process Clause and the Virginia long-arm statute because Defendant Hifter resides and transacts significant business activity within the Eastern District of Virginia.

7.     Venue is proper in this judicial district under 28 U.S.C. § 1391(b), and the events giving rise to these claims have occurred in, or otherwise touch and concern, the Eastern District of Virginia.

8.     Defendant Hifter has no right to any *ratione personae* or *ratione materiae* immunity for violations of international humanitarian law that are *jus cogens*.  Nor can Defendant Hifter rely on any invocation of sovereign immunity as he is not recognized as a head of state.  Instead, Defendant Hifter is subordinate to Libya's state legislature, the House of Representatives.

9.     The Plaintiffs named herein are unable to exhaust any remedies in Libya because there is no functioning or effective justice system to adjudicate their claims.  Moreover, the Plaintiffs cannot reasonably be expected to file a claim against Defendant Hifter in relation to war crimes and crimes against humanity in the jurisdiction of which he is reported to effectively control 90% of the territory.

### III.     PARTIES

*Plaintiffs*

10.     Plaintiff Ali Abdalla Hamza ("Ali Hamza" or collectively "Hamza Plaintiffs"), a dual Canadian/Libyan citizen and Canadian resident, is the son of decedent Aalya Faleh Al-Derbali ("Aalya") and a brother of decedents Ibrahim Abdalla Hamza ("Ibrahim") and Mahmoud (Naser) Abdalla Hamza ("Naser"), and his sisters, Fariha Abdalla Hamza ("Fariha") and Faiza Abdalla Hamza ("Faiza")(hereinafter the "Decedents").

11.     Nehma Abdalla Al-Mahdi Hamza ("Nehma Hamza" or collectively "Hamza Plaintiffs"), a Libyan citizen and resident, is the son of decedent Aalya, and a sister of decedents Ibrahim, Naser, Fariha and Faiza.

12.     Abdelhalim Abdalla Mahdi Hamza ("Abdelhalim Hamza" or collectively "Hamza Plaintiffs"), a Libyan citizen and resident, is the son of decedent Aalya, and a brother of decedents Ibrahim, Naser, Fariha and Faiza.

13.     Hamza Decedents were victims of LNA war crimes, crimes against humanity, and terrorism under Defendant Hifter's command.

14.     Plaintiff Salimah Jibreel ("Plaintiff Jibreel"), a Libyan citizen and resident, along with her husband and their four children were victims of LNA war crimes, crimes against humanity, and terrorism under Defendant Hifter's command.

15.     Plaintiff Jibreel's three-year-old daughter Aziza and eight-year-old daughter Maryam, and her eleven-year-old son "Mohammad" were killed January 5, 2017, when a shell hit their house.  Her sole surviving ten-year-old daughter Mayada was injured, as was her husband.

16.     Plaintiff Jibreel's husband, Alaa, has been detained by LNA forces without charges since March 19, 2017 and is still being held in incommunicado detention.

*Defendant*

17.     Defendant Hifter is a citizen of the United States and a resident of the Commonwealth of Virginia and has extensive property, business, and personal contacts in the Eastern District of Virginia.

18.     Defendant Hifter maintains at least one permanent residence in Virginia, which upon information and belief, includes a residential condominium in Falls Church, Virginia, an eighty-five (85) acre estate located in Keysville, Virginia, and a single-family home in Vienna, Virginia.

19.     Since 2014, he appears to have invested at least US$ 8.5 million in property in the Eastern District of Virginia.

20.     In 2017, within the Commonwealth of Virginia, Defendant Hifter, through his son, Khaled Khalifa Hifter, entered into a contract with Grassroots Political Consulting, LLC of Alexandria, Virginia to provide political and strategic consulting services for the Hifter family.

## IV.     LEGAL FRAMEWORK

21.     The Alien Tort Statute ("ATS"), 28 U.S.C. § 1350 permits non-citizens to bring suits in U.S. courts for violations of the law of nations or a treaty of the United States.  Federal courts are authorized to support civil damages by non-citizens against the individual perpetrators of well-established war crimes and crimes against humanity [*Sosa v. Alvarez-Machian*, 542 U.S. 692, 732 (2004)] where they "touch and concern the territory of the United States."  *Kiobel v. Royal Dutch Petroleum Co.*, 569 U.S. 108, 125 (2013) (Kennedy, J., concurring).

22.     The Torture Victim Protection Act ("TVPA") provides civil causes of action for the victims of torture and the heirs of victims of extrajudicial killings when acting under the actual or apparent authority, or color of law, of any foreign nation.  28 U.S.C. § 1350 *note.*

23.      Defendant Hifter's unlawful siege and attacks upon the civilian neighborhoods, which resulted in the deaths of the Plaintiffs' family members, constitute the following, but not limited to, war crimes and/or crimes against humanity:  attacking civilians, attacking civilian objects, extrajudicial killing, mutilation or maiming, hostage taking, forced starvation, besieging undefended dwellings, denying quarter, desecration of the dead, and inflicting terror upon the civilian population.

## V.     FACTUAL ALLEGATIONS

*Governance in Libya*

24.     From 1969 to 2011, Libya was under the control of Colonel Muammar Gaddafi ("Gaddafi").

25.     In 2010-2011, in the wake of the regional uprising "Arab Spring," a protest movement emerged, demanding more freedom and democracy, better respect for human rights, a better distribution of wealth and stopping corruption within the state and its institutions.  Popular protests were brutally repressed, turning a political conflict into an armed one.

26.     A revolution in Libya took place between February 15, 2011 and October 23, 2011. Armed groups and brigades, with the help of the international community, overthrew Gaddafi. The civil war was over, but a low-level insurgency by former Gaddafi loyalists continued.  Months of fighting and political instability led to the collapse of security and justice systems.  Existing rebel forces did not give up arms and were not integrated into a national army, causing periodic fighting between various armed groups in following years.

27.      In July 2012, successful first democratic elections took place under good conditions according to international observers.  The General National Congress ("GNC") was formed for a temporary period of two years.

28.     In June 2014, the Tobruk-based House of Representatives ("HoR") was established and is Libya's sole legitimate legislative authority.

29.     On December 17, 2015, under a United Nations led initiative, members of the HoR and the GNC signed a political agreement, generally known as the "Libyan Political Agreement" or the "Skhirat Agreement."   Under its terms, a nine-member Presidency Council and the seventeen-member interim GNA was formed, with a view to holding new elections within two years.

30.     In the summer of 2016, the HoR withdrew its recognition of the GNA.

31.     The GNA is still recognized by the United Nations and the United States of America as Libya's legitimate State government.

*The Application of International Law in Libya*

32.      Libya is a State party to eleven international core human rights treaties, including, but not limited to, the International Covenant on Civil and Political Rights, the International Covenant on Economic, Social, and Cultural Rights, the Convention Against Torture and Other Cruel and Inhuman or Degrading Treatment or Punishment, the International Convention on the Elimination of All Forms of Discrimination Against Women and its Optional Protocol, the International Convention on the Protection of the Rights of All Migrants Workers and Members of their Families, the Convention on the Rights of The Child and Its Optional Protocols.  It is also a party to the African Charter on Human and Peoples Rights.

33.      International humanitarian law is applicable to the non-international armed conflict which has taken and is taking place in Libya.  Libya is a party to the four Geneva Conventions of 1949 and Additional Protocols I and II.  Of particular relevance are common Article 3 to the Geneva Conventions and Additional Protocol II, which both apply to non-international conflicts and contain protections applicable to civilians and other persons not taking a direct part in hostilities, as well as applicable norms of customary international humanitarian law.

34.      Under the Libyan political agreement, all armed factions have committed to comply with Libyan domestic law and international humanitarian law and human rights.

*Defendant Hifter's Military Occupation of Libya*

35.      In 1969, Defendant Hifter participated in Gaddafi's coup against the Libyan monarchy and rose to become one of Gaddafi's top officers.

36.      In 1987, Defendant Hifter commanded Libyan troops in conflict with Chad over disputed territory on the Libyan-Chad border.  Defendant Hifter's forces are alleged to have used poisonous gas against the Chadians in contravention of international humanitarian law.  Defendant

Hifter and hundreds of his men were taken prisoner by Chad.  When Gaddafi publicly disavowed Defendant Hifter and his men, Defendant Hifter joined the Chadian-based Gaddafi opposition group, the National Front for the Salvation of Libya (the Salvation Front) and was released from prison.  As a military commander of the Salvation Front, Defendant Hifter planned an unsuccessful invasion of Libya.  Afterwards, he fled to the United States, settled in Virginia and obtained U.S. citizenship.

37.     When the people of Libya rose up against Gaddafi in February 2011, Defendant Hifter returned to Libya to participate in guerilla activities against Gaddafi, who was assassinated in October 2011.

38.     In 2012, the GNC was elected as the legislative authority of Libya, tasked with transitioning the country to a democracy.  In February 2014, Defendant Hifter appeared on television to call for the unilateral dissolution of the GNC.

39.     In the summer of 2014, Defendant Hifter was appointed to be the LNA commander by the HoR.

40.     Defendant Hifter was excluded from the political coalition that would ultimately form the GNA and which received unanimous recognition from the U.N. Security Council "as the sole legitimate government of Libya" in December 2015.[1]  The United States recognizes the Libyan Government as the lawful government of Libya and conducts regular diplomatic relations with its representatives.

