**IN THE UNITED STATES DISTRICT COURT**
**FOR THE EASTERN DISTRICT OF VIRGINIA**
**Alexandria Division**

|  |  |  |
|---|---|---|
| ALI ABDALLA HAMZA *et al.* | ) | |
| | ) | |
| Plaintiffs, | ) | |
| | **)** | Civil Action No. |
| v. | ) | 20-cv-01038 LMB-JFA |
| | ) | |
| KHALIFA HIFTER, | ) | March 12, 2021 |
| | ) | |
| Defendant. | ) | |
| | ) | |

**MEMORANDUM OF LAW IN OPPOSITION TO**
**<u>DEFENDANT'S MOTION TO DISMISS</u>**

i

# TABLE OF CONTENTS

Page

TABLE OF AUTHORITIES ................................................................................................ ii

INTRODUCTION ................................................................................................................1

FACTUAL SUMMARY .....................................................................................................2

PROCEDURAL BACKGROUND ......................................................................................4

ARGUMENT .......................................................................................................................4

I.     Legal Standards....................................................................................................4

II.    The Political Question Doctrine Does Not Preclude
       Consideration By This Court Of Plaintiffs' Allegations....................................5

III.   The Defendant Is Not Entitled To Head-Of-State Immunity...............................7

IV.    This Court Possesses Personal Jurisdiction Over Defendant................................9

V.     Plaintiffs Have Properly Pled A Claim Under The TVPA .................................12

       A.     There is No Available Due Process in Libya and Plaintiffs Should
              be Constructively Viewed as Having Exhausted All Adequate
              and Available Remedies. ..........................................................................12

       B.     The Killings Alleged by Plaintiffs Meet the Standards of the TVPA ...............15

              1.     Defendant is Responsible for the Conduct of the Troops
                     Who Murdered the Plaintiffs.......................................................18

              2.     Defendant Failed to Address the Alleged Claims ......................19

              3.     The Killings Were Extrajudicial and Deliberate ........................19

CONCLUSION..................................................................................................................20

## <u>TABLE OF AUTHORITIES</u>

**CASES**                                                                   Page(s)

*Kerns v. United States*,
   585 F.3d 187 (4th Cir. 2009) ............................................4

*Al Shimari v. CACI Premier Tech.*,
   300 F. Supp. 3d 758 (E.D.Va. 2018) ..................................4

*Combs v. Bakker,*
   886 F.2d 673 (4th Cir. 1989) ............................................5

*Adams v. Bain,*
   697 F.2d 1213 (4th Cir. 1982) ..........................................5

*Warfaa v. Ali,*
   33 F. Supp. 3d 653 (E.D.Va. 2014)
   (Brinkema, D.J.), <u>aff'd</u>, 811 F.3d 653 (4th Cir.)....................5, 10, 17

*Mohamad v. Palestinian Auth.*,
   566 U.S. 449 (2012)....................................................6, 18

*Matar v. Ditcher*,
   563 F.3d 9 (2d Cir. 2009) ................................................7

*Mamani v. Berzain*,
   654 F.3d 1148 (11th Cir. 2011) ........................................7

*Lafontant v. Aristide,*
   844 F. Supp. 128 (E.D.N.Y. 1994) ..................................8

*Ye v. Zemin*,
   383 F.3d 620 (7th Cir. 2004) ............................................8

*Leutwyler v. Office of Her Majesty Queen Rania al-Abdullah,*
   184 F.Supp.2d 277 (S.D.N.Y. 2001)..................................8

*Yousuf v. Samantar*,
   No. 1:04cv1360, 2012 WL 7445583 (E.D. Va. 2012)................8, 17

*In re Grand Jury Proceedings, Doe No. 700*,
   817 F.2d 1108 (4th Cir. 1987) ..........................................8

*Sosa v. Alvarez-Machain*,
   542 U.S. 692 (2004)........................................................9

*Kiobel v. Royal Dutch Petro. Co.*,
   569 U.S. 108 (2013)....................................................9, 10

*Al Shimari v. CACI Premier Tech., Inc.*,
   758 F.3d 516 (4th Cir. 2014) ..........................................10

*Abukar Hassan Ahmed v. Abdi Aden Magan,*
   2013 U.S. Dist. LEXIS 117963, *4 (Aug. 20, 2013)....................11

*Jean v. Dorelien,*

    431 F.3d 776 (11th Cir. 2005) ...................................................................12, 13

*Boniface v. Viliena*,
    338 F. Supp. 3d 50, 65 (D. Mass 2018) .............................................................13

*Enahoro v. Abubakar*,
    408 F.3d 877 (7th Cir. 2005) ...............................................................................13

*In re Chiquita Brands Int'l, Inc. Alien Tort Statute & Sholder Derivative Litig.*,
    190 F. Supp. 3d 1100 (S.D. Fla. 2016) ...............................................................13

*Doe v. Drummond Co.*,
    No. 7:09cv1041, 2009 WL 9056091, at *17 (N.D. Ala. Nov. 9, 2009)...........................13

*Chiminya Tachiona v. Mugabe*,
    216 F. Supp. 2d 262 (S.D.N.Y. 2002).........................................................14, 18

*Filartiga v. Pena-Irala*,
    630 F.2d 876 (2d Cir. 1980)...........................................................................15, 16

*Kadic v. Karadzic*,
    10 F.3d 232 (2d Cir. 1995)..............................................................................16, 17

*Doe v. Islamic Salvation Front*,
    993 F. Supp. 3 (D.D.C. 1998) .............................................................................16

*Hilao v. Estate of Marcos*,
    103 F.3d 767 (9th Cir. 1996) ...............................................................................18

*United States v. Williams*,
    8 M.J. 506 n.1 (A.F.C.M.R. 1979)....................................................................18

## STATUTES, RULES AND REGULATIONS

Fed. R. Civ. P. 12 (b)(1)..............................................................................................4