41.     Soon after taking command of the LNA, Defendant Hifter announced a coup of the Libyan Government and the initiation of "Operation Dignity," which was directed at "clearing" eastern Libya of rival political and military groups.  Operation Dignity initially made a priority of

---

[1] Security Council Resolution, S/RES/2259 (2015), at *http://unscr.com/en/resolutions/doc/2259* (accessed August 18, 2020).

targeting Ansar al-Shari'a, a State-Department listed Foreign Terrorist Organization and an al-Qaeda affiliate in Libya.   Subsequently, there have been reports that Defendant Hifter has developed ties to local Salafist groups[2] and has provided safe passage to local Islamic State fighters.[3]

42.     Defendant Hifter has repeatedly and publicly directed his forces to commit war crimes.   On or about September 18, 2015, at the commencement of what Defendant Hifter titled "Operation Doom," he ordered his men to take no prisoners, saying "No mercy.   Give up on that story facing the opponent.   Never mind consideration of bringing a prisoner here.   There is no prison here.   The field is the field, end of the story."[4]

43.     Defendant Hifter has made regular use of grave desecration to terrorize the civilian population.[5] One of Defendant Hifter's top lieutenants, Mahmoud Mustafa Busayf Al-Werfalli, directed or participated in a series of executions of thirty-three (33) prisoners between June 2016 and July 2017, leading the International Criminal Court to issue arrest warrants in August 2017 and July 2018.

44.     Defendant Hifter continues to oppose the Libyan Government in Tripoli and enjoys the sponsorship of the governments of France, Russia, Egypt and the United Arab Emirates. Starting in 2016, the Russian government began to sponsor Defendant Hifter with approximately

---

[2]  Ahmed Salah Ali, "Hafter and Salafism: A Dangerous Game," June 6, 2017, at *http://www.atlanticcouncil.org/blogs/menasource/haftar-and-salafism-a-dangerous-game* (accessed August 18, 2020).

[3]"Inquiry sought into ISIL escape under Khalifa Hafter, Al Jazeera," May 26, 2017, at *http://www.aljazeera.com/news/2017/05/inquiry-sought-isil-escape-khalifa-hafter-170526210718755.html* (accessed August 18, 2020).

[4]  Ryan Goodman and Alex Whiting, "Smoking Gun Videos Emerge: US Citizen, Libyan Warlord Haftar Ordering War Crimes," Just Security, Sept 19, 2017, at *https://www.justsecurity.org/45094/Hafter-smoking-gun-videos-emerge-citizen-libyan-warlord-khalifa-haftar-ordering-war-crimes/* (accessed August 18, 2020).

[5]  "Libyan Army accused of 'war crimes' as mutilated bodies paraded around Benghazi", Middle East Monitor, March 20, 2017, at *https://www.middleeastmonitor.com/20170320-libyan-army-accused-of-war-crimes-as-mutilated-bodies-paraded-around-benghazi/* (accessed August 18, 2020).

$2.9 billion in military and financial support.  There are also reports that he has received support from the French government.[6]  However, on August 18, 2017, the French government joined a statement by the governments of the United States and the United Kingdom "reaffirm[ing] their support for the Government of National Accord."[7]

*Defendant Hifter's Command Responsibility under International Law*

45.     As a commander of the LNA, Defendant Hifter has a duty under customary international law and multilateral treaties to ensure the protection of civilians, to prevent violations of international law by the LNA, and to ensure all persons under his command were trained in, comply with and are punished under, the laws of warfare and international law, including the prohibitions against torture, extrajudicial killing, cruel, inhuman or degrading treatment or punishment, arbitrary detention, crimes against humanity and war crimes.

46.     Defendant Hifter has failed or refused to take all necessary measures to investigate and prevent these abuses, or to punish personnel under this command for committing such abuses. The acts of torture, attempted extrajudicial killing, cruel, inhuman or degrading treatment or punishment, and arbitrary detention inflicted upon the Plaintiffs and their Decedents were part of a pattern and practice of systematic or widespread human rights violations against the civilian population.  At all relevant times, Defendant Hifter knew or reasonably should have known of the pattern and practice of gross human rights abuses perpetrated against the civilian population by

---

[6] Aria Bendix, "Libyan Rivals Agree to a Ceasefire and Elections," The Atlantic, July 24, 2017, at *https://www.theatlantic.com/news/archive/2017/07/libyan-rivals-agree-to-a-ceasefire-and-elections/534897/* (accessed August 18, 2020).

[7] Press Statement, "ICC Arrest Warrant for Major Mahmoud al-Werfalli in Libya: Joint Statement by the Governments of France, the United Kingdom, and the United States of America," August 18, 2017, at *https://www.state.gov/icc-arrest-warrant-for-major-mahmoud-al-werfalli-in-libya-joint-statement-by-the-governments-of-france-the-united-kingdom-and-the-united-states-of-america/* (accessed August 18, 2020).

subordinates under his command, including the abuses committed against the Plaintiffs and Decedents.

*Absence of Legal Remedies in Libya*

47.     The Plaintiffs do not have the ability to seek a legal remedy or appropriate civil relief in Libya.

48.     As reported by Freedom House in its April 8, 2020, report "Freedom in the World 2020," and posted online by the U.S. Department of Justice:

> Since the 2011 revolution, the right of citizens to a fair trial and due process has been challenged by the continued interference of armed groups and inability to access lawyers and court documents.  Militias and semiofficial security forces regularly engage in arbitrary arrests, detentions, and intimidation with impunity.  Thousands of individuals remain in custody without any formal trial or sentencing.[8]

49.     This is expanded upon by *Human Rights Watch* in a 2019 report:

> Despite the magnitude of the human rights crimes in Libya, attempts to hold wrongdoers to account, in domestic and international courts, and through sanctions imposed by the United Nations Security Council have failed to break the cycle of impunity.
>
> Few cases have been heard by civil and military courts in Libya, the post-Gaddafi interim government, strongly support by the UN and western governments, did not prioritize a functioning justice system.  So thousands of people in east and west of the country remained in long-term abusive arbitrary detention without a hearing.  Domestic courts, affected by political decisions and armed conflict, are barely functional, with procedures hampered by grave due process violations, including forced confessions, ill-treatment, and lack of access to lawyers.  In some areas, including the south, the criminal justice system has collapsed.  Lawyers, judges and prosecutors are also prime targets of militias.

---

[8] Freedom House, "Freedom in the World 2020", April 8, 2020, at *https://www.justice.gov/eoir/page/file/1267406/download* (accessed August 18, 2020).

The prosecutor of the international criminal court (ICC) has a mandate to investigate war crimes, crimes against humanity and genocide in Libya yet the prosecutor has issued only one arrest warrant since 2011.[9]

## GENERAL ALLEGATIONS

*Reckless Bombing and Attacks on Civilians*

50.     Under international humanitarian law, warring parties have an obligation to take all measures to spare civilians and civilians objects:

a.     The principle of distinction requires that parties to the conflict distinguish between civilians and combatants and between civilian objects and military objectives, and therefore direct attacks only at military targets.

b.     This rule is applicable to both international and non-international conflicts.

c.     The principle of proportionality prohibits attacks, which may be expected to cause incidental loss of civilian life, injury to civilians, damage to civilian objects, which would be excessive in relation to the concrete and direct military advantage anticipated.

d.     The presence of fighters in residential areas does not absolve parties from their obligation to minimize harm to civilians.

e.     Each party must, to the extent feasible, avoid locating military objective within or near densely populated areas.

f.     Making civilians the object of the attack, intentionally launching indiscriminate attacks resulting in death or injury to civilians and launching disproportionate attacks constitute war crimes.

51.     The LNA, under Defendant Hifter's command, has committed indiscriminate attacks against the civilian population in Libya.  The United Nations High Commissioner for

---

[9] Hanan Salah, "Justice Delayed, In Libya", September 11, 2019, at *https://www.hrw.org/news/2019/09/11/justice-delayed-libya* (accessed August 18, 2020).

Human Rights ("UNHCHR") stated: "the available information indicated a pattern of attacks using imprecise weapons in heavily populated or residential areas, which together may amount to indiscriminate attacks.  Weapons that are imprecise or that have wide-area effects, may be unsuited for targeting military objectives located in densely populated areas.  Mines, booby-traps and explosive remnants of war are also indiscriminate by nature."[10]

52.    During Defendant Hifter's Operation Dignity, reckless shelling over civilians and residential areas in Benghazi routinely occurred.  The targeting of medical institutions and staff, which is also prohibited under international law, also occurred.

53.    For example, in one case investigated by the Office of the High Commissioner for Human Rights, two children were killed on April 26, 2015, when their residential building in the Al-Hada'eq neighborhood of Benghazi was hit by a rocket.  In May 2015, three children were killed and two injured when a shell struck a house in Balo'n in the Al-Fuweihat neighborhood of Benghazi.  It was reported that there was no fighting in either area at the time of the attacks, nor were there any known military objectives being pursued.[11]

54.    On October 23, 2015, nine people were killed and over 40 injured during a shelling of a demonstration in Al-Kish Square.  Then, on May 7, 2016, six civilians were reportedly killed and over 30 injured in the same square under the same circumstances.

---

[10] Report of the United Nations High Commissioner for Human Rights on the situation of human rights in Libya, including on the effectiveness of technical assistance and capacity building measures received by the Government of Libya, January 13, 2017, A/HRC/34/42, at *https://undocs.org/A/HRC/34/42* (accessed August 18, 2020)("UNHCR Report").

[11] Human Rights Council, Report of the Office of the UN High Commissioner for Human Rights, Investigation by the Office of the UN High Commissioner for Human Rights on Libya, February 15, 2016, A/HRC/31/47, at *https://undocs.org/A/HRC/31/47* (accessed August 18, 2020).