Fed. R. Civ. P. 12 (b)(2)..........................................................................................4, 5

Fed. R. Civ. P. 12 (b)(6)..........................................................................................4, 5

28 U.S.C. § 1350.......................................................................................6, 9, 12, 19

18 U.S.C. § 2441(b) ....................................................................................................11

Restatement (Third) of Foreign Relations Law § 402(2)(1987)......................11, 12, 16

## ARTICLES

*Head of State Immunity As Sole Executive Lawmaking,* 44 Vand. J. Transnat'l L.
    911 (2011) .......................................................................................................8

*A former CIA asset has become a U.S. headache in Libya,*
    WASHINGTON POST, (Aug. 17, 2016_ .......................................................10

Pub. L. No. 102-256, § 2(a), 2(b), 2(c) 106 Stat. 73 (1993) ............................12, 15, 16

D. Kilpatrick, *A Police State With an Islamic Twist*, NEW YORK TIMES (Apr. 14,
2020), https://www.nytimes.com/2020/02/20/world/middleeast/libya-hifter-
benghazi.html Libya Travel Advisory, April 9, 2019.........................................................14

S. Rep. No. 249, at 9 (1991) ........................................................................................18

*Libya's Haftar Promotes Accused War Criminal Wanted by International Court,*
MIDDLE EAST EYE, July 9, 2019.....................................................................................19

## OTHER AUTHORITIES

TVPA Sen. Rep., .................................................................................................6, 15, 20

Convention Against Torture and Other Cruel, Inhuman or Degrading Treatment
or Punishment, UNCHR (ratified by U.S. Senate on October 27, 1990) ..........................7

Statement for the United Nations Human Rights Council's Interactive Dialogue
on the High Commissioner's Report on Libya, Amnesty International (Feb. 20,
2018), available at https://www.refworld.org/pdfid/5b55c0fb4.pdf................................13

H.R. Rep. No. 102-367, at 5 (1991) ..........................................................................7, 16

Rome Statute of the International Criminal Court,
8 J. Int'l L. & Prac. 227, 232 (1999)

Plaintiffs Ali Abdalla Hamza, Nehma Abdalla Al-Mahdi Hamza, Abdelhalim Abdalla Mahfi Hamza, and Salimah Abudullah Abraheem Jibreel (collectively "Plaintiffs") submit this Memorandum of Law in Opposition to Defendant Khalifa Hifter's ("Defendant") Motion to Dismiss and Supporting Memorandum (Dkt. Nos. 24, 25) (the "Motion").

## INTRODUCTION

This lawsuit is actually the third to be filed against Defendant Hifter, a United States citizen and Virginia resident, whose militia actions have led to the murders of countless innocent civilians in Libya, including those of the families of the Plaintiffs. While the United States government has clear criminal jurisdiction, but has yet to act, civil accountability is sought under the Alien Tort Statute ("ATS") and Torture Victim Protection Act ("TVPA") for various violations of state and international law.

Following his failure to respond to the lawsuit and the issuance of a default judgment by this Court, the Defendant's newly hired counsel successfully had the default set aside and was permitted to file a Motion to Dismiss. All of the arguments now before the Court have actually already recently been considered and addressed as part of the consolidated cases of <u>Elzagally et al. v. Hifter et al.</u>, 1:19-cv-00853, and <u>al-Suyid et al. v. Hifter et. al.</u>, 1:20-cv-00170, wherein the claims under the TVPA were permitted to proceed.[1]

## FACTUAL SUMMARY

Since 2014, the Defendant has been the self-described leader of the Libyan National Army ("LNA") after he declared a coup against the Libyan government. Since that time, he has waged a campaign of illegal siege warfare in Libya in an effort to completely overthrow the Government of National Accord, which was recognized by both the United States and United Nations as the

---

[1] <u>See</u> Transcript of Oral Arguments, <u>Elzagally et al. v. Hifter et al.</u>, 1:19-cv-00853 and <u>al-Suyid et al. v. Hifter et. al.</u>, 1:20-cv-00170, Sept. 29, 2020, Dkt. 44 ("Tr."), attached as Exhibit "1".

legitimate government until February 2021, when the Interim Unity Government was formed pending elections in December. First Amended Complaint, ¶¶31,40 (filed September 17, 2020)("FAC"). Shockingly, the Defendant is not only a citizen of the United States but he is a resident of the Commonwealth of Virginia and owns extensive property, business, and maintains personal contacts within this very jurisdiction. Id. at ¶17. He has continued to invest millions of dollars in the area. Id. at ¶19.

The Plaintiffs are members of two separate families. Ali, Nehma and Abdelhalim Hamza lost five members of their family due to the international crimes. Id., ¶¶10-12. Salimah Jebreel witnessed the murder of three of her minor children, the injury of a fourth, and the disappearance of her husband who has not been seen in four years. Each of these atrocities was permitted or authorized by the Defendant. Id. at ¶¶14-16.

Libya is a State party to multiple international human rights conventions that bind its conduct and that of its citizenry, to include the Defendant. Id. at ¶¶32-33. For years the Defendant has made it perfectly clear that he intends to forcibly dominate Libya and eradicate anyone who is perceived as getting in his way. His "Operation Dignity", which was directed at "clearing" eastern Libya of rival political and military groups, and "Operation Doom" has resulted in the frequent commission of war crimes. Id. at ¶¶41-42. For example, his forces have recklessly shelled civilian and residential areas in Benghazi, as well as targeted medical institutions and staff, cut off essential supplies and kidnapped, tortured and murdered civilians. Id. at ¶¶51-52,56,112.

The Defendant has publicly sanctioned such conduct by ordering his men to take no prisoners, saying "No mercy. Give up on that story facing the opponent. Never mind consideration of bringing a prisoner here. There is no prison here. The field is the field, end of the story." Id. at ¶¶42,109. Other LNA officials have also apparently made similar statements regarding prisoners.