55.     During May 2016, the Benghazi medical center repeatedly came under attack.[12]

56.     For two years, the Libyan National Army under Defendant Hifter's command carried out repeated air strikes on areas in Benghazi - namely Ganfouda, a residential district in south-west Benghazi, and other smaller pockets in the city.

57.     Defendant Hifter's forces have also restricted entry to, and departure from Ganfouda, leaving many people pinned down by airstrikes.  As a result, hundreds of civilians were trapped during these months.

58.     Amnesty International and Human Rights Watch documented several cases in 2016 underlining the constant fear of airstrikes and shelling.  For example, Hassan, a Ganfouda resident said to Amnesty International: "Planes are patrolling the skies and people are scared to even walk outside because any area where they see movement, they strike.  Even a mosque was hit by shelling a few months ago."[13]

59.     Another Ganfouda resident told Amnesty International: "There are constant airstrikes, and we don't leave our houses at all."  She has been a woman trapped with her four young children including a 10-month-old girl who she was forced to give birth to at home because of the fighting.[14]

60.     Samir, another resident and former judicial police officer who lives in Ganfouda with his wife, three sons and a one-year old daughter, told Amnesty International: "Our house has

---

[12] In an open letter sent June 4, 2016, to all parties engaged in fighting in Benghazi, Martin Kobler, Special Representative of the UN Secretary General, expressed his concern about "repeated violations of international humanitarian law" taken place in Benghazi, "some of which may amount to war crimes." *See https://unsmil.unmissions.org/open-letter-all-parties-engaged-fighting-benghazi* (accessed August 18, 2020).

[13] Amnesty International, "Libya: Civilians trapped in Benghazi in desperate conditions as fighting encroaches," September 30, 2016, at *https://www.amnesty.org/en/latest/news/ 2016/09/libya-civilians-trapped-in-benghazi-in-desperate-conditions-as-fighting-encroaches/ * (accessed August 18, 2020).

[14] Id.

been hit and damaged by three tank shells.  One hit the bedroom, another the stairs, while the third shell hit the kitchen but did not explode.  The shell is still there and intact."[15]

61.    A Human Rights Watch investigation a reported that members of at least six families in Ganfouda had been killed by air strikes and shelling from neighboring areas in 2016, according to residents.[16]

62.    The following testimonies had been gathered by the Human Rights Watch:

a.    An air strike on August 12th, killed a mother, father, and two daughters from the Sudanese Doma family, the resident said.  It took place at night, after the family had left the television on: "They made the mistake of not covering the window with a blanket. I went to see the damage, and it was chilling";

b.    One resident said by phone that members of six families had been killed by airstrikes since the beginning of hostilities.  The resident described how attacks on a home on October 4, killed two women and two children from the Zubi family.  This event had also been reported by media reports; and

c.    Another airstrike killed a mother and three children from the Abdali family, together with an elderly man and woman, the resident said.

63.    In 2016 alone, UNHCHR noted that attacks in populated areas with imprecise weapons from January through the end of October continued to cause civilian casualties.  It documented 498 civilian casualties, including 212 killed and 286 injured.  Victims included 121 men killed, 151 injured, 31 women killed and 28 injured, 43 children killed and 51 injured and 73

---

[15] Id.

[16] Human Rights Watch, "Libya: Civilians under Siege in Benghazi", November 2, 2016, at *https://www.hrw.org/news/2016/11/02/libya-civilians-under-siege-benghazi* (accessed August 18, 2020)("HRW – Libya Civilians").

other victims whose sex or age is unknown.  It is clearly explained that the leading cause is airstrikes, gunfire and shelling. "The largest number of civilian deaths documented were in Benghazi."[17]

*Unlawful Siege Warfare in Ganfouda Neighborhood*

64.     Under international humanitarian law, the starvation of civilians as a method of warfare is prohibited and constitutes a war crime.  All parties to a conflict should facilitate the movement of civilians, in particular to enable them to escape a zone of fighting or siege.[18]

65.     In July 2016 the LNA started a siege on Ganfouda, a coastal neighborhood of Benghazi, after Defendant Hifter announced the start of Operation Dignity.

66.     The LNA, under Defendant Hifter's command, intentionally carried out repeated air strikes against civilians and civilian objects and also restricted entry to, and departure from Ganfouda, deliberately leaving many civilians trapped in the conflict.

67.     On August 27, 2016, Defendant Hifter's tribal relations advisor Belaid Shikhi, acting on his behalf, held a press conference announcing that "whoever is above 14 years of age will never get out alive" and "he will never exit alive at all."[19]

68.     On August 31, 2016, given the GNA did not have control over this area, the Minister of Interior, Alaref Saleh Alkhoja, requested the support of the International Committee of the Red Cross.  He asked that "the evacuation [of civilians] to be carried out by sea and with

---

[17] UNHCR Report, *infra* fn.10.

[18] HRW – Libya Civilians, *infra*, fn. 16.

[19] A link for a video of the remarks (with unverified translation) is available at *https://www.youtube.com/ watch?v=mRa0vGIIVzc&t=1s.*

the support and supervision of friendly countries supporting the Government of National Accord, to move the stranded civilians to the city of Tripoli."[20]

69.     On October 13, 2016, Colonel Ahmed al-Oreibi, who represented the LNA in Ganfouda, told Human Rights Watch that only women and children and males younger than 15 years old and older than 65 in age, would be given a safe passage.  Moreover, to prevent men from sneaking out, he said that the LNA would not allow women to wear a niqab that fully covers their faces.

70.     On October 14, 2016, Tamim al-Gharyani – the Tripoli-based head of the Benghazi Crisis Committee, and mediator on behalf of the BRSC – told Human Rights Watch, that BRSC had also set conditions for people leaving Ganfouda.

71.     On December 10, 2016, the LNA announced a temporary, six-hour ceasefire to allow the evacuation of civilians.  Only a handful of civilians, however, were able to leave the besieged Benghazi neighborhood.

72.     The UN condemned the failure of the LNA to assure safe passage to civilians during its pledged cessation of hostilities.[21]

73.     Defendant Hifter was personally alerted about the dire situation in the neighborhood in a detailed letter sent by HRW.[22]

74.     Defendant Hifter and his LNA blocked the roads in Ganfouda, and cut the civilian population's access to food, water, medicine, and electricity supplies.

---

[20] Copies of the original letter in English and in Arabic are available.

[21] UN News, "Concerned for civilian safety in Libya's Ganfouda, UN envoy calls for safe passage to allow evacuations", December 10, 2016, at *http://www.un.org/apps/news/story.asp?NewsID=55774* (accessed August 18, 2020).

[22] Human Rights Watch, Letter to General Haftar re: Civilians Trapped by Benghazi Hostilities, March 8, 2017, at *https://www.hrw.org/sites/default/files/supporting_resources/gl.2017.3.8.letter_to_general_hiftar_regarding_civilians_trapped_by_benghazi_hostilities_0.pdf* (accessed August 18, 2020) ("HRW Letter").

75.     Civilians struggled to survive on rotten food and dirty water.[23]

76.     Amnesty International has gathered testimony from some of the 130 Libyan families and hundreds of foreign nationals who have been trapped for months.[24]

77.     For example, Mohamed, a resident of Ganfouda, stated: "Children look like skin and bones because of the lack of food and poor nutrition."  He also described how the flour, rice and oil available had all expired, and how lack of cooking fuel meant they had to cook in a wheelbarrow filled with coal.  Mohamed took in eight other families who fled the fighting and around 45 people, including 23 children, were living in terribly cramped conditions in his house.  "There are no fighters amongst us: we're just normal civilians," he said.[25]

78.     Another resident of Ganfouda told Amnesty International: "We just want a safe way to leave.  I have two sons; one is three and a half and the other is two years old.  There is no baby milk or food for them.  I have to fill bottles with water and fool them into thinking it's milk."[26]

79.     During the fall of 2016, Human Rights Watch spoke with six Ganfouda residents, as well as with relatives abroad who described the living conditions:[27]

        a.     Residents said they live in constant fear of air strikes and had no access to fresh food for months, no access to medical care with exception of one doctor with limited capacities, and limited drinking water.  Electricity had been cut off for months, and only

---

[23] Ali Abdelrahman, "Will the world let Libya's Ganfouda become the next Srebrenica?", Middle East Eye, November 11, 2016, at *https://www.middleeasteye.net/fr/node/58592* (accessed August 18, 2020).

[24] Amnesty International, "Libya: Civilians trapped in desperate conditions as fighting encroaches", September 30, 2016, at *https://www.amnesty.org/en/latest/news/2016/09/libya-civilians-trapped-in-benghazi-in-desperate-conditions-as-fighting-encroaches/* (accessed August 18, 2020).

[25] Id.

[26] Id.

[27] HRW – Libya Civilians, *infra*, fn. 16.

those residents who had a generator and fuel had access to some electricity.  They said the intense fighting made them afraid to try to leave their neighborhood to get food and other necessities.  They said they could not use a sea route in the coastal city, due to the LNA's expansion of the siege to include coastal areas.  The residents interviewed said they wanted to leave but have been prevented by the refusal of the LNA to allow many males to leave, as well as by the fighting.[28]

 b. Some Ganfouda residents also said that the distribution of food – pasta, rice, cooking oil – had stopped for months and that they had had no fresh fruit or vegetables since February 2016.[29]

 c. On October 10, 2016, a resident of Ganfouda and mother of four, stated she could barely provide one meal a day for her children.  She said that although there was one medical doctor in the area, the repeated overflights and air strikes made it nearly impossible to transport sick and injured people to get medical care.[30]

 d. Another resident said that the medication available in her neighborhood was past its expiration date.  She said that overflights kept people from leaving their homes for long periods, even when there were casualties.[31]

---

[28] Id.