In August 2016, a spokesperson for the Defendant publicly said with regard to fighting in Ganfouda, Libya, that "whoever is above 14 of age will never get out alive." Id. at ¶110. In August 2017, members of Operation Dignity admitted that the Defendant had ordered them to kill the captives and to show no mercy, and that they had committed summary executions for the purposes of causing horror. Id. at ¶111.

The Defendant is more than aware that those under his command have not only committed such crimes but have also been publicly accused of them, yet he takes no action against them despite his obligations under international law. One of the Defendant's top lieutenants directed or participated in a series of executions of thirty-three prisoners between June 2016 and July 2017, leading the International Criminal Court to issue arrest warrants in August 2017 and July 2018. Id. at ¶¶43,46.

Directly as a result of the Defendant's conduct and/or orders, the Plaintiffs' family members were injured, tortured, kidnapped and/or murdered. Id. at ¶¶114-162. There is absolutely nothing that the Plaintiffs can reasonably undertake to seek a legal remedy or appropriate civil relief in Libya. Id. at ¶47. It has been widely reported that the legal and judicial system in Libya is completely broken and unavailable. Id. at ¶¶48-49. Any effort to try could condemn the Plaintiffs and/or their surviving family members to horrors including death.

Fortunately, under U.S. and international law, this civil action is available for the pursuit of justice.

## PROCEDURAL BACKGROUND

Three Plaintiffs filed the initial Complaint on September 3, 2020. Dkt. No. 1. A First Amended Complaint was filed on September 17, 2020 and added two additional plaintiffs. Dkt. No. 8. Upon completion of service and having received no response, a default was issued by the Court on January 4, 2021. Dkt. No. 12. That, however, was set aside by an Order dated

3

February 23, 2021, Dkt. No. 22, and the Defendant was permitted to file a responsive pleading, which he did through a Motion to Dismiss on February 26, 2021. Dkt. No. 24. An Errata and Supplement was filed, without having sought permission either from the Court or the Plaintiffs, containing new arguments on March 1, 2021. Dkt. No. 27. This Opposition brief follows.

## ARGUMENT

### I.   LEGAL STANDARDS

The Federal Rules of Civil Procedure provide that a defendant may move to dismiss a complaint for, among other things, lack of subject matter jurisdiction, personal jurisdiction, or failure to state a claim upon which relief can be granted. See Fed. R. Civ. P. 12 (b)(1), (2), and (6).

Under Rule 12(b)(1), the "facts alleged in the complaint are taken as true and the motion must be denied if the complaint alleges sufficient facts to invoke subject matter jurisdiction." Kerns v. United States, 585 F.3d 187, 192 (4th Cir. 2009). A Court may also "consider evidence outside the pleadings without converting the proceeding to one for summary judgment." Al Shimari v. CACI Premier Tech., 300 F. Supp. 3d 758, 777 (E.D.Va. 2018).

Under Rule 12(b)(2), a defendant must affirmatively raise a personal jurisdiction challenge, but the plaintiff bears the burden of demonstrating personal jurisdiction at every stage following such a challenge. See Combs v. Bakker, 886 F.2d 673, 676 (4th Cir. 1989). And a Rule 12(b)(2) challenge raises an issue for the court to resolve, generally as a preliminary matter. Id. ("[T]he jurisdictional question thus raised [under Rule 12(b)(2)] is one for the judge"). Indeed, only when a material jurisdictional fact is disputed, and that fact overlaps with a fact that needs to be resolved on the merits by a jury might a court defer its legal ruling on personal jurisdiction to let the jury find the overlapping fact. Cf. Adams v. Bain, 697 F.2d 1213, 1219 (4th Cir. 1982) (noting that, "where the jurisdictional facts are intertwined with the facts central to the

merits of the dispute," deferring resolution of that factual dispute to a proceeding on the merits "is the better view").

Finally, a civil action should be dismissed for failure to state a claim pursuant to Rule 12(b)(6) only if the complaint lacks sufficient facts to state a claim plausible on its face. Courts must assume that well-pleaded allegations are true and must view the complaint in the light most favorable to the plaintiff. Id.; Warfaa v. Ali, 33 F. Supp. 3d 653, 658 (E.D.Va. 2014) (Brinkema, D.J.), aff'd, 811 F.3d 653 (4th Cir.).

## II.   THE POLITICAL QUESTION DOCTRINE DOES NOT PRECLUDE CONSIDERATION BY THIS COURT OF PLAINTIFFS' ALLEGATIONS

As an initial matter, the Defendant offers broad sweeping arguments that this Court cannot resolve the dispute in this litigation as it is better suited, so is claimed, for the Legislative or Executive Branches. Memorandum in Support of Defendant Khalifa Hifter's Motion to Dismiss at 6, Dkt. No. 25 ("Def's Memo"). "Plaintiffs' allegations of extrajudicial killings and torture under the TVPA and ATS essentially require a U.S. court to adjudicate the conduct of the armed forces of a foreign government that is actively working with the United States to try to bring peace to the region." Id. at 10-11. The Defendant, however, failed to offer any binding judicial decision that supports this premise with respect to TVPA or ATS lawsuits, and for good reason. If accepted Defendant's argument would render TVPA and ATS cases irrelevant.

For one thing, every TVPA case necessarily involves a foreign official who allegedly commits acts of torture or extrajudicial killings under "actual or apparent authority, or color of law." 28 U.S.C. § 1350 note. Indeed, the Supreme Court has made clear that the TVPA "does not impose liability on perpetrators who act without authority or color of law of a foreign state." Mohamad v. Palestinian Auth., 566 U.S. 449, 459 (2012). In other words, every TVPA claim will be against a foreign official committing acts purportedly on behalf of his government. In creating

5

TVPA almost thirty years ago, Congress explicitly decided that U.S. courts must hear these claims. And the ATS has existed since 1789.