[29] Id.

[30] Id.

[31] Id.

80.     In December 2016, the LNA, in response to an attempt to bring food and medicine to Ganfouda's residents by sea through a Canadian shipment organized by Plaintiff Hamza, responded that they would bomb any humanitarian ship delivering aid to the civilian population.[32]

81.     In February 2017, the elected Benghazi City Council issued appeals for basic humanitarian aid for families under siege in Ganfouda stating that residents were eating wild plants and drinking puddle water to sustain themselves.

82.     At the beginning of March 2017, it appeared that between 30 and 40 families remained in Ganfouda, along with an unknown number of migrant foreign workers.[33]

*Denial of Right to Safe Passage*

83.     Under international humanitarian law, the parties to the conflict must allow the safe passage of civilians.

84.     In early 2017, a Ganfouda neighborhood called Block 12 became a bastion of fighting between the LNA and the Benghazi Revolutionary Shura Council.  Block 12 is a group of twelve apartment buildings that were in the process of being constructed by Chinese nationals.  As winter set in, the conditions became extraordinarily desperate.  These rudimentary buildings lacked doors or windows, power, heat, and running water.  There was no power in Block 12, and any light or movement inside of a building was subject to attack by Defendant Hifter's LNA.

85.     On March 18, 2017, dozens of civilians attempted to break free from the siege on Block 12.  According to reports, half of the civilians were able to flee to the Al-Sabri and Souq

---

[32] A link for a video of the remarks (with unverified translation) is available at *https://www.youtube.com/watch?v=JOvJF2kMCP8* (accessed August 18, 2020).

[33] HWR Letter, *infra*, fn. 23.

Elhout neighborhoods in downtown Benghazi, but LNA fighters intercepted about seven families.  The LNA fighters attacked and killed civilians and arrested others.[34]

86.     Amnesty International spoke to three separate sources close to the families of those trapped in Block 12:[35]

a.      A source closely associated with the victims stated that one of the vehicles, which was carrying at least four families, broke down near the Juliana Bridge approximately five kilometers away from Block 12.  At this point, they allegedly came under attack by LNA forces. An exchange of fire ensued, which led to the LNA forces capturing the occupants inside the van.

b.      Another source said that five members of one family – a mother, her two daughters and two sons – who had been travelling in that van were later found dead.  Their family were able to confirm their deaths after photographs of their dead bodies surfaced online.  Other families remain missing.

87.     Human Rights Watch also relayed facts and photographs from relatives of those who were killed attempting to flee Ganfouda on March 18, 2017.  The victims included an unidentified girl, a 75-year-old woman, and a 47-year-old man.  These were members of Plaintiff Hamza's family.[36]

88.     In a video shared with Human Rights Watch, an LNA fighter interviews two girls – who had been caught by LNA soldiers while attempting to flee on March 18th – who alleged

---

[34] Human Rights Watch, "Libya: War Crimes as Benghazi Residents Flee", March 22, 2017, at *https://www.hrw.org/news/2017/03/22/libya-war-crimes-benghazi-residents-flee* (accessed August 18, 2020 ("HRW – Benghazi").

[35] Amnesty International, "Evidence points to war crimes by Libyan National Army forces", March 23, 2017, at *https://www.amnesty.org/en/latest/news/2017/03/evidence-points-to-war-crimes-by-libyan-national-army-forces/* (accessed August 18, 2020)("Amnesty Int'l – March 2017").

[36] HRW – Benghazi, *infra*, fn.34.

89.     that an LNA fighter beat them and their mother during the evacuation.  Relatives of Ganfouda residents believed both girls to be 14 or 15-years-old.  Their whereabouts are unknown.[37]

90.     The United Nations Support Mission in Libya ("UNSMIL") reported that "on 18 March, 7 civilians (4 women, 2 children and 1 elderly man) were killed and 1 woman injured as they were fleeing Block 12 in Ganfouda, controlled by the Benghazi Revolutionaries Shura Council ("BRSC") and surrounded by the LNA."[38]

91.     A spokesperson for the LNA claimed that no civilians were killed during this incident and said that five young civilian women had been captured and handed over to the Ministry of Interior "to be returned to their families."  He also stated that the LNA has no civilians in their custody.[39]

92.     However, reports from family members of those who fled contradict these claims and suggest that a number of civilians were killed, including children.[40]

*Arbitrary Arrest and Detention Leading to*
*Torture, Summary Execution or Disappearances*

93.     Under International Humanitarian Law, arbitrary deprivation of liberty is prohibited and all parties to the conflict may not engage in torture, cruel or inhuman treatment or outrages upon personal dignity.

94.     According to the U.S. State Department, abductions and arbitrary arrest have dramatically increased since the conflict escalation in 2014.  In many cases, civilians are arrested

---

[37] Id.
[38] UNSMIL, Human Rights report on civilian casualties, March 2017, at *https://unsmil.unmissions.org/human-rights-report-civilian-casualties-march-2017* (accessed August 24, 2020).

[39] Amnesty Int'l – March 2017, *infra*, fn. 35.

[40] HRW – Benghazi, *infra*, fn. 34;  Amnesty Int'l – March 2017, *infra*, fn. 35.

on mere suspicions or on account of their origin, opinion, perceived political affiliation or tribal belonging.[41]

95.    In most cases, civilians, including children, are abducted from their homes, workplaces, gas stations, checkpoints, and on the street by masked armed men often driving in ordinary civilian cars without registration plates.  Among those abducted are journalists, activists, members of the judiciary targeted for their activities, public officials, civil servants, aid workers and foreign nationals.[42]  The victims of abduction are completely cut off from their families and the outside world.  Families are kept in the dark about the whereabouts of their loved ones and usually find out about such killings from social media sites.[43]

96.    Since mid-May 2014, Operation Dignity forces has captured many fighters and detained civilians accused of supporting SCBR or possessing arms.  They have also detained civilians uninvolved in the fighting merely on account of their political affiliation and opinion, often in relation to voicing their dissent on social media.[44]

97.    Members of Operation Dignity forces, while driving in pick-up trucks with mounted anti-aircraft guns, have carried out door-to-door house searches in entire neighborhoods under their control.  During these searches, they have seized any perceived opponents and

---

[41] State Department, "2016 Country Reports on Human Rights Practices: Libya", at *https://www.state.gov/ reports/2016-country-reports-on-human-rights-practices/libya/* (accessed August 18, 2020)("State Department 2016 Libya Country Report").

[42] Libya Observer, "Famous writer abducted in Libya's Benghazi", June 14, 2017, at *https://www.libyaobserver.ly/ crimes/famous-writer-abducted-libya%E2%80%99s-benghazi* (accessed August 24, 2020).

[43] Amnesty International – August 5, 2015 - "Vanished off the face of the Earth" 19/2178/2015, at *https://www.amnesty.org/en/documents/mde19/2178/2015/en/* (accessed August 24, 2020).

[44] UNSMIL - UNHRC, "Overview of violations of international human rights and humanitarian law during the ongoing violence in Libya", September 4, 2014, at *https://www.ohchr.org/Documents/Countries/LY/ OverviewViolationsLibya_UNSMIL_OHCHR_Sept04_en.pdf* (accessed August 18, 2020).

transferred them to detention facilities in and around Benghazi (Kweifiah Prison, the Minors' Prison in al-Rhaba area and the Barsis detention centre) for interrogation.[45]

98.     The LNA continues to hold prisoners without charge, without access to counsel, without formal charges, or the opportunity to challenge their detention before a judicial authority.[46]

99.     Amnesty International has received several reports that LNA detainees have faced torture and other ill-treatment in several detention centers under the control of members of Operation Dignity, including at al-Marj, al-Abyar, al-Rajma and Gernada prisons.  Most often, however, victims and their families have been reluctant to speak out for fear of reprisals against them or their property.  Punitive attacks against family homes of perceived SCBR supporters have only reinforced such fears.[47]

100.     On June 17, 2015, Human Rights Watch released the findings of its investigation into detention centers operated by the LNA and the Ministries of Justice and Interior.  In January and April 2015, Human Rights Watch had received rare access to visit detention facilities in al-Bayda and Benghazi that were controlled by the LNA, and the Justice and Interior Ministries. They were able to interview 73 individual detainees without any guards present.  Many detainees said that interrogators had forced them under torture to "confess" to serious crimes, and reported electric shocks, prolonged suspension, insertion of objects into body cavities, solitary confinement, and denial of food and hygiene facilities.  It was also alleged that there had been at least two deaths in custody as a result of torture.  Other abuses were described, including lack of due process,

---

[45] Amnesty International, "Libya: Benghazi's Descent Into Chaos: Abductions, Summary Killings and Other Abuses", January 28, 2015, at *https://www.amnesty.org/en/documents/mde19/0001/2015/en/* (accessed August 18, 2020) ("Amnesty Benghazi").

[46] State Department 2016 Libya Country Report, *infra*, fn.41.