Moreover, torture and extrajudicial killings can *never* be an "official act" of a foreign government and therefore there is no risk of offending the Defendant's government. The Senate Report to the TVPA explained that "no state commits torture as a matter of public policy" and therefore doctrines relying on "official" or "public" acts "cannot shield former officials from liability under this legislation." TVPA Sen. Rep., at § IV(D) (discussing Act of State defense). It is presumed that the Defendant's government (as opposed to Defendant himself) does not condone torture or extrajudicial killings, and that it could not claim offense if a person guilty of such crimes is brought to justice.

That is why Congress had no problem vesting in courts the responsibility to address and resolve the legality of torture and extra-judicial killings occurring in foreign countries, pursuant to the TVPA. And the Executive Branch would not object on political question grounds because it is the United States' official policy to oppose those crimes. See Convention Against Torture and Other Cruel, Inhuman or Degrading Treatment or Punishment (ratified by U.S. Senate on October 27, 1990). Congress, in its wisdom, did not intend on passing the TVPA to override the common law doctrines of diplomatic and head-of-state immunity (which do not apply here), H.R. Rep. No. 102-367, at 5 (1991), but "the TVPA will apply to any individual official whom the Executive Branch declines to immunize." Matar v. Ditcher, 563 F.3d 9, 15 (2d Cir. 2009). These claims require the Court to evaluate the lawfulness of the conduct of specific persons towards the victims, not to decide the legitimacy of the United States' Executive Branch's foreign policy decisions, the political question doctrine does not bar these claims. See Mamani v. Berzain, 654 F.3d 1148 (11th Cir. 2011)(rejecting political question doctrine in ATS case).

On January 4, 2021, the U.S. Department of State notified this Court that it declined the invitation to submit a Statement of Interest with respect to "its views on whether these actions should proceed in this court" in the <u>Elzagally</u> and <u>al-Suyid</u> cases. <u>See</u> <u>Elzagally et al. v. Hifter et al.</u>, 1:19-cv-00853, Dkt. 46; <u>al-Suyid et al. v. Hifter et. al., 1:20-cv-00170</u>, Dkt. 54. Obviously since that time the Trump Administration has been replaced by that of President Joseph Biden and a new regime of officials. The Defendant therefore requests that the Court renew its invitation to the State Department to see if the Biden Administration would desire to support an individual accused the world over of horrific crimes and atrocities against innocent civilians. Def's Memo at 10-12,14 fn.8. The Plaintiffs have no objection if the Court believes it should exercise its discretion to invite such a submission.

## III.   THE DEFENDANT IS NOT ENTITLTED TO HEAD-OF-STATE IMMUNITY

Based on little more than news reports, Defendant requests he be accorded head-of-state immunity and have this lawsuit dismissed. Def's. Mem. 12–14. As noted above, in <u>Elzagally</u> and <u>al-Suyid</u>, also pending before this Court, neither the U.S. Government nor this Court has agreed with this request. Nor has the Government of Libya, whether that recognized by the United States or the one controlled by the Defendant, formally invoked head-of-state immunity on the Defendant's behalf.

Head-of-state immunity is rarely granted, and almost never unless the Executive Branch files an official "Suggestion of Immunity" with the court. The doctrine of head-of-state immunity affords absolute immunity from suit to foreign heads of state while they remain in office. <u>See</u> <u>Lafontant v. Aristide</u>, 844 F. Supp. 128, 131–32 (E.D.N.Y. 1994). It is settled law that "a determination by the Executive Branch that a foreign head of state is immune from suit is conclusive and a court must accept such a determination without reference to the underlying claims

of a plaintiff." Ye v. Zemin, 383 F.3d 620, 626 (7th Cir.2004); Leutwyler v. Office of Her Majesty Queen Rania al-Abdullah, 184 F.Supp.2d 277, 280 (S.D.N.Y. 2001); Lafontant, 844 F. Supp. at 139.

In most instances where the U.S. Government does not file a Suggestion of Immunity, courts have denied the underlying motions to dismiss. See *Head of State Immunity as Sole Executive Lawmaking*, 44 Vand. J. Transnat'l L. 911, App. A (2011)(listing ten instances); see also Yousuf v. Samantar, No. 1:04cv1360, 2011 WL 7445583 (E.D. Va. Feb. 15, 2011)(order denying motion to dismiss suit against former Somali President and Defense Minister Samantar where Executive Branch determined no immunity applied); In re Grand Jury Proceedings, Doe No. 700, 817 F.2d 1108 (4th Cir. 1987)(declining to recognize head-of-state immunity for former Philippine president in grand jury proceedings where subsequent Philippine regime "waived any residual head-of-state or diplomatic immunity" he enjoyed).

While the Executive Branch has not voiced its opinion as part of this litigation, on January 4, 2021, the Department of State declined an express invitation to do so in the two other civil cases pending against the same Defendant. Unless the Biden Administration takes a different position, this Court has no legal or factual basis upon which to even consider whether the Defendant is entitled to head-of-state immunity.

## IV.     THIS COURT POSSESSES PERSONAL JURISDICTION OVER DEFENDANT

The Defendant asserts that this Court does not have personal jurisdiction over him. Def's Memo at 15; Errata and Supplement to Mr. Hifter's Motion to Dismiss, Dkt. 27 (filed March 1, 2021). His argument particularly pertains to the ATS claims. This Court has already ruled that it has jurisdiction over the Defendant for purposes of the TVPA. See Tr. at 26-27.

With respect to the ATS, it states in full: "The district courts shall have original jurisdiction of any civil action by an alien for a tort only, committed in violation of the law of nations or a treaty of the United States." 28 U.S.C. § 1350. It is a "jurisdictional" statute in the sense that it "address[es] the power of the courts to entertain cases concerned with a certain subject." Sosa v. Alvarez-Machain, 542 U.S. 692, 714 (2004). The Plaintiffs acknowledge, as they must, that the extraterritorial jurisdictional reach of the ATS was significantly curtailed by the Supreme Court in Kiobel v. Royal Dutch Petro. Co., 569 U.S. 108 (2013).