[47] Amnesty Benghazi, *infra*, fn.46.

absence of medical care, denial of family visits, lack of notification of families about their detention, and poor conditions.[48]

101.    A number of abducted civilians died under torture or were summarily killed in custody, and their dead bodies were dumped on the streets or brought to hospitals.  Families would usually find out about such killings from social media sites.[49]

102.    Several videos emerged on the web throughout 2015 – 2018 showing members of the LNA committing arbitrary killings of captured prisoners from the SCBR in the Ganfouda area. These events have been documented by local journalists, activists and UNSMIL.[50]

103.    Al-Werfalli, an officer under Defendant Hifter's command in the LNA, was directly responsible for the killing of at least thirty-three persons in Benghazi or surrounding areas, between June 3, 2016, and July 17, 2017, either by personally killing them or by ordering their execution. The persons killed appear to have been detained and to have been either civilians or persons *hors de combat*.  The executions took place in the course of exceptionally cruel, dehumanizing and degrading incidents, and form the basis for an arrest warrant from the International Criminal Court, which Defendant Hifter refuses to comply with.[51]

*Mutilation and Desecration of Bodies*

104.    International humanitarian law prohibits mutilation of dead bodies, and parties to a conflict must also endeavor to return the deceased upon the request of their families.

---

[48] Human Rights Watch, "Libya: Widespread Torture in Detention", June 17, 2015, at *https://www.hrw.org/ news/2015/06/17/libya-widespread-torture-detention* (accessed August 18, 2020).

[49] Amnesty International, "Vanished off the face of the Earth", August 5, 2016, at *https://www.amnesty.org/ en/documents/mde19/2178/2015/en/* (accessed August 18, 2020).

[50] See Amnesty Int'l – March 2017, *infra*, supra 35; *supra* fn.71-72
.
[51] "Situation in Libya: In the case of the Prosecutor v. Mahmoud Mustafa Busayf al-Werfalli, August 15, 2017 (ICC Arrest Warrant), at *https://www.icc-cpi.int/CourtRecords/ CR2017_05031.pdf*, (accessed August 18, 2020).

105.    Alarming photos shared by sources close to family members of individuals in Ganfouda showed LNA members posing alongside dead bodies and burned corpses of victims. Some photos were reviewed by Amnesty International and include those from the Hamza Plaintiffs' family.[52]

106.    The dead bodies in the images include civilians who were trapped in Block 12 and were not taking any active or direct role in the hostilities.  Yet they were killed by the LNA.

*LNA Official Statements and Reactions to Atrocities*

107.    Defendant Hifter has repeatedly used rhetoric of "cleansing" Libya from Islamists, especially in Benghazi.[53]

108.    In June 2014, in an interview with the Al-Arabiya TV channel, Defendant Hifter declared that "all terrorists who have entered Libya should leave it or they will be buried in it."[54]

109.    In a video on YouTube posted on October 10, 2015, Defendant Hifter delivered a speech to LNA fighters in which he can be heard saying "Never mind consideration of bringing a prisoner here.  There is no prison here.  The field is the field, end of the story." [55]

110.    Other LNA officials have also apparently made similar statements regarding prisoners.  In another video from August 2016, Beleed Al Sheikhy, identified as a spokesperson

---

[52] Amnesty International, "Evidence points to war crimes by Libyan National Army forces", March 23, 2017, at *https://www.amnesty.org/en/latest/news/2017/03/evidence-points-to-war-crimes-by-libyan-national-army-forces/* (accessed August 18, 2020).

[53] Ethan Chorin, "The New Danger in Benghazi", New York Times, May 27, 2014, *https://www.nytimes.com/2014/05/28/opinion/the-new-danger-in-benghazi.html* (accessed August 18, 2020).

[54] Word Press, "'Leave Libya or be buried here' Hafter warns Ansar Al-Sharia", June 16, 2014, at *https://pressall.wordpress.com/2014/06/16/leave-libya-or-be-buried-here-hafter-warns-ansar-al-sharia/* (accessed August 18, 2020.

[55] Just Security - Smoking Gun Videos Emerge: US Citizen, Libyan Warlord Haftar Ordering War Crimes – September 19, 2017. *https://www.justsecurity.org/45094/hifter-smoking-gun-videos-emerge-citizen-libyan-warlord-khalifa-haftar-ordering-war-crimes/* (accessed August 24, 2020).

for Defendant Hifter, said with regard to fighting in Ganfouda "whoever is above 14 of age will never get out alive."[56]

111.   In August 2017, members of Operation Dignity admitted that their commander, Defendant Hifter, had ordered them to kill the captives and to show no mercy, and that they had committed summary execution to cause horror.  "We were killing them "captives" in public and we published their killing videos to the public," a militiaman boasted in the statement.  "We are not afraid of anyone, we only fear Allah," he said.[57]

## SPECIFIC ALLEGATIONS

### *The Hamza Family*

112.   Since the Fall of 2014, Defendant Hifter has waged a campaign of siege warfare, involving indiscriminate bombing, against Benghazi neighborhoods he sought to bring under his control.  This involved indiscriminate bombing of residential neighborhoods and the cutting off of basic food, water, and electricity supplies.  In neighborhoods that fell under his control, Defendant Hifter sought to maintain control through the murder, kidnapping torture and other cruel, inhuman, and degrading treatment of civilians.

113.   In 2015 and early 2016, Defendant Hifter extended his campaign of siege warfare to Al-Laitti and Bu-Atni, which are residential neighborhoods of Benghazi.

114.   The Hamza Plaintiffs' mother, Aalya Hamza, owned the family home in Al-Laitti, where their brother, Ibrahim, and three sisters, Fariha, Faiza, and Abtisam, also lived.

---

[56] See *infra*, fn.20.

[57] The Libyan Observer, "Dignity Operation militias defy ICC arrest warrant by boasting of war crimes", August 19, 2017, at *https://www.libyaobserver.ly/news/dignity-operation-militias-defy-icc-arrest-warrant-boasting-war-crimes* (accessed August 24, 2020).

115.    The Hamza Plaintiffs' brother, Naser, owned a home in the Bu-Atni neighborhood, where he lived with his wife and six daughters.

116.    The Hamza Plaintiffs' family were subjected to illegal siege warfare, starvation, and repeated attacks by LNA soldiers in Benghazi who prevented their safe evacuation.

117.    Defendant Hifter's unlawful military campaign forced the Hamza family from their homes in February 2016.

118.    After fleeing, members of the LNA, under Defendant Hifter's command, looted the Hamza Plaintiffs' mother's and family's home.  Their brother Ibrahim used rooms in their mother's home to store commercial goods, including French perfumes the market value of which was hundreds of thousands of dollars.  These goods were all stolen, along with their mother's furniture and other belongings that had been left behind.  The Hamza family sought refuge in Ganfouda, a district on the outskirts of Benghazi.  The housing conditions in Ganfouda were at best rudimentary.

119.    In July 2016, Defendant Hifter extended his campaign of terrorism to the refugee population of Ganfouda, including the Hamza family.  Plaintiff Ali Hamza spoke frequently with his family members, who told him that members of the LNA, under Defendant Hifter's command, dumped fourteen (14) dead bodies on a public trash pile within LNA controlled territory.  These individuals had been kidnapped and then shot with their hands and legs tied.  Upon the discovery of these bodies, Martin Kobler, the head of the U.N.'s Support Mission in Libya, issued a public statement describing this act of terrorism as a "war crime".[58] Plaintiff Ali Hamza especially recalls his mother telling him about the murder of and cruelty towards civilians by the LNA and the mutilation and desecration of the bodies of the deceased.

---

[58] https://www.aljazeera.com/news/2016/07/libya-brands-apparent-group-execution-war-crime-160722133419085.html (accessed August 18, 2020).

120.    On August 10, 2016, Plaintiff Ali Hamza personally wrote to Defendant Hifter and appealed for the safety, security and human treatment of his family and other civilians and also requested that they be granted safe passage out of Ganfouda.

121.    On August 27, 2016, a spokesman for the LNA, under Defendant Hifter's command, Beleid Sheikhi, made a public statement on national television stating that all families in Ganfouda would be treated as targetable.  He "guaranteed" that Defendant Hifter's organization would kill all males fourteen (14) years of age and older and would kidnap all women and children for "interrogation."  Defendant Hifter's terrorist organization is known to have murdered twenty-five (25) civilian residents of Ganfouda in August 2016 alone.[59]

122.    In furtherance of the Operation Dignity siege warfare campaign, Defendant Hifter has been recorded directing his military forces to take "no mercy" and to "[n]ever mind consideration of bringing a prisoner here.  There is no prison here.  The field is the field, end of the story."[60]

123.    On August 31, 2016, the GNA sought the intercession of the International Committee of the Red Cross ("ICRC") to support the evacuation of approximately 126 families in Ganfouda.  Defendant Hifter still continued to direct a campaign of siege warfare on the civilians in Ganfouda and refused to allow them to evacuate as well as prevented any food, medicine, or other relief supplies to enter.

124.    In September 2016, alarmed by the reports from his family and many other civilians within Ganfouda, Plaintiff Ali Hamza and his wife extended their outreach efforts from Canada to

---

[59] See *infra*, fn.20; Libya Observer, "Kill all besieged families in Benghazi's Ganfouda, ex-Gaddafi procurer incites", September 1, 2016, at *https://www.libyaobserver.ly/crimes/kill-all-besieged-families-benghazis-ganfouda-ex-gaddafi-procurer-incites* (accessed August 18, 2020).

[60] See *https://www.youtube.com/watch?v=PlBWhuMsdW4* (accessed August 18, 2020) (Arabic).

help the besieged civilians through the initiation of the "Free Ganfouda humanitarian campaign". This effort was focused on advocating for the rights and safety of those under siege in Ganfouda with NGOs, governments, and international bodies including UNSMIL, UNICEF, the ICC and other relevant authorities.  As part of the siege, Defendant Hifter ordered an unlawful campaign of indiscriminate terrorist bombing and shelling against civilian homes, a school, a mosque, and a clinic in Ganfouda.