The Supreme Court concluded in Kiobel that "[t]he principles underlying the presumption against extraterritoriality … constrain courts exercising their power under the ATS." Id. at 117. The Court reached this conclusion after examining the statutory text and historical setting of the ATS's passage, seeking evidence of congressional intent that it apply extraterritorially, id. at 118-125, but determining that "there is no clear indication of extraterritoriality here," id. at 124 (internal quotation marks and alteration omitted). Accordingly, the Court held that the ATS could not form the basis for jurisdiction of U.S. courts over acts occurring entirely beyond the territory of the United States. Id. But the Court appeared to leave open a window for ATS actions that are based in part on extraterritorial conduct when it wrote: "And even where the claims touch and concern the territory of the United States, they must do so with sufficient force to displace the presumption against extraterritorial application." Id. at 124-125.

This begs the questions of whether the fact that a defendant in an ATS case is a U.S. citizen could be sufficient to permit extraterritorial jurisdiction in U.S. courts. The Fourth Circuit has recognized that exceptions could exist and that courts should conduct a "fact-based analysis." Al Shimari v. CACI Premier Tech., Inc., 758 F.3d 516, 529 (4th Cir. 2014). In Warfaa v. Ali,

9

811 F.3d 653 (4th Cir. 2016), the Court noted "the presumption against ATS extraterritorial application is not irrefutable." Id. at 660. Although the Circuit added that an "ATS claim premised on no relevant conduct in the United States will fit within the heartland of cases to which the extraterritoriality presumption applies," Id., it never addressed the specific fact pattern found here.

Warfaa ultimately rejected the premise (and agreed with the decision of this Court) that the defendant's "after-acquired residence in the United States long after the alleged events of abuse" was insufficient to permit jurisdiction. Id. at 661. See also Warfaa, 33 F.Supp. 3d at 658-59 (present location of defendant insufficient) (Brinkema, J.). This case, however, presents one of the more unusual – and perhaps unique – fact patterns. The defendant is not a U.S. corporation being accused of atrocities committed abroad. Nor an alleged war criminal who committed their crimes overseas and eventually found their way to the United States long after they occurred. Here, the Defendant – who is a former asset of the Central Intelligence Agency – has been a U.S. citizen for decades, long before he committed the crimes alleged in this litigation. See *A former CIA asset has become a U.S. headache in Libya*, Wash. Post, Aug. 17, 2016, at https://www.washingtonpost.com/world/ national-security/a-former-cia-asset-has-become-a-us-headache-in-libya/2016/08/17/a766e392-54c6-11e6-bbf5-957ad17b4385_story.html.

This Court did address the fact of the Defendant's citizenship in the Elzagally and al-Suyid cases, and nonetheless dismissed the ATS claims. But the Court seemed to have been particularly persuaded by its belief that it had never seen jurisdiction specifically predicated in a criminal case based solely on the defendant's citizenship. Tr. at 16. Yet that is exactly what does exist under the unique circumstances here. Under the War Crimes Act of 1996, the United States has clear criminal jurisdiction over the Defendant and his overseas conduct precisely and *solely* because he is a U.S.

citizen. <u>See</u> 18 U.S.C. § 2441(b). If criminal jurisdiction exists, it would be reasonable to construe civil jurisdiction similarly flows with it.

Respectfully, the Plaintiffs would submit that this fact, which was apparently not argued in the <u>Elzagally</u> or <u>al-Suyid</u> cases, carves the exception that fits within the window left open in <u>Kiobel</u>, thereby allowing jurisdiction to exist and their ATS claims to proceed.[2] <u>See also</u> <u>Abukar Hassan Ahmed v. Abdi Aden Magan</u>, 2013 U.S. Dist. LEXIS 117963, *4 (Aug. 20, 2013)("as a permanent resident of the United States, the presumption of against extraterritoriality has been overcome in this case. The United States Department of State expressly stated its assessment that it is appropriate to give effect to the proposition that U.S. residents who enjoy the protections of U.S. law ordinarily should be subject to the jurisdiction of the courts."); Restatement (Third) of Foreign Relations Law § 402(2)(1987)(principle that sovereign may exercise jurisdiction to prescribe conduct of its nationals outside its territory is widely recognized).

## V.      PLAINTIFFS HAVE PROPERLY PLED A CLAIM UNDER THE TVPA

The TVPA provides for a civil cause of action where:

> An individual who, under actual or apparent authority, or color of law, of any foreign nation-
>
> (1) subjects an individual to torture shall, in a civil action, be liable for damages that individual; or
>
> (2) subjects an individual to extrajudicial killing shall, in a civil action, be liable for damages to the individual's legal representative, or to any person who may be a claimant in an action for wrongful death.

---

[2] The Plaintiffs also respectfully note that in the <u>Elzagally</u> and <u>al-Suyid</u> cases this Court raised the issue of statute of limitations with respect to the state tort claims that would underly the ATS. Tr. at 17. In considering this matter, it is notable that – unlike the other cases – there does exist ongoing criminal behavior. It is alleged that Plaintiff Jibreel's husband remains in the custody of the Defendant and continues to be tortured and subject to conduct illegal under international and domestic law. FAC, at ¶162. Therefore, at least those ATS claims that pertain to that situation should remain viable.

Pub. L. No. 102-256, § 2(a), 106 Stat. 73 (1993)(codified at 28 U.S.C. § 1350 note). To bring a TVPA claim, a claimant has to have exhausted all adequate and available remedies "in the place in which the conduct giving rise to the claim occurred." <u>Id</u>. § 2(b). Furthermore, the statute contains a ten-year statute of limitations. <u>Id</u>. § 2(c).