125.    By October 2016, the Hamza Plaintiffs' mother had run out of her medication for diabetes and hypertension. At the start of 2017, the Hamza family reported to Plaintiff Ali Hamza that they were resorting to eating grass.

126.    On November 22, 2016, an LNA representative signed an agreement in Istanbul, Turkey to permit the safe evacuation of civilians from Ganfouda under LNA's control.  However, Defendant Hifter did not honor this agreement.

127.    On or before December 1, 2016, in response to efforts by Free Ganfouda to ship humanitarian supplies, Defendant Hifter's spokesperson and military officer, Colonel Ahmed El-Mesmari, stated that Defendant Hifter's forces would bomb any humanitarian sea shipments to the trapped civilians in Ganfouda under the LNA's control:

> They have another hope of a ship coming from Turkey or from Canada to try to enter Ganfouda with families and children like the Marmara flotilla that tried to enter Israel and Gaza.  As such the LNA states with regards to the coasts where there is a military operation, they are closed.  Any intervention in Libyan national waters will be bombed.  We announce this will full courage.  These dirty operations in the name of human rights that politicize human rights, we announce that human rights is secondary in these matters, and that the security of Libya and Libyans is more important that human rights claimed by these traitors.  As such we announce that the ocean and coast of Benghazi from Derna is closed and the only port open is the Briga Port for commercial trade and Toburk Port and any ship attempting to port otherwise will be denied and will be attacked by air strikes and ground artillery forces.[61]

---

[61] See *infra*, fn.33.

128.    On December 10, 2016, many individuals, including the Hamza family, attempted to flee Ganfouda en masse.  But, under Defendant Hifter's command, members of the LNA began targeting the fleeing refugees and forced them to turn back.

129.    The United States' Department of State has confirmed Defendant Hifter's control over Ganfouda during this time and his refusal to permit civilians to flee:

> [U]nder an LNA military blockade, hundreds of civilians, including Libyans and foreign nationals, remained trapped in the Ganfouda neighborhood of southwest Benghazi and suffered from a severe shortage of water, food, medical supplies, and electricity. On December 10, the LNA announced a temporary, six- hour ceasefire to allow the evacuation of civilians. Only a handful of civilians, however, were able to leave the besieged Benghazi neighborhood. The UN condemned the failure of the LNA to assure safe passage to civilians during its pledged cessation of hostilities.[62]

130.    On January 5, 2017, in the very early morning hours, the LNA coordinated safe passage for ISIS militia, as well as their families, arms and munitions, out of Ganfouda.  Defendant Hifter's official military spokesman, Colonel Ahmed Al-Mesmari, claimed it was a tactical move to remove ISIS from the area where they could then be taken out by a coordinated strike.[63]   The move was condemned by others who accused the LNA of allowing ISIS to leave Ganfouda to allow it to carry out its own attacks on GNA forces.[64]  Meanwhile, the LNA continued to prevent civilians from leaving Ganfouda.   That evening, LNA drones struck homes killing five small children from three to eleven years of age.   These included Plaintiff Jibreel's three children. Neighbors, including the Hamza Plaintiffs' brother, Mahmoud, could help those in the rubble of

---

[62] State Department 2016 Libya Country Report, *infra*, fn.42.

[63] "LNA Confirm ISIS has Left Benghazi and Ganfouda", January 9, 2017, at *https://www.youtube.com/ watch?v=J0bhATrDjU4* (accessed August 18, 2020) (In Arabic with unverified English translation).

[64] Al Jazeera, "Inquiry sought into ISIL escape under Khalifa Haftar", May 26, 2017, at *https://www.aljazeera.com/news/2017/05/inquiry-sought-isil-escape-khalifa-hafter-170526210718755.html* (accessed August 18, 2020).

the homes as drones circled overhead waiting to attack anyone who sought to aid the dying or the wounded.

131.     On January 23, 2017, Defendant Hifter's indiscriminate bombing campaign against Ganfouda escalated significantly.  The next day, Defendant Hifter told families to evacuate.  Most of the families refused to evacuate until the Libyan Government, the United Nations, or other third parties were present to ensure their safety.  Defendant Hifter failed to take any steps to facilitate or allow the ICRC, UNSMIL or any humanitarian organization to oversee an evacuation.  Driven by terror and starvation, some civilians attempted to leave, including Plaintiff Hamza's sister-in-law and his six young nieces.

132.     As civilians attempted to flee, the LNA, under Defendant Hifter's command, kidnapped and held them against their will along with other women and children who had attempted to evacuate.  Men who sought to evacuate were separated and many were murdered summarily.  Two of these men were Ali and Adel Bugeigees, family friends who were murdered by the LNA on January 24, 2017, as they attempted to evacuate with their elderly mother.

133.     The Hamza Plaintiffs' mother, Aalya, their two brothers, Ibrahim and Naser, and three sisters, Fariha, Faiza, and Abtisam, remained behind and took shelter in an unoccupied apartment in Block 12 on or about January 26, 2017.

134.     Defendant Hifter's siege continued over the course of February.  The Hamza family tried to eat grass and tree bark to survive.  There was no fresh water.

135.     Defendant Hifter ordered snipers to attack anyone who attempted to move throughout the ruins of the city.  Frequently, Defendant Hifter did this with drones, which would drop a bomb, wait, and then bomb again if anyone attempted to rescue the wounded and dead from the first attack.

136.    From February 14-22, 2017, the elected City Council of Benghazi issued public statements to appeal for basic humanitarian help for families under siege in Ganfouda, stating that they were suffering a slow death from starvation with only wild plants to eat and puddle water to drink.  These statements were sent to the Ambassadors to Libya from the United States, France and Italy, as well as to other international parties.  The Benghazi City Council appealed for international humanitarian aid to supply food and water to Ganfouda and to facilitate the safe evacuation of its residents.

137.    Along with the other residents of Ganfouda, the Hamza family members became so weak that they could barely walk and were subject to repeated artillery and aerial bombing attacks all around them.  The combination of the engulfing dust from the bombing attacks and starvation caused them to experience temporary blindness.  In February 2017, Plaintiff Ali Hamza's young children asked their Uncle Naser over the phone: "Baba, is it true that you are eating grass to survive?" Naser replied: "yes, and now we can't find anything to eat, I can't find grass, I walk and fall."

138.    On February 21, 2017, Plaintiff Ali Hamza travelled with his wife and four children from Canada to Istanbul, Turkey, on behalf of their "Free Ganfouda" effort and attempted to deliver water and food to besieged families.[65]  They had sufficient supplies of water, food and basic medicines for approximately 30 families and sought permission to travel from Istanbul to Ganfouda.[66]

---

[65] See *https://www.youtube.com/watch?v=C63zOByDPHc* (accessed August 18, 2020) (Video of Hamza family leaving Canada to Turkey).

[66] CBC, "'I will give up a Kidney': Canadian Seeks aid for family trapped in Libyan Conflict", March 3, 2017, at *https://www.cbc.ca/radio/thecurrent/the-current-for-february-28-2017-1.4001280/i-will-give-up-a-kidney-canadian-seeks-aid-for-family-trapped-in-libyan-conflict-1.4001423* (accessed August 24, 2020).

139.    On February 26, 2017, LNA soldiers under Defendant Hifter's command murdered the Hamza Plaintiffs' brother, Ibrahim, by targeting the family in Block 12 with a tank shell.  The Hamza Plaintiffs' mother and surviving sister, Abtisam, were hit with shrapnel during the strike.

140.    On February 28, 2017, Defendant Hifter's LNA again struck the Hamza family's location in Block 12 with another barrage of shells from a tank.  The Hamza Plaintiffs' sister Fariha's leg was severed during the strike.  With her broken thighbone splinted by sticks due to the absence of any medical care or first aid supplies, Fariha died from her bleeding on March 2, 2017.

141.    On March 8, 2017, Human Rights Watch sent an open letter to Defendant Hifter requesting the release of civilians, to include the Hamza family, who were trapped in Ganfouda and starving while fearing ill treatment by his LNA forces.[67]  The letter urged Defendant Hifter "to instruct forces under your command to allow humanitarian aid into Ganfouda, ensure humanitarian workers have freedom of movement, and to allow the safe departure of all remaining civilians who wish to leave the neighborhood."  Defendant Hifter did not respond.

142.    From late February to the middle of March, Defendant Hifter's LNA forces laid siege to Block 12 with sustained assaults by ground shelling and air attacks by drones, planes, and helicopters.

143.    The Hamza family reported to Plaintiff Ali Hamza that they could hear the LNA's ground forces call out and taunt them.  They terrorized civilians, including the Hamza family, by asking them if they were hungry, telling them they would give them safe passage, while calling them sons of bitches and asking if "we can get your women."

---

[67] Letter from Human Rights Watch, dated March 8, 2017, available at *https://www.hrw.org/sites/default/files/ supporting_resources/gl.2017.3.8.letter_to_general_hiftar_regarding_civilians_trapped_by_benghazi_hostilities_0. pdf* (accessed August 24, 2020).

144.    On March 18, 2017, under the desperate conditions and the dire need to survive, ten of the remaining families loaded into three cars and attempted to flee back into Benghazi.  The LNA, under Defendant Hifter's command, opened fire on these cars with machine guns and heavy artillery.  The Hamza Plaintiffs' brother Naser used his body to shield their mother, Aalya, and their sister, Faiza.  All three were killed along with other civilians, including women and infant children.