A. **There Is No Available Due Process in Libya and Plaintiffs Should Be Constructively Viewed as Having Exhausted All Adequate and Available Remedies.**

This requirement "is an affirmative defense, requiring the defendant to bear the burden of proof," a burden which is considered "substantial." <u>Jean v. Dorelien</u>, 431 F.3d 776, 781 (11th Cir. 2005). Defendant, in fact, correctly concedes this at the outset. Def's Memo at 17. The Defendant nonetheless proffers two arguments that Plaintiffs have failed to exhaust adequate or available remedies in Libya. First, that they have "not demonstrated that they have attempted in any way to seek relief before the Libyan courts". Second, that the International Criminal Court "is currently engaged in an ongoing investigation regarding the circumstances of the war in Libya." <u>Id</u>. at 18. Both of these arguments lack merit, especially since the Defendant failed to take any steps to demonstrate his acknowledged legal and factual burden.

"In most instances, initiation of litigation under the TVPA 'will be virtually prima facie evidence that the claimant has exhausted his or her remedies in the jurisdiction in which the torture occurred.'" <u>Boniface v. Viliena</u>, 338 F. Supp. 3d 50, 65 (D. Mass 2018), <u>citing</u> <u>Dorelien</u>, 431 F.3d at 781-82. To the extent there is any doubt surrounding this issue, "both Congress and international tribunals have mandated that such doubts be resolved in favor of the plaintiffs." <u>Id</u>., <u>citing</u> <u>Enahoro v. Abubakar</u>, 408 F.3d 877, 892 (7th Cir. 2005).

Courts have found allegations that a country's judicial system is corrupt sufficient to show that a claimant lacks "effective domestic legal remedies." <u>Boniface</u>, 338 F. Supp. 3d at 66-67,

citing Enahoro, 408 F.3d at 892; In re Chiquita Brands Int'l, Inc. Alien Tort Statute & Sholder

Derivative Litig., 190 F. Supp. 3d 1100, 1115 (S.D. Fla. 2016); Doe v. Drummond Co.,

No. 7:09cv1041, 2009 WL 9056091, at *17 (N.D. Ala. Nov. 9, 2009). There is absolutely nothing

that the Plaintiffs can reasonably undertake to seek a legal remedy or appropriate civil relief in

Libya. FAC at ¶47. It has been widely reported that the legal and judicial system in Libya is

completely broken and unavailable. Id. at ¶¶48-49.[3] According to a 2019 travel advisory issued by

the U.S. Department of State, which remains in place, Libya is beset by "crime, terrorism, civil

unrest, kidnapping, and armed conflict" and the "threat of kidnapping for ransom." The capital of

Tripoli, and at least eight other cities including Plaintiffs' hometown of Benghazi, are fraught with

"fighting among armed groups, as well as terrorist attacks … Even demonstrations intended to be

peaceful can turn confrontational and escalate into violence." Militia groups detain persons "for

arbitrary reasons, do not grant detainees access to a lawyer or legal process, and do not allow

detainees to inform others of their status."[4] Any effort to try and use the existing system, to the

extent it even exists, could condemn the Plaintiffs and/or their surviving family members to horrors

including death.

---

[3] According to Amnesty International, Libya has a "domestic judicial system [that] is highly dysfunctional and is unable to provide recourse for victims of human rights violations or bring those responsible for these abuses to justice. Perpetrators of serious human rights abuses continue to operate with absolute impunity without fear of accountability." Statement for the United Nations Human Rights Council's Interactive Dialogue on the High Commissioner's Report on Libya, Amnesty International, February 20, 2018, available at https://www.refworld.org/pdfid/5b55c0fb4.pdf. The New York Times reported that opposition members disappear without warning and reported that if "you are with Hifter then you are under his umbrella and you can do whatever you want. If you aren't, you are an enemy and you may be jailed, killed or exiled." D. Kilpatrick, *A Police State With an Islamic Twist*, NEW YORK TIMES (Apr. 14, 2020), https://www.nytimes.com/2020/02/20/world/middleeast/libya-hifter-benghazi.html.
[4] Libya Travel Advisory, April 9, 2019, at https://travel.state.gov/content/travel/en/traveladvisories/traveladvisories/libya-travel-advisory.html.

Of course, the individuals who perpetrated the heinous crimes against the Plaintiffs continue to hold positions of power, including control over the country's military apparatus, and domination of the court systems. The Court in <u>Chiminya Tachiona v. Mugabe</u>, 216 F. Supp. 2d 262 (S.D.N.Y. 2002), faced a similar situation. The plaintiffs there showed that the defendants controlled the Zimbabwean judicial system, making any appeals thereto futile. As a result, the Court ruled the Plaintiff had exhausted all adequate and available remedies.

The Defendant's suggestion that there is a role for the ICC has no merit. It would be a legal and practical impossibility for the ICC to conduct litigation using the Federal Rules of Civil Procedure or Evidence, determine Plaintiffs' rights under the applicable United States statute(s), or enforce any judgment in this District. Moreover, as individuals and not States, Plaintiffs lack standing to bring any type of action to the ICC. Finally, far from deferring to ICC judgments, Defendants give command positions and promotions to officers currently under ICC war crimes indictments. FAC at ¶¶43,46.

Of course, this issue was raised and disposed of in the <u>Elzagally</u> or <u>al-Suyid</u> cases when this Court noted that "I'm satisfied that there's enough evidence that the functioning of the Libyan courts will not be sufficient to give them an -- a fair opportunity to raise these issues there." Tr. at 35.

**B.   The Killings Alleged by Plaintiffs Meet The Standards of the TVPA**

The Defendant also seek dismissal of the Plaintiffs' TVPA claim by asserting he did not deliberately kill their family members, and, in fact, their deaths may have been "lawfully carried out". Def's Memo at 22-23. This is preposterously insulting but in any event is insufficient to overcome the legal standard and factual allegations at this early stage.