145.    The Hamza Plaintiffs' sister, Abtisam, was shot in the shin, but survived her wounds.  She was then kidnapped by Defendant Hifter's men and held hostage for several weeks in an LNA-controlled prison until the Libyan government negotiated a release of prisoners associated with the LNA.

146.    During her detention, LNA interrogators beat the Hamza Plaintiffs' sister, Abtisam, with a steel pipe on the same leg as her gunshot injury.  Abtisam only received medical attention for her gunshot wound after her release to Tripoli, where she lives in hiding to this day.

147.    The U.S. Department of State noted, based on reporting from Amnesty International, that on March 22, 2017, "LNA forces ended a multi-year military blockade of the Ganfouda neighborhood of southwest Benghazi [where] LNA forces killed and beat civilians".[68]

148.    Amnesty International France, to include other organizations, have reported on the murder and mistreatment of the Hamza Plaintiffs' family members in February and March 2017.[69]

149.    The U.N. Human Rights Council has similarly reported that:

> [Paragraph] 19.  By late March [2017], the Libyan National Army . . . took full control of the Ganfouda neighborhood of Benghazi . . . Civilians had

---

[68] U.S. Department of State, "Libya 2017 Human Rights Report" at 13, at *https://www.state.gov/wp-content/uploads/2019/01/Libya-1.pdf* (accessed August 18, 2020).

[69] Amnesty Interantional-France, "Evidence Highlights War Crimes Attributable to Libyan National Army Forces", March 23, 2017, at *https://www.amnesty.org/fr/press-releases/2017/03/evidence-points-to-war-crimes-by-libyan-national-army-forces/* (accessed August 18, 2020).

been besieged for months in a small area of Ganfouda, subjected to airstrikes and a shortage of food, water and medical supplies. On 18 March, Libyan National Army forces opened fire on individuals fleeing Ganfouda, killing at least seven civilians, including two children, and injuring a woman.

[Paragraph] 34.  Some women were arbitrarily detained, often because of family affiliations or for prisoner exchanges, and were held in facilities without female guards, exposed to the risk of sexual abuse. Eight women and five girls taken by the Libyan National Army following their escape from Ganfouda between 18 and 20 March.[70]

150.    A video was posted online of Defendant Hifter's men walking in pride amongst the dead after this final attack on Ganfouda.  The body of the Hamza Plaintiffs' mother, Aalya, and their brother, Naser are clearly seen on the ground in the video.  There are also images of many other women, girls, and men who were massacred.  Another man is shown in this video, being pulled alive from a building in Block 12.  The video shows Defendant Hifter's men dragging him to a pile of garbage and then murdering him with machine gun fire.[71]  These images, as well as other videos, were posted on social media to terrorize the civilian population.[72]

151.    The Hamza Plaintiffs and surviving siblings have not had access to the bodies of their mother, Aalya, or their sisters, Fariha and Faiza, or brothers, Ibrahim and Mahmoud.  The body of their sister, Fariha, was found and exhumed from a burial site in Ganfouda on October 14, 2017, but they have been unable to claim her remains for fear of retaliation from the LNA.

---

[70] UNOHCR, "Situation of human rights in Libya, and the effectiveness of technical assistance and capacity-building measures received by the Government of Libya", February 21, 2018, at *https://ap.ohchr.org/documents/dpage_e.aspx?si=A/HRC/37/46* (accessed August 18, 2020).

[71] The video has since been removed by YouTube for violation of its Community Guidelines but was previously available at *https://www.youtube.com/watch?v=89B6HYLBUt4*.

[72] BBC News, **"**Libya 'war crimes' videos shared on social media", April 30, 2019, at *https://www.bbc.com/news/av/world-africa-48105968/Libya-war-crimes-videos-shared-on-social-media* (accessed August 18, 2020).

*The Jibreel Family*

152.     Plaintiff Salimah Jibreel, her husband, Alaa, and their four children were victims of LNA war crimes, crimes against humanity, and terrorism under Defendant Hifter's command.

153.     Plaintiff Jibreel's family were subjected to illegal siege warfare, starvation, repeated attacks by LNA soldiers in Benghazi who prevented their safe evacuation.

154.     Plaintiff Jibreel and her family witnessed repeated instances of indiscriminate shelling and bombings of civilians and civilian objects in Ganfouda, including the use of foreign planes assisting LNA forces.

155.     On around July 3, 2016, Plaintiff Jibreel and her family were awakened by neighbors to warn them that the LNA was coming.  They fled down the beach where they were shot at by advancing LNA soldiers.  As they fled, Plaintiff Jibreel overheard a soldier say to his commander, "Sir, they are ladies, sir, they are ladies."  She heard the commander reply with the order, "shoot, shoot."

156.     The attacks by Defendant Hifter's LNA military forced many families to abort their evacuation trials.  Some of the families who were on the first bus made it to a boat, including Plaintiff Jibreel's husband, Alaa.  A second bus with Plaintiff Jibreel and her children, as well as other families, was prevented by LNA shelling from reaching the water.  Alaa learned his family did not make it and stayed in western Libya for twelve days while waiting for their evacuation. When it was obvious they could not escape, he returned to them in Ganfouda.

157.     On August 24, 2016, Plaintiff Jibreel's son, Mohammad, was shot in the leg by LNA soldiers as he played outside.  Though he survived this incident, she recalls him saying to her "Mom, I think I may die, it may be better for me if I die."

158.    On December 16, 2016, the LNA carried out airstrikes on Plaintiff Jibreel family's neighborhood.

159.    On January 5, 2017, in the predawn hours, Plaintiff Jibreel heard a nearby explosion and aerial strikes from overhead planes.  Later that evening, at approximately 7:55 pm, with her children at home, LNA forces bombed Plaintiff Jibreel's house.  She was wounded, and the bombing killed three of her children: three-year-old Aziza; eight-year-old Maryam; and eleven-year-old "Mohammad."  As Plaintiff Jibreel and her husband tried to remove the debris and rescue their children, another shell hit their house.  Her husband suffered a disjoined shoulder when a wall fell on him.

160.    Another family taking shelter in the Jibreel family home that evening, including two young children aged eight and ten, was also killed.

161.    Plaintiff Jibreel, her husband, Alaa, and their surviving child ran away on March 18, 2018.  They were captured two days later by the LNA and detained.  Plaintiff Jibreel and her daughter would later be swapped for an LNA prisoner being held by the GNA in a prisoner exchange several weeks later.  They remain in Libya fearful for their lives.

162.    Plaintiff Jibreel's husband, Alaa, was detained by LNA forces without charges, has been tortured, and remains in incommunicado detention.

## VI.    CAUSES OF ACTION

### COUNT ONE
### (Alien Tort Statute:  War Crime of Murder of Civilians)

163.    Plaintiffs re-allege and incorporate by reference each and every allegation contained in the preceding paragraphs as if set forth fully herein.

164.    The LNA's summary execution and murder of the civilian Decedents described herein constitutes a tort committed in violation of the law of nations or a treaty of the United States

under the Alien Tort Statute, 28 U.S.C. § 1350, in that it was in violation of customary international law prohibiting extrajudicial killing and murder of civilians as reflected, expressed, defined and codified in multilateral treaties and other international instruments, international and judicial decisions and other authorities.

165.     The murder of the civilian Decedents also violated Virginia Code § 8.01-50, et seq. which provides that whenever the death of a person is caused by the intentional and wrongful act of a person, that person responsible shall be liable for damages, including the decedent's survivors' deprivation of the decedent's aid, comfort, and financial support.

166.     The extrajudicial killing of Decedents was not authorized by any court judgment and the Decedents took no active or direct part in the hostilities.

167.     Defendant Hifter personally committed, or exercised command responsibility over or directed, ordered, conspired with, or aided and abetted soldiers in the LNA to commit the extrajudicial killing and murder of Decedents. As a result, Defendant Hifter, who is a U.S. citizen, has committed war crimes in violation of 18 U.S.C. § 2441.

168.     As a result of the Decedents' murders, the Plaintiffs are entitled to damages in an amount to be determined at trial.

169.     Defendant Hifter's acts were deliberate, willful, intentional, wanton, malicious and oppressive and should be punished by an award of punitive damages.

### COUNT TWO
### (Alien Tort Statute:  War Crime of Attacking Civilians)

170.     Plaintiffs re-allege and incorporate by reference each and every allegation contained in the preceding paragraphs as if set forth fully herein.

171.     The LNA's attacks on the civilian Decedents described herein constitute a tort committed in violation of the law of nations or a treaty of the United States under the Alien Tort

Statute, 28 U.S.C. § 1350, in that it was in violation of customary international law prohibiting attacks on civilians as reflected, expressed, defined, and codified in multilateral treaties and other international instruments, international and judicial decisions, and other authorities.

172.    The attacks on the civilian Decedents described herein specifically constitute the torts of assault and battery in the Commonwealth of Virginia. In Virginia, at common law, assault is a nonconsensual act intended to cause the reasonable apprehension of an imminent battery. Battery includes the intentional, nonconsensual, and unlawful infliction of immediate injury upon another through harmful contact and the aiding and abetting of the same.

173.    Defendant Hifter personally committed, or exercised command responsibility over or directed, ordered, conspired with, or aided and abetted soldiers in the LNA to commit the attacks on the civilian Decedents.  As a result, Defendant Hifter, who is a U.S. citizen, has committed war crimes in violation of 18 U.S.C. § 2441.

174.    As a result of the attacks on the civilian Decedents, the Plaintiffs are entitled to damages in an amount to be determined at trial.