The TVPA defines the term "extrajudicial killing" as "a deliberate killing not authorized by a previous judgment pronounced by a regularly constituted court affording all the judicial guarantees which are recognized as indispensable by civilized peoples." Pub. L. No. 102-256, § 3(a), 106 Stat. 73 (1993). It does not include "any such killing that, under international law, is lawfully carried out under the authority of a foreign nation." Id.

"Official torture and summary execution violate standards accepted by virtually every nation." S. Rep. No. 102-249, at § IV(D) (1991)("TVPA Sen. Rep."). As the Second Circuit held, "official torture is now prohibited by the law of nations." Filartiga v. Pena-Irala, 630 F.2d 876, 884 (2d Cir. 1980). "There are few actions so dehumanizing as torture. Victims bear the physical and psychological scars of their experience for life. Its use is designed to terrorize and oppress entire populations. The prohibition against summary executions has acquired a similar status." TVPA Sen. Rep., at § II (internal quotation marks omitted). But before TVPA was enacted, these universal principles provided little comfort "to the thousands of victims of torture and summary executions around the world. Despite universal condemnation of these abuses, many of the world's governments still engage in or tolerate torture of their citizens, and state authorities have employed extrajudicial killings to execute many people." Id. Therefore, Congress passed the TVPA "to provide a Federal cause of action against any individual who, under actual or apparent authority or under color of law of any foreign nation, subjects any individual to torture or extrajudicial killing." Id.

To bring a civil cause of action under the TVPA, a claimant must show that the liable individual was acting under the authority of a "foreign nation." Pub. L. No. 102-256, § 2(a), 106 Stat. 73 (1993). The claimant must establish that there was "some governmental involvement in the torture or killing to prove a claim" as the TVPA "does not attempt to deal with torture or killing

by purely private groups." <u>Kadic v. Karadzic</u>, 10 F.3d 232, 246 (2d Cir. 1995), <u>citing</u> H.R. Rep. No. 367, at 5 (1991)). This state action requirement, however, "does not require that a particular government be officially recognized ... [c]ertain private groups may constitute a de facto state, in which case they will be held liable under the TVPA." <u>Doe v. Islamic Salvation Front</u>, 993 F. Supp. 3, 9 (D.D.C. 1998), <u>citing</u> <u>Karadzic</u>, 70 F.3d at 244. "The de facto state doctrine recognizes that the TVPA does not concern the legitimacy of a particular organization but its power." <u>Id</u>. A state is considered, according to international law, as "an entity that has a defined territory and a permanent population, under the control of its own government, and that engages in, or has the capacity to engage in, formal relations with such other entities." <u>Id</u>., <u>quoting</u> Restatement (Third) § 201.

Plaintiffs assert that the Defendant was acting with the authority granted by a de facto foreign nation. In support of their assertion, Plaintiffs described in their First Amended Complaint two different factions in the Libyan Civil War that encompass the two rival centers of power that emerged following the overthrow of Colonel Qaddafi. FAC at ¶¶26-31, 37-44. The Defendant controls one of those governmental powers.

Plaintiffs' allegations, which must be admitted as true given the Defendant's Motion to Dismiss, demonstrate that Defendant was acting under the authority of a foreign government. In <u>Karadzic</u>, the Second Circuit found that the appellants had alleged sufficient facts for them to prove that defendant's regime satisfied the criteria for a state as considered in the context of international law. <u>Id</u>. 70 F.3d at 245. There, "Srpska" was alleged to "control defined territory, control populations within its power, and to have entered into agreements with other governments ... [i]t has a president, a legislature, and its own currency." <u>Id</u>. The Second Circuit continued by reframing the inquiry, noting that the concept of a state, where required for violations such as "official"

16

torture, "requires merely the semblance of official authority ... not whether statehood in all its formal aspects exists." Id. Based on virtually identical facts, in the al-Suyid lawsuit Magistrate Judge Anderson recommended to this Court on June 17, 2020, the adoption of his finding that Defendant's authority and actions were sufficient to meet the "foreign nation" requirement of the TVPA. Exhibit "2".

The Defendant acknowledges, as he must, that someone can be held liable under the TVPA even if they did "not personally engage in torture or extrajudicial killing." Def. Mem. 18. He also admits, as he must, that a commander of a troops can be held liable under the TVPA for the actions of his subordinates under the doctrine of command responsibility. Id. at 19-20, citing Yousuf v. Samantar, 1:04-CV-1360 (LMB/JFA), 2012 U.S. Dist. LEXIS 122403, at *1 (E.D. Va. Aug. 28, 2012) and Warfaa, 33 F. Supp. 3d at 653. But the Defendant contends he is not liable because Plaintiffs allegedly failed to show that (1) the perpetrators of the alleged offenses were part of the LNA and under his control; (2) that he knew of subordinates that had committed, were committing, or planned to commit the alleged offenses, (3) that he failed to address such offenses, or that (4) the torture and killings were deliberate. Def's Memo at 20-23.

The Defendant's arguments fail for the reasons set forth below, just as they recently did in the Elzagally and al-Suyid cases.

### 1. Defendant Is Responsible for the Conduct of the Troops Who Murdered the Plaintiffs.

While it is true that the Defendant himself did not likely personally "pull the trigger" that killed the Plaintiffs' loved ones, he is nonetheless still liable under the doctrine of "command responsibility". The Ninth Circuit described the principle of "command responsibility" as that which "holds a superior responsible for the actions of subordinates". Hilao v. Estate of Marcos, 103 F.3d 767, 777 (9th Cir. 1996). Under international law, responsibility for torture, summary execution, or disappearances extends beyond the person who commits the acts, and includes

anyone with higher authority who authorized, tolerated, or knowingly ignored those acts. Id. See also United States v. Williams, 8 M.J. 506, 509 n.1 (A.F.C.M.R. 1979)(noting "commander may be held criminally responsible for the acts of his subordinates"). Furthermore, the legislative history of the TVPA explained that under international law "responsibility for torture, summary execution, or disappearances extends beyond the person or persons who actually committed those acts – anyone with higher authority who authorized, tolerated or knowingly ignored those acts is liable for them." Id., citing S. Rep. No. 249, at 9 (1991).