175.    Defendant Hifter's acts were deliberate, willful, intentional, wanton, malicious and oppressive and should be punished by an award of punitive damages.

**COUNT THREE**
**(Alien Tort Statute:  War Crime of Mutilation)**

176.    Plaintiffs re-allege and incorporate by reference each and every allegation contained in the preceding paragraphs as if set forth fully herein.

177.    The LNA's mutilation of civilian Decedents described herein constitutes a tort committed in violation of the law of nations or a treaty of the United States under the Alien Tort Statute, 28 U.S.C. § 1350, in that it was in violation of customary international law prohibiting

mutilation as reflected, expressed, defined and codified in multilateral treaties and other international instruments, international and judicial decisions, and other authorities.

178.    Defendant Hifter personally committed, or exercised command responsibility over or directed, ordered, conspired with or aided and abetted soldiers in the LNA to commit the mutilations of the Decedents.  As a result, Defendant Hifter, who is a U.S. citizen, has committed war crimes in violation of 18 U.S.C. § 2441.

179.    As a result of Decedents' mutilations, the Plaintiffs are entitled to damages in an amount to be determined at trial.

180.    Defendant Hifter's acts were deliberate, willful, intentional, wanton, malicious and oppressive and should be punished by an award of punitive damages.

## COUNT FOUR
### (Alien Tort Statute:  War Crime of Torture, Cruel, Inhuman, or Degrading Treatment)

181.    Plaintiffs re-allege and incorporate by reference each and every allegation contained in the preceding paragraphs as if set forth fully herein

182.    The LNA's treatment of the Decedents described herein constitutes a tort committed in violation of the law of nations or a treaty of the United States under the Alien Tort Statute, 28 U.S.C. § 1350, in that it was in violation of customary international law prohibiting torture, cruel, inhuman, or degrading treatment as reflected, expressed, defined and codified in multilateral treaties and other international instruments, international and judicial decisions, and other authorities.

183.    Defendant Hifter personally committed, or exercised command responsibility over or directed, ordered, conspired with or aided and abetted soldiers in the LNA to commit the torture, cruel, inhuman, or degrading treatment of Decedents.  As a result, Defendant Hifter, who is a U.S. citizen, has committed war crimes in violation of 18 U.S.C. § 2441.

184.    As a result of Defendant Hifter's torture, cruel, inhuman, or degrading treatment of Decedents, the Plaintiffs are entitled to damages in an amount to be determined at trial.

185.    Defendant Hifter's acts were deliberate, willful, intentional, wanton, malicious and oppressive and should be punished by an award of punitive damages.

## COUNT FIVE
### Alien Tort Statute:  War Crime of Siege Warfare

186.    Plaintiffs re-allege and incorporate by reference each and every allegation contained in the preceding paragraphs as if set forth fully herein.

187.    The LNA's treatment of the Decedents described herein constitutes a tort committed in violation of the law of nations or a treaty of the United States under the Alien Tort Statute, 28 U.S.C. § 1350, in that it was in violation of customary international law prohibiting siege warfare on the civilian populations as reflected, expressed, defined and codified in multilateral treaties and other international instruments, international and judicial decisions and other authorities.

188.    Defendant Hifter personally committed, or exercised command responsibility over or directed, ordered, conspired with or aided and abetted soldiers in the LNA to commit the acts of siege warfare on the Decedents.

189.    As a result of Defendant Hifter's siege warfare on Decedents, the Plaintiffs are entitled to damages in an amount to be determined at trial.

190.    Defendant Hifter's acts were deliberate, willful, intentional, wanton, malicious and oppressive and should be punished by an award of punitive damages.

## COUNT SIX
### Alien Tort Statute:  Crimes Against Humanity

191.    Plaintiffs re-allege and incorporate by reference each and every allegation contained in the preceding paragraphs as if set forth fully herein.

192.    The LNA's treatment of the Decedents described herein constitutes a tort committed in violation of the law of nations or a treaty of the United States under the Alien Tort Statute, 28 U.S.C. § 1350, in that it was in violation of customary international law prohibiting crimes against humanity as reflected, expressed, defined and codified in multilateral treaties and other international instruments, international and judicial decisions and other authorities.

193.    These acts were committed as part of a widespread or systematic attack against a civilian population, namely, the Decedents.

194.    These acts were committed by the LNA, or persons or groups acting in coordination with the LNA or under their control, with knowledge of the attack.

195.    Defendant Hifter personally committed, or exercised command responsibility over or directed, ordered, conspired with or aided and abetted soldiers in the LNA to commit the crimes against humanity against Decedents, to wit: extrajudicial killing; and torture, cruel, inhuman, degrading treatment or punishment of Decedents as part of a widespread or systematic attack against a civilian population, with knowledge of the attack.

196.    Defendant Hifter's acts or omissions described above and the acts committed by his subordinates against the Decedents were committed under actual or apparent authority, or color of law, of foreign governments that provide support to Defendant, such as Egypt, the United Arab Emirates, Russia, and France.

197.    As a result of Defendant Hifter's acts on the Decedents, the Plaintiffs are entitled to damages in an amount to be determined at trial.

43

198.     Defendant Hifter's acts were deliberate, willful, intentional, wanton, malicious and oppressive and should be punished by an award of punitive damages.

**COUNT SEVEN**
**Torture Victim Protection Act:  Extrajudicial Killing and Torture**

199.     Plaintiffs re-allege and incorporate by reference each and every allegation contained in the preceding paragraphs as if set forth fully herein.

200.     The LNA's execution and torture of the civilian Decedents described herein constitutes a violation of the Torture Victim Protection Act ("TVPA").

201.     The TVPA provides for civil liability for any individual who, under actual or apparent authority or color of law of a foreign nation, commits torture or extrajudicial killings.

202.     The TVPA defines extrajudicial killing as a deliberate killing unauthorized by a previous judgment pronounced by a regularly constituted court, affording all the judicial guarantees which are recognized as indispensable by civilized peoples.

203.     The TVPA also defines torture as any act directed against an individual in the offenders' custody, by which severe physical or mental pain or suffering is intentionally inflicted, for example, to punish an individual for an act he/she or a third person is suspected of committing, or intimidating or coercing him/her, for any discriminatory reason.  Mental pain is defined as including prolonged mental harm caused by the intentional or threatened infliction of severe physical pain, the threat of imminent death, or the threat that another individual will imminently be subjected to death.

204.     The extrajudicial killing of Decedents was not authorized by any court judgment.

205.     These extrajudicial killings violated international agreements to which the United States is a party, such as the Third Geneva Convention, and therefore violated U.S. federal law.

206.    The murder of the civilian Decedents violated Virginia Code § 8.01-50, et seq. which provides that whenever the death of a person is caused by the intentional and wrongful act of a person, that person responsible shall be liable for damages including the decedent's survivors' deprivation of the decedent's aid, comfort and financial support.

207.    Defendant Hifter has acted under actual or apparent authority, or color of law of foreign nations providing logistical and other support, to include the United Arab Emirates, Russia, and France.

208.    Defendant Hifter personally committed, or exercised command responsibility over or directed, ordered, conspired with or aided and abetted soldiers in the LNA to commit the extrajudicial killings of Decedents.

209.    The Plaintiffs are unable to exhaust adequate remedies in Libya where the conduct giving rise to the claim occurred given the on-going hostilities and dysfunctional judicial systems and any such attempts would be futile or otherwise create risk of reprisal.

210.    As a result of Decedents' extrajudicial killings and torture, the Plaintiffs are entitled to damages in an amount to be determined at trial.

211.    Defendant Hifter's acts were deliberate, willful, intentional, wanton, malicious and oppressive and should be punished by an award of punitive damages.

### VII.    JURY TRIAL DEMANDED

212.    Plaintiff Hamza demands a jury trial on all issues so triable.

### VIII.    PRAYER FOR RELIEF

The Hamza Plaintiffs and Jibreel pray that this Court enter an ORDER against Defendant Hifter:

a. Awarding compensatory damages in an amount to be proven at trial, but for Plaintiff Ali Hamza not less than $40,000,000.00;

b. Awarding compensatory damages in an amount to be proven at trial, but for Plaintiff Nehma Hamza not less than $40,000,000.00;

c. Awarding compensatory damages in an amount to be proven at trial, but for Plaintiff Abdelhalim Hamza not less than $40,000,000;

d. Awarding compensatory damages in an amount to be proven at trial, but for Plaintiff Jibreel not less than $10,500,000.00;

e. Awarding punitive and exemplary damages to both plaintiffs in an amount to be proven at trial;

f. Awarding reasonable attorneys' fees and costs of suit; and

g. Awarding such further relief as it deems appropriate, just, and equitable.

Date: September 17, 2020

_____/s/_____

Thomas M. Craig, Esq.
Virginia Bar #68063
FH+H
1751 Pinnacle Drive
Suite 1000
Mclean, Virginia 22102
(703) 590-1234
(703) 590-0366 fax
tcraig@fhhfirm.com

_____/s/_____
Mark S. Zaid, Esq.
*Admitted Pro Hace Vice*
D.C. Bar #440532
Mark S. Zaid, P.C.
1250 Connecticut Avenue, N.W.
Suite 700
Washington, D.C. 20036
(202) 454-2809
(202) 330-5610 fax
Mark@MarkZaid.com


_____/s/_____
Matthew Jury, Esq.
*Admitted Pro Hace Vice*
NYS Bar # 706563
84 Brook Street
London W1K 5EH
+44 (0) 20 7096-3767
Matthew.Jury@mccue-law.com