The Supreme Court has affirmed that "the TVPA contemplates liability against officers who do not personally execute the torture or extrajudicial killing." Palestinian Auth., 566 U.S. at 458. The Defendant, as the LNA commander, bears responsibility for the deaths of the Plaintiffs. FAC at ¶¶45-45,107-162. The Plaintiffs contend that the Defendant's actions were a part of a common plan, design, and scheme of the LNA. See Chiminya Tachiona v. Mugabe, 216 F. Supp. 2d 262 (S.D.N.Y. 2002)(finding members of Zimbabwe's ruling party liable under TVPA for "organiz[ing] targeted violence against political opponents and their families and supporters, assassinations and assassination attempts, kidnappings, tortures, rapes, beatings, mass destruction of property, and mob riots in a consistent and focused campaign of terror designed to crush political opposition to ZANU-PF").

For the Defendant to claim he had no idea his troops committed these atrocities is not credible. It was rejected previously by this Court and it should be rejected again.

### 2. *Defendant Failed to Address the Alleged Crimes.*

The Defendant also claims that Plaintiffs did not demonstrate that he failed to address these war crimes. Def's Memo at 21. Not surprisingly, the Defendant does not provide any evidence or even allegation that a single participant in Operation Dignity or Operation Doom was investigated,

disciplined, court-martialed, or even chastised for the murder of Plaintiffs' family members. To the contrary, all the evidence before this Court reveals that Defendant condoned the behavior. FAC at ¶¶42,109-111.[5]

### 3. The Killings Were Extrajudicial and Deliberate

The Plaintiffs adequately pled that the Defendant committed custodial, extrajudicial killings of multiple members of their families. FAC at ¶¶112-162. The TVPA defines an "Extrajudicial Killing" as a "deliberated killing not authorized by a previous judgment pronounced by a regularly constituted court affording all the judicial guarantees which are recognized as indispensable by civilized people." TVPA § 3(a), note following 28 U.S.C. § 1350. The same section proceeds to exclude from the definition "any such killing that, under international law, is lawfully carried out under the authority of a foreign nation." Id. The Defendant's forces committed extrajudicial killings on the Plaintiffs' family members within that definition.

The Defendant wishes the world to believe these were not extrajudicial killings and instead they were the result of lawful military operations. It is true that the TVPA does not create liability for "collateral civilian casualties resulting from legitimate military operations undertaken in a civil war." TVPA Sen. Rep., at 5. Of course, every war sees the unfortunate collateral deaths of innocent civilians who are mistakenly killed. But neither "Operation Dignity" nor "Operation Doom" is a "legitimate" military operation, and civilian casualties are not "collateral" where, as here, the commander's intent of the operation is to specifically target and kill them.

Under the Rome Statute of the ICC, Article 8, it is a war crime to:

- "Intentionally direct[] attacks against the civilian population as such or against

---

[5] He even promoted one of his officers alleged to have been responsible and who is wanted by the ICC. See "Libya's Haftar Promotes Accused War Criminal Wanted by International Court", MIDDLE EAST EYE, July 9, 2019, at *https://www.middleeasteye.net/news/libyas-haftar-promotes-accused-war-criminal-wanted-international-court.*

individual civilians not taking direct part in hostilities" <u>Id</u>. at §2(b)(i);

- "Intentionally launch[ ] an attack in the knowledge that such attack will cause incidental loss of life or injury to civilians or damage to civilian objects." <u>Id</u>. at §2(b)(iv);
- "Attack[ ] or bombard[ ], by whatever means, towns, villages, dwellings . . . which are undefended and which are not military objectives." <u>Id</u>. at §2(b)(v).

Rome Statute of the International Criminal Court, 8 J. Int'l L. & Prac. 227, 232 (1999). None of these are "legitimate military operations" and all are egregious violations of international law. And those acts—prohibited by the Rome Statute—are precisely what the Defendant allegedly did in this case to the family members of the Plaintiffs. And as the Court noted in the <u>Elzagally</u> and <u>al-Suyid</u> cases, allegations of jus cogens violations at the pleading stage were sufficient to allow the TVPA claims to proceed. Tr. at 14.

<u>**CONCLUSION**</u>

For the reasons set forth above, the Plaintiffs respectfully request that this Court deny the Defendant's Motion to Dismiss and issue a Scheduling Order to allow the matter to proceed to discovery.

Date: March 12, 2021

Respectfully Submitted,

*/s/ Thomas M. Craig*_____
Thomas M. Craig, Esq., VSB #68063
FH+H
1751 Pinnacle Drive
Suite 1000
Mclean, Virginia 22102
(703) 590-1234
(703) 590-0366 fax
tcraig@fhhfirm.com

*/s/ Mark S. Zaid*_____
Mark S. Zaid, Esq.
*Admitted Pro Hace Vice*
D.C. Bar #440532
Mark S. Zaid, P.C.
1250 Connecticut Avenue, N.W.
Suite 700
Washington, D.C. 20036
(202) 454-2809
(202) 330-5610 fax
Mark@MarkZaid.com

*/s/ Matthew Jury*_____
Matthew Jury, Esq.
*Admitted Pro Hace Vice*
NYS Bar # 706563
84 Brook Street
London W1K 5EH
+44 (0) 20 7096-3767
Matthew.Jury@mccue-law.com

*Counsel for Plaintiffs*

_____

**CERTIFICATE OF SERVICE**

I HEREBY CERTIFY that on this 12th day of March, 2021, I electronically filed the

foregoing "Plaintiffs' Memorandum of Law in Opposition to Defendant's Motion to Dismiss"

with the Clerk of the Court using the CM/ECF system, which will send a notification of such

filing to counsel of record for all Parties.

/s/ Thomas M. Craig_____
Thomas M. Craig, Esq.