## UNITED STATES DISTRICT COURT
### EASTERN DISTRICT OF VIRGINIA
### ALEXANDRIA DIVISION

|  |  |  |
|---|---|---|
| ALI ABDALLA HAMZA *et al.* | ) | |
| | ) | |
| | ) | |
| Plaintiffs, | ) | |
| | ) | CIVIL ACTION NO. 20-cv-01038 LMB-JFA |
| v. | ) | |
| | ) | **FILED UNDER SEAL** |
| KHALIFA HIFTER, | ) | |
| | ) | |
| Defendant. | ) | |
| | ) | |

### MEMORANDUM OF LAW IN SUPPORT OF
### PLAINTIFFS' MOTION FOR SUMMARY JUDGMENT ON LIABILITY

Defendant Khalifa Hifter is a Libyan warlord who is a United States citizen and for decades lived in Northern Virginia under the very shadow of this Court. Plaintiffs Ali Abdalla Hamza, Nehma Abdalla Al-Mahdi Hamza, Abdelhalim Abdalla Mahfi Hamza, and Salimah Abudullah Abraheem Jibreel (collectively "Plaintiffs") had their family members murdered in 2017 at the hands of the Defendant through command and control of his military forces within Libya. Defendant did nothing to stop it, took no action in the aftermath, and given there are no adequate judicial remedies for the Plaintiffs to pursue in Libya, liability attaches as a matter of United States law.

### I. UNDISPUTED MATERIAL FACTS

1.  The Defendant, ███████████████████████████ Deposition Transcript of Khalifa Hifter, Nov. 6, 2022, at 26 ("First Hifter Dep. Tr."), attached hereto as PEX 1 (FILED UNDER SEAL), *See also* ECF No. 40 at 1-2. ████████████████

████████████████████████████████████████████████

████████ PEX 1 at 30. ██████████████████ *Id*. at 26. ████████

████████████████████████████████ *Id*. at 26. *See also* ECF No. 34, ECF 40 at ¶2

(Def. Answer); ECF No. 14.

2.      The Defendant admitted he was formally appointed Field Marshal/Commander in

Chief of the Libyan National Army ("LNA") ████████████████████████

████████████████████████ *Id*. at 43. *See also* ECF No. 34; ECF No. 45 at 3;

ECF No. 40 at ¶39; Declaration of Defendant Khalifah Hifter, Apr. 22, 2022, KH_000001 –

KH000063, attached hereto as PEX 33 at 1 (FILED UNDER SEAL).[1]

3.      The LNA is a coalition of armed groups founded by the Defendant in May 2014

and has evolved from a loose alliance of militias towards a hierarchical organization tightly

controlled by the Defendant, his sons, close relatives, and associates. *See* Expert's Report by

Wolfram Lacher at § 2, ¶1, p.1, attached hereto as PEX 2.

4.      The Defendant was excluded from the political coalition that would ultimately form

the Libyan Government of National Accord, which received unanimous recognition from the U.N.

Security Council as the "sole legitimate government of Libya" in December 2015. *See* UN Security

Council Resolution, S/RES/2259 (2015), attached hereto as PEX 3.

5.      Despite this exclusion, the Defendant took up a role as General Commander of the

Armed Forces of the LNA and became the top official in the eastern-based authorities. He was

appointed to the role by Aguila Saleh (Speaker of the Libyan House of Representatives) in March

2015, and despite nominally reporting to him, is more powerful than Saleh, and is *de facto* leader

of the Eastern breakaway state. PEX 2 at §2 ¶6.

---

[1] This unsolicited and self-serving sworn declaration was submitted by the Defendant as part of his responses to the Plaintiffs' First Set of Interrogatories and Requests for Production.

6.      Plaintiff Ali Abdalla Hamza ("Hamza"), a Libyan-Canadian citizen, is the son of decedent Aalya Faleh Al-Derbali ("Aalya") and a brother of decedents Ibrahim Abdalla Hamza Al-Jarari ("Ibrahim") and Mahmoud Naser Abdalla Hamza Al-Jarari ("Nasar"), and their sisters, Fairha Abdalla Hamza Al-Jarari ("Fairha") and Faiza Abdalla Hamza ("Faiza").

7.      Plaintiff Nehma Abdalla Al-Mahdi Hamza is a Libyan citizen and resident, and is the son of Aalya Hamza, and a sister of Ibrahim, Naser, Fariha and Faiza Hamza.

8.      Plaintiff Abdelhalim Abdalla Mahdi Hamza is a Libyan citizen and resident, and is the son of Aalya Hamza and the brother of Ibrahim, Naser, Fariha and Faiza.

9.      Plaintiff Salimah Jibreel is a Libyan citizen and resident, along with her husband and their four children. Three of Plaintiff Jibreel's children were killed on January 5, 2017, Aziza (3), Maryam (8) and Mohammad (11). She has one surviving child, Mayada. Plaintiff Jibreel's husband, Alaa, was detained by LNA forces without charges on March 19, 2017 and remains in incommunicado detention. Deposition Transcript of Salimah Jibreel ("Jibreel Dep. Tr."), at 41:3-58:24, attached as PEX 4.



10.     ███████████████████████████████████████

███████████████████████████████████████████

███████████████████████████████████████████

█████████████████████████   Deposition Transcript of Khalifa Hifter, June 26, 2023, at 203 ("Second Hifter Dep. Tr."), attached hereto as PEX 5 (FILED UNDER SEAL).

11.     The Defendant agreed that ████████████████████████████

███████████████████████████████████████████

███████████████████   *Id*. at 202.

12.     The Defendant ███████████████████████████████████████

████████████████████████████████████████████████████████████████

█████████████████████████████████████████████ (PEX 1 at 51) and are

attached hereto as PEX 6A, PEX 6B, and PEX 6C (FILED UNDER SEAL). ██████

███████████████████████████ See PEX 6A at KH000118, PEX 6B at KH000146, and PEX

6C at KH000175.[2]

13.     ███████████████████████████████████████████████

███████████████████ ECF No. 40 at ¶41. PEX 1 at 27 and 78-79. (FILED UNDER SEAL).

14.     In practice, however, the LNA opened hostilities against a wide range of armed

groups that included jihadists, but also revolutionary armed groups. Following the beginning of

the LNA operation in May 2014, these groups joined together as the "Benghazi Revolutionaries

Shura Council" ("BRSC"). *See* UN Human Rights Council, *Investigation by the Office of the*

*United Nations High Commissioner for Human Rights on Libya: detailed findings*,

A/HRC/31/CRP.3 (Feb. 15, 2016), p. 18, attached hereto as PEX 7; PEX 2, §3, ¶13 pp.4-5.

15.     On May 16, 2014, the Defendant and forces aligned to him declared the launch of

"Operation Dignity." This operation conducted attacks on several jihadist groups Benghazi and

the surrounding areas. ECF No. 40 at ¶41; PEX 2 at § 1, ¶3 p.2.

16.     The BRSC took control of much of Benghazi, Libya, during July-August 2014,

pushing LNA-affiliated groups to the city's outskirts. In October 2014, an uprising by LNA-

affiliated cells of civilians allowed the LNA to take back control of Benghazi's eastern suburbs.

*Id*. *See also* Amnesty International, *Benghazi's descent into chaos: Abductions, summary killings*

---

[2] ████████████████████████████████████████████████████████
████████████████████████████████████

*and other abuses*, London 2015, attached hereto as PEX 8. Over the subsequent year, LNA progress against its adversaries was slow. In late 2014, an affiliate of Islamic State emerged in Benghazi to fight against the LNA separately from the BRSC. PEX 8, p. 25.

17.     From the outset of Operation Dignity, Hifter began creating a hierarchical, centralized command structure with an operation (from August 2014 onwards) and appointments of commanders for different frontlines in Benghazi. *See* Tim Eaton, *The Libyan Arab Armed Forces* (June 2021) at 14, attached hereto as PEX 9; Wolfram Lacher, *A Most Irregular Army: The Rise of Khalifa Haftar's Libyan Arab Armed Forces* (Nov. 2, 2020), at 9, attached hereto as PEX 10. *See also* Libya's Channel, coverage of Hifter's meetings with senior officers and frontline commanders: Libya's Channel القتال في مدينة بنغازي ويفطر مع الجنود حفتر ي جري زيارة ميدانية لمحاور *[Hifter Makes a Field Visit to Frontlines in Benghazi and Breaks Fast with the Soldiers]* (July 16, 2015), attached hereto as PEX 11; LNA Media Office, العام للقوات المسلحة العربية الليبية بقادة محاور جبهات القتال جتماع القائد *[Meeting of the General Commander of the Libyan Arab Armed Forces with Frontline Commanders]*, Oct. 10, 2015; LNA Media Office, قادة محاور القتال في مقر غرفة عمليات الكرامة ببنغازي القائد العام للقوات المسلحة يلتقي *[The General Commander of the Armed Forces meets with Frontline Commanders at the Seat of the Dignity Operations Room in Benghazi]*, Feb. 18, 2016. *See further* PEX 2, §1 ¶8 p.3. In March 2015, Hifter's appointment as General Commander formalized his de facto leadership of this structure. *Id.*

18.     From the beginning of the Benghazi war, pilots and their fighter jets were under Hifter's direct control via his close associate, Saqr al-Jaroushi, while most of the forces that adhered to Hifter's operation were local armed groups from Benghazi and the surrounding area. They included armed groups led and dominated by civilians, as well as army units that had absorbed many civilians and had devolved into militia-like units. These forces had their own

leaders, weapons, internal loyalties, and motivations to participate in Hifter's operation, but were under his command and control. PEX 2, §2, ¶9 p.3; PEX 9, pp.15-16; PEX 10, pp.9-10.

19.     In July-October 2016, the LNA gained further territory. By late 2016, the LNA's adversaries were confined to the Ganfouda area, where the Plaintiffs' family resided, as well as the al-Sabri and Suq al-Hout areas of central Benghazi. PEX 2 at § 3 ¶14, p. 5. *See also* Ayman al-Warfalli, "East Libyan Army Claims Control of Long-Contested Benghazi District", Reuters (Nov. 17, 2016), attached hereto as PEX 12.

20.     In sum, by late 2016, Hifter exerted both formal and de facto command-and-control over the forces fighting for the LNA in and around Benghazi. He also exerted de facto authority over civilian politics and the economy in eastern Libya, such as by directing Chief of Staff al-Nadhuri (his subordinate) during autumn 2016 to appoint military governors to replace elected municipal councils in several eastern cities, including Benghazi. PEX 2 at §2, ¶11, p. 4. *See also* UN Security Council, *Final report of the Panel of Experts on Libya established pursuant to resolution 1973 (2011)*, S/2017/466 (June 1, 2017), p. 11, attached hereto as PEX 13.

>The 2016 U.S. State Department report on Libya described the LNA's siege of Ganfounda:
>
>According to AI [Amnesty International], under an LNA military blockade, hundreds of civilians, including Libyans and foreign nationals, remained trapped in the Ganfouda neighborhood of Southwest Benghazi and suffered from a severe shortage of water, food, medical supplies, and electricity. On December 10, [2016] the LNA announced a temporary, six- hour ceasefire to allow the evacuation of civilians. Only a handful of civilians, however, were able to leave the besieged Benghazi neighborhood. The UN condemned the failure of the LNA to assure safe passage to civilians during its pledged cessation of hostilities…AI also reported indiscriminate and disproportionate shelling of the densely populated Benghazi neighborhood of Ganfouda.

U.S. Department of State, *2016 Country Reports on Human Rights Practices: Libya*, https://www.state.gov/wp-content/uploads/2019/01/Libya-2.pdf (last visited Feb. 23, 2024) attached hereto as PEX 14.

21.     The Amnesty International report relied upon by the State Department was based upon the collective testimony of 130 Libyan families and hundreds of foreign nationals who were trapped in Ganfouda during the siege. *See* Amnesty International, *Libya: Civilians trapped in Benghazi in desperate conditions as fighting encroaches* (Sept. 30, 2016), https://www.amnesty.org/en/latest/press-release/2016/09/libya-civilians-trapped-in-benghazi-in-desperate-conditions-as-fighting-encroaches/, attached hereto as PEX 15.

22.     The LNA adopted an openly distributed policy not to allow any male of fighting age to leave Ganfouda. *See* Human Rights Watch, *Libya: Civilians Under Siege in Benghazi* (Nov. 2, 2016, 12:00 AM), https://www.hrw.org/news/2016/11/02/libya-civilians-under-siege-benghazi, attached hereto as PEX 16. This included boys as young as fifteen.

23.     ██████████████████████████████████████████████
███████████████████████████████████████ PEX 5 at 84, 87.

24.     Following the capture of Ganfouda in early 2017 by the LNA, the last remaining pockets of resistance in central Benghazi were eventually cleared out in December 2017. PEX 2 at § 2, ¶11, p. 4. *See also* UN Security Council, *Report of the Secretary-General on the United Nations Support Mission in Libya*, S/2018/140 (Feb. 12, 2018), p. 4, attached hereto as PEX 17.

25.     LNA's air force and affiliated armed groups indiscriminately targeted civilians whom they believed to oppose the LNA. PEX 2 at § 3, ¶14, p. 5. Commanders in the LNA's operation also indiscriminately targeted "Misratans" – members of families whose origins lay in the city of Misrata – due to their origins and alleged political orientation. *Id*. Thousands of members of such families fled to western Libya; LNA-affiliated armed groups seized or destroyed many of their properties. *Id*. *See also* OHCHR/UNSMIL, *Report on the Human Rights Situation in Libya* (Nov. 16, 2015), p. 9, attached hereto as PEX 18; PEX 8, pp. 16-20; PEX 7, pp. 33-34;

Human Rights Watch, *Libya: Displaced Benghazi Families Prevented From Return* (Feb. 1, 2018), attached hereto as PEX 19.

26.    Human rights organizations and the United Nations ("UN") have documented in great detail the extrajudicial killings, arbitrary detention, and torture committed on a large scale by LNA-affiliated forces, under the command and control of the Defendant, in and around Benghazi. *See* PEX 7, pp. 21-22; United Nations Office of the High Commissioner on Human Rights, *Abuse Behind Bars: Arbitrary and unlawful detention in Libya* (Apr. 2018), pp. 19-20, 27-30, 33-34, attached hereto as PEX 20; Human Rights Watch, *Libya: Widespread Torture in Detention*, 2015, attached hereto as PEX 21. Among the most infamous of those acts was the videotaped mass executions of prisoners carried out by Mahmoud al-Warfalli, an officer in the Saeqa Special Forces (itself part of the LNA), between 2016 and 2018. PEX 2 at § 3, ¶14, p. 5. *See also* International Criminal Court, *Situation in Libya: ICC Pre-Trial Chamber I issues a second warrant of arrest* (July 5, 2018), attached hereto as PEX 22. ███████████████████████████ PEX 1 at 67, ████████████████████████████████████ Deposition Transcript of Wolfram Lacher, Nov. 3, 2021, at 52:1-18, attached hereto as PEX 23.

27.    The tactics employed by the LNA during subsequent offensives have replicated those it used in Benghazi. As stated by ICC Prosecutor Fatou Bensouda in December 2020, the pattern of violence used by the LNA in its Tripoli offensive involved "the indiscriminate airstrikes and shelling of civilian areas; arbitrary abduction; detention and torture of civilians; extrajudicial killings; enforced disappearances; and pillaging of civilian property, repeating a pattern of violence that has been previously reported in places such as Benghazi, Derna, Ajdabiya, Marzuq and Sirte". *See* International Criminal Court, *Statement of ICC Prosecutor to the United Nations Security Council on the Situation in Libya, pursuant to UNSCR 1970 (2011)* (Nov. 10, 2020), attached

hereto as PEX 24. It is notable, for example, that the LNA used starvation as a tactic both in the Ganfouda area of Benghazi and in the city of Darna, on which it had long imposed a siege before launching its offensive. PEX 2 at §3, ¶16, p. 6. *See also* Human Rights Watch, *Libya: Battle for City Endangers Civilians* (May 14, 2018), attached hereto as PEX 25; Human Rights Watch, *Libya: Civilians Caught in Tightening Siege* (Feb. 22, 2019), attached hereto as PEX 26.

28.     In October 2020, LNA and GNA representatives signed a ceasefire agreement under UN auspices, which stipulated that foreign forces should withdraw from Libya within three months. In March 2021, the UN-led political process led to the formation of a new Government of National Unity ("GNU"). The parallel government in eastern Libya dissolved itself. However, the LNA has refused to recognize the authority of the GNU and no withdrawal of foreign forces has taken place. PEX 2 at § 3, ¶18, pp.6-7. *See also* UN Security Council, *United Nations Support Mission in Libya Report of the Secretary-General*, S/2021/752 (Aug. 25, 2021), p. 2, attached hereto as PEX 27; Sarah Vernhes, *Libya: Khalifa Haftar Prepares For Battle*, The Africa Report (Aug. 20, 2021), attached hereto as PEX 28.

29.     Regional disputes have continued since the cease fire was announced, and no elections have taken place. *See* Center for Preventative Action, Civil Conflict in Libya, *Civil Conflict in Libya: Recent Developments* (Sept. 19, 2023), available at https://www.cfr.org/global-conflict-tracker/conflict/civil-war-libya#RecentDevelopments-2, attached hereto as PEX 29.

30.     For purposes of the legal arguments presented in this Motion, notably as a factual consequence of Operation Dignity (*see infra* ¶15):

(i)     The Plaintiffs' families were forced from their homes in the Al-Laitti and Bu-Atni neighbourhoods of Benghazi. Deposition Transcript of Ali Abdalla Hamza, Oct. 28, 2021, at 30:1-31; ("Ali Hamza Dep. Tr."), attached hereto as PEX 30 .

(i)    In February 2016, while trying to flee Ganfouda, Plaintiff Jibreel's boat was attacked by naval and air forces and so they were forced to cease attempting to escape. PEX 4 at 18:1 – 19:11;

(ii)   The Plaintiffs' families' homes were looted. *Id*. at 60;

(iii)  On August 24, 2016, Plaintiff Jibreel's son, Mohammad, was shot in the leg on his 11th birthday by LNA soldiers while playing in the street with a friend. *Id*. at 34, 36;

(iv)   Seeking refuge in Ganfouda, the Hamza family were subsequently attacked again by the Defendant's forces and were placed under siege. PEX 30 at 30:1-25;

(v)    The Defendant's forces prevented the Hamza and Jibreel families from leaving Ganfouda, and forced them to resort to eating grass and drink seawater. PEX 4 at 68:1-25; PEX 30 at 43:1-15;

(vi)   On December 16, 2016, Plaintiff Jibreel personally witnessed air strikes on Ganfouda that were carried out by the LNA, and which led to the destruction of the property that Plaintiff Jibreel and her family had been staying in. PEX 4 at 38:1-25;

(vii)  On January 5, 2017, LNA air strikes directly killed three of Plaintiff Jibreel's children, leaving only her, her husband and their daughter alive. *Id*. at 41;

(viii) On January 26, 2017, the Hamza Plaintiffs' mother, two brothers and three sisters took shelter in an unoccupied apartment building known as "Block 12". Deposition Transcript of Abdalhalem Hamza, October 28, 2021, at 24:1-25, ("Abdalhalem Hamza Dep. Tr."), attached at PEX 31;

(ix)   The Hamza Plaintiffs' brother, Ibrahim, was murdered on February 26, 2017, when the Defendant's forces fired a tank shell into Block 12. This attack injured the Hamza Plaintiffs' mother. PEX 30 at 75:1-25; PEX 31 at 32:1-25;

(x)    On February 28, 2017, the Hamza Plaintiffs' sister Fariha's leg was severed during another LNA strike, and she died on March 2, 2017, from her injuries. PEX 30 at 76. Plaintiff Jibreel personally witnessed her death. PEX 4 at 69:1-25;

(xi)   Block 12 was bombarded by LNA forces from later February 2017 to mid-March 2017, and these attacks also included sustained assaults by ground shelling, and aerial assaults; PEX 30 at 34:1-36:19.

(xii)  While trying to escape on March 18, 2017, the Defendant's forces killed the Hamza Plaintiffs' brother Naser, their mother Aalya and his sister Faiza. PEX 31 at 36. Following the Hamza Plaintiffs' mother's murder, video footage emerged of LNA forces specifically desecrating her corpse. PEX 30 at 43:1-44:25, 51, PEX 2 at § 4, ¶24-25, p. 9. *See also* News Channel, *Libya 'war crimes' videos shared on social media*, YouTube (May 1, 2019), https://www.youtube.com/watch?v=dMdSYQ98Vr0 (video of Hamza family bodies).

(xiii) In the same LNA attack, the Hamza Plaintiffs' sister Abtesam was shot and captured but did not die of her wounds. PEX 30 at 32:1033:25. During her detention by the Defendant's forces, she was beaten with a steel pipe and was eventually released;

(xiv)  Also on Mar. 18, 2017, while attempting to flee Plaintiff Jibreel's husband was shot while carrying their infant daughter, and they were captured by LNA forces and imprisoned. PEX 4. at 44:1-25;

(xv)   During their detention Plaintiff Jibreel was held first in a Police station near Ganfouda and then in Kuwayfiyah Prison in Benghazi. Plaintiff Jibreel and her daughter were later freed as part of a prisoner exchange. PEX 4. at 47:1-25, 52:1-25, 55:1-25; and

(xvi)   During his detention Plaintiff Jibreel's husband was tortured by LNA forces. PEX 4. at 57:1-25. The effect of the torture was so severe that his own daughter was unable to recognise him during a brief prison visit. *Id*. at 60:1-61:25.

## II.   **ARGUMENT**

Before this Court are the Plaintiffs' claims (Count Seven) under the Torture Victim Protection Act of 1991 ("TVPA"), 106 Stat. 73, note following 28 U.S.C. § 1350, which authorizes a cause of action against "[a]n individual" for acts of torture and extrajudicial killing committed under authority or color of law of any foreign nation." *Mohamad v. Palestinian Auth.*, 566 U.S. 449, 451 (2012). *See* ECF No. 8 at ¶¶199-211. As a matter of law, the Defendant is responsible and liable for the deaths of the Plaintiffs' family members in Libya.[3] The TVPA provides:

"An individual who, under actual or apparent authority, or color of law, of any foreign nation—

---

[3] That these crimes occurred in Libya is of no consequence. The language of the TVPA "naturally contemplates conduct occurring in the territory of a foreign sovereign." *Warfaa v. Ali*, 33 F. Supp. 3d 653, 659 (E.D.Va. 2014)(Brinkema, J.), *citing* 28 U.S.C. § 1350 note. *See also Kiobel v. Royal Dutch Petro. Co*., 569 U.S. 108, 125 (2013)(TVPA addresses "human rights abuses committed abroad")(Kennedy, J., concurring); *Chowdhury v. Worldtel Bangladesh Holding, Ltd*., 746 F.3d 42, 51 (2d Cir. 2014)("no bar on the basis of extraterritoriality to [the plaintiff's] TVPA claim").

"(1) subjects an individual to torture shall, in a civil action, be liable for damages to that individual; or

"(2) subjects an individual to extrajudicial killing shall, in a civil action, be liable for damages to the individual's legal representative, or to any person who may be a claimant in an action for wrongful death."

28 U.S.C. § 1350, note, § 2(a).

In *Mohamad*, the Supreme Court made it clear that "the TVPA contemplates liability against officers who do not personally execute the torture or extrajudicial killing." 566 U.S. at 458 (citation omitted). Even before *Mohamad*, virtually every court to address the issue "recogniz[ed] secondary liability for violations of international law since the founding of the Republic." *Aziz v. Alcolac, Inc.*, 658 F.3d 388, 396 (4th Cir. 2011)(internal quotation marks and alterations omitted); *accord Doe VIII v. Exxon Mobil Corp.*, 654 F.3d 11, 19 (D.C. Cir. 2011), *citing The Presbyterian Church of Sudan v. Talisman*, 582 F.3d 244, 258-59 (2d Cir. 2009); *Khulumani v. Barclay Nat'l Bank*, 504 F.3d 254, 260 (2d Cir. 2007)(*per curiam*); *Sinaltrainal v. Coca-Cola Co.*, 578 F.3d 1252, 1258 n.5 (11th Cir. 2009), *abrogated on other grounds*, *Mohamad*, 566 U.S. at 452 & n.2. The Fourth Circuit has also appropriately noted that "the political branches already have indicated that the United States will not tolerate acts of torture, whether committed by United States citizens or by foreign nationals." *Al Shimari III v. CACI Premier Tech. Inc.*, 758 F.3d 516, 530 (4th Cir. 2014).

The Defendant, as a military leader and in command of the Libyan National Army ("LNA"), murdered, or as more properly termed under international law, committed the extrajudicial killing of, the Plaintiffs' family members.[4] As recognized by this Court in *Bashe Abdi*

---

[4] As the TVPA prescribes a limitations period of ten years from the date the cause of action arose, 28 U.S.C. § 1350 note sec. 2(c), and the killings occurred in 2017, this lawsuit was timely filed.

*Yousuf v. Mohamed Ali Samantar*, 2012 U.S. Dist. LEXIS 122403 (E.D.Va. Aug 28, 2012)(Brinkema, J.), for command responsibility to apply, three elements must be established:

> (1) [A] superior-subordinate relationship between the defendant/military commander and the person or persons who committed human rights abuses;
>
> (2) the defendant/military commander knew, or should have known, in light of the circumstances at the time, that subordinates had committed, were committing, or were about to commit human rights abuses; and (3) the defendant/military commander failed to take all necessary and reasonable measures to prevent human rights abuses and punish human rights abusers.

*Id*. at *31-32, *quoting Chavez v. Carranza*, 559 F.3d 486, 499 (6th Cir. 2009), *citing Ford v. Garcia*, 289 F.3d 1283, 1288 (11th Cir. 2002); *see also Hilao v. Estate of Marcos*, 103 F.3d 767, 776-79 (9th Cir. 1996)(same); *see generally Doe v. Qi*, 349 F. Supp. 2d 1258, 1329 (N.D. Cal. 2004)("The principle of command responsibility that holds a superior responsible for the actions of subordinates appears to be well accepted in U.S. and international law in connection with acts committed in wartime . . . ."), *citing In re Yamashita*, 327 U.S. 1, 14-16 (1946).

The command responsibility doctrine imposes liability upon civilian and military commanders for the unlawful acts of their subordinates, even if that commander "[n]either committed [n]or directed the commission of such acts." *Id. See also Garcia*, 289 F.3d at 1286 (command responsibility doctrine "makes a commander liable for acts of his subordinates, even where the commander did not order those acts, when certain elements are met."). As the Supreme Court explained, civilian populations would face an increased risk of harm "if the commander of an invading army could with impunity neglect to take reasonable measures for their protection." *In re Yamashita*, 327 U.S. at 15.

In recognizing the doctrine, this Court noted "the *Chavez* test accords with the legislative history of the TVPA, which explains that 'higher official need not have personally . . . ordered the abuses in order to be held liable.'" *Samantar*, 2012 U.S. Dist. LEXIS 12, *32, citing S. Rep. No.

102-249, at 9 (1991). Rather, "[u]nder international law, responsibility for torture, summary execution, or disappearances extends beyond the person or persons who actually committed those acts — anyone with higher authority who authorized, tolerated or knowingly ignored those acts is liable for them." *Id*.

Sadly, the legal issue of command responsibility continues to be judicially addressed in the present day. In the years since atrocities of the 1980s-90s, the International Tribunals for Rwanda and the former Yugoslavia have repeatedly applied the doctrine of command responsibility and accepted that effective control of a commander over his troops is required before liability will be imposed. The consensus is that "the concept of effective *control* over a subordinate – in the sense of a material ability to prevent or punish criminal conduct, however that control is exercised – is the threshold to be reached in establishing a superior- subordinate relationship." *Prosecutor v. Delalic* (Appeals Chamber ICTY, Feb. 20, 2001) ¶256; *accord id.* at ¶266; *Prosecutor v. Aleksovski*, Judgment (Appeals Chamber ICTY, Mar. 24, 2000) ¶76; *Prosecutor v. Blaskic*, Judgment (Trial Chamber ICTY, Mar. 3, 2000) ¶¶295, 302 ("Proof is required that the superior has effective control over the persons committing the violations of international humanitarian law in question, that is, has the material ability to prevent the crimes and to punish the perpetrators thereof."); *Prosecutor v. Kayishema*, Judgment (Trial Chamber ICTR, May 21, 1999) ¶229 ("material ability to control the actions of subordinates is the touchstone of individual responsibility under Article 6(3)"); *Prosecutor v. Delalic*, Judgment (Trial Chamber ICTY, Nov. 16, 1998) ¶¶ 377, 378; *Prosecutor v. Akayesu*, Judgment (Trial Chamber 1, ICTR, Sept. 2, 1998) ¶491.[5] *See also Doe v. Drummond Co.*, 782 F.3d 576, 610 (11th Cir. 2015) (command

---

[5] ICTR and ICTY Judgment lists are available at each respective Tribunal website, which was last visited February 23, 2024, at https://www.icty.org/en/cases/judgement-list (for ICTY) and

responsibility doctrine "is available if the requisite degree of responsibility, authority, and control is present to support liability."). Of course, for more than a century our courts have considered that "international law is part of our law." *The Paquette Habana*, 175 U.S. 677, 700 (1900).

A showing of a defendant's actual ability to control guilty troops is required as part of the plaintiff's burden under the superior-subordinate prong of command responsibility, whether the plaintiff attempts to assert liability under a theory of *de facto*[6] or *de jure*[7] authority. *See Delalic*, P 196 ("Effective control has been accepted, including in the jurisprudence of the Tribunal, as a standard for the purposes of determining superior responsibility. ... The showing of effective control is required in cases involving both *de jure* and *de facto* superiors.").

―――――――――――――――――――

https://unictr.irmct.org/en/cases/trial-judgements (for ICTR). A foreign judgment that shows no sign of being unreliable should be admitted under public-records exception to the hearsay rule, unless it appears to lack trustworthiness. The burden is on the party opposing its admission to show lack of trustworthiness. *U.S. v. Garland*, 991 F.2d 328, 335(6th Cir. 1993).

[6]A de facto superior-subordinate relationship exists under the command responsibility doctrine when "one party—the superior—has acquired over one or more people enough authority to prevent them from committing crimes or to punish them when they have done so." Guénaël Mettraux, The Law of Command Responsibility 142-43 (2009), attached hereto as PEX 32. "A de facto superior must be (1) "cognizant of his position vis-à-vis other persons whose conduct he is responsible for," and (2) "aware of the duties which his relationship with another person, or group of persons, implied for him (in particular, a duty to prevent and punish crimes) and must have accepted this role and responsibility, albeit implicitly*." Id*. at 145.

[7]A de jure superior-subordinate relationship exists for purposes of the command responsibility doctrine when "the superior has been appointed, elected or otherwise assigned to a position of authority for the purpose of commanding or leading other persons who are thereby to be legally considered his subordinates." A formal title or position of authority is insufficient to establish a superior subordinate relationship; rather, "any inference concerning the relationship of subordination" must be "accompanied by the powers and authority normally attached to such a role." *Id*. at 141. A defendant in a position of de jure authority exercises effective control over his subordinates when he "was effectively able to enforce his legal authority through the exercise of his legal powers over the perpetrators." *Id*. at 174.

16

As the Eleventh Circuit adopted in *Garcia*, "*Delalic* indicates that *de jure* authority of a commander over the troops who perpetrated the underlying crime is prima facie evidence of effective control, which accordingly can be rebutted only by the defense putting forth evidence to the finder of fact that the defendant lacked this effective control." *Garcia*, 289 F.3d at 1291. *See* Black's Law Dictionary (7th ed. 1999) 579 (defining prima facie evidence as "evidence that will establish a fact or sustain a judgment unless contrary evidence is produced"). As will be detailed below, the Plaintiffs can factually and legally demonstrate the Defendant exercised the requisite degree of control over his military forces and as a result is liable to the Plaintiffs for the extrajudicial killing of their family members.

**A.   Defendant Hifter Held Command Responsibility Over The LNA.**

The Defendant, through his military forces, committed the extrajudicial killing of the Plaintiffs' loved ones. ECF No. 8, ¶208. Extrajudicial killing has long been condemned by international law. *See Doe I v. UNOCAL Corp.*, 395 F.3d 932, 959 (9th Cir. 2002); *Presbyterian Church of Sudan v. Talisman Energy, Inc.*, 244 F. Supp. 2d 289, 345 (S.D.N.Y. 2003).

The Defendant has conceded to this Court, both through his legal filings and in his sworn depositions, that he "is the commander of an army in Libya which is in ongoing civil war." ECF No. 14. Of particular value are his acknowledged admissions, a selection of which are provided below:

- ███████████████████████████████████████████ PEX 1 at 27, 40;
- ████████████████████████████ *Id*. at 43;
- ████████████████████████████████████████████ *Id*. at 44;

17

- ███████████████████████████████████████ *Id*. at 74.

These facts are also supported by the uncontested expert evidence adduced by the Plaintiffs:

> The LNA is a coalition of armed groups founded by Khalifa Hifter in May 2014, and led by him ever since. PEX 2 at §1 ¶ 2 p.1;

> The LNA, later increasingly referred to itself as the Libyan Arab Armed Forces, though LNA continues to be used in English language coverage. Both names are used interchangeably in this report. Neither name is the official designation for Libya's military according to legislation. Both names therefore underline the character of the LNA as Hifter's personal organization. Tellingly, "Libyan National Army" was also the name of a paramilitary organization Hifter founded and led in the late 1980s, when he was part of an exiled opposition group. "Operation Dignity" is also continually used to refer to Hifter's forces. *Id*. at §1 ¶ 4 p.2;

> During 2015 and 2016, Hifter gradually centralized authority over the forces in his alliance, using his exclusive access to foreign military support as an instrument to promote loyalists and sideline challengers. Hifter set up new units in order to counterbalance the weight of pre-existing armed groups over which he had limited influence. These units were led by close loyalists. *Id*. at § 2 ¶ 11-12 p.4.

Accordingly, there should be no doubt in the Court's mind as to the role of the Defendant as the commander of the LNA.

### i.    A Superior-Subordinate Relationship Exists Between The Defendant And Those LNA Forces Who Committed The Extrajudicial Killings.

The Defendant was in 2017, when the Plaintiffs' family members were murdered, and still is now, in full control of the LNA. ██████████████████████████████████████

██████████████████████████ PEX 1 at 211.[8]

---

[8] Although the Defendant's depositions were conducted through a certified Arabic translator, the Defendant, who lived in the United States for decades, often answered questions in English, even before the question had been translated. At no time did the Defendant remark he did not understand or comprehend a question or the substance that was being discussed.

1.   The Defendant Acknowledged He and His Military Forces Were Aware of
     Their International Law Obligations and Prohibitions.

Under oath, the Defendant testified that:



- ████████████████████████████████████████ PEX 5 at 202; (FILED UNDER SEAL).

- ████████████████████████████████████████
  ████████████████████████████████████████
  ███████████████████ *Id.* at 205-06;

- ████████████████████████████████████████
  ████████████████████████████████████████
  ████████████████████████████████████████
  ████████████████████ attached hereto as PEX 6D (FILED UNDER SEAL).

████████████████████████████████████████████

█████████████████ PEX 1 at 159, the Defendant acknowledged ████████████

████████████████████████████████████████ PEX 33

KH_000001 at ¶6. Even if that statement were true, and there is absolutely no evidence of it beyond

a self-serving defensive comment, the Defendant bears legal responsibility for ensuring that any

member of his forces who commits an unlawful act is properly disciplined/prosecuted.

Importantly, the Defendant explicitly acknowledged that ████████████████████

████████████████████████████████████████████

████████████████████████████████████████████

█ PEX 5 at 204.

Brazenly, the Defendant claimed in written responses that he ████████████████

████████████████████████ Defendant's Responses to Plaintiffs' First Set of

19

Interrogatories and Requests for Production (Apr. 28, 2022) at 5, 7-8, attached hereto as PEX 34 (FILED UNDER SEAL). Yet no one was ever prosecuted, much less had charges filed against them by the Defendant, with respect to the murder of the Plaintiffs' family members or concerning any other atrocities alleged to have been committed by the LNA. International efforts to seek accountability and justice for atrocities committed by LNA forces have been completely thwarted by the Defendant and his allies. *See* Human Rights Watch, Libya: ICC Reignites Hole for Long-Delayed Justice, Dec. 4, 2022, available at Human Rights Watch, *Libya: ICC Reignites Hope for Long-Delayed Justice* (Dec. 4, 2022, 12:01 AM), *https://www.hrw.org/news/2022/12/04/libya-icc-reignites-hope-long-delayed-justice,* attached hereto as PEX 35.

For example, Al-Werfalli, under the command and control of the Defendant, is alleged to have directly committed and ordered the murders of at least 33 persons in seven incidents in Benghazi and the surrounding areas. The crimes are alleged to have taken place on or before June 3, 2016, until on or about July 17, 2017. *See* International Criminal Court, *Pre-Trial Chamber I: Situation in Libya in the Case of The Prosecutor v. Mahmoud Mustafa Busayf Al-Werfalli* (Aug. 15, 2017), https://www.icc-cpi.int/sites/default/files/CourtRecords/CR2017_05031.pdf (International Criminal Court arrest warrant), attached hereto as PEX 36. The Defendant declined to comply with international law and turn his subordinate over to the International Criminal Court or prosecute him nationally. *See* Coalition for the International Criminal Court, Mahmoud Mustafa Busayf Al-Werfalli, https://www.coalitionfortheicc.org/cases/mahmoud-mustafa-busayf-alwerfalli#: (last visited Feb. 23, 2024), attached hereto as PEX 37 (noting Al-Werfalli to be in LNA custody). Al-Werfalli is now dead and proceedings terminated June 15, 2022. The International Criminal Court, Office of the Prosecutor released a public notice of his death on June 20, 2022.  *See* International Criminal Court, *Pre-Trial Chamber I: Situation in Libya in the Case*

20

*of The Prosecutors v. Mahmoud Mustafa Busayf Al-Werfalli* (June 20, 2022), https://www.icc-cpi.int/sites/default/files/CourtRecords/CR2022_04899.PDF, attached hereto as PEX 38.

> **ii.      The Defendant Knew, Or Should Have Known, in Light of the Circumstances at the Time, That his Subordinates had Committed, Were Committing, or Were About to Commit Human Rights Abuses to Include the Extrajudicial Killing of the Plaintiffs' Family Members.**

In the absence of an effective judicial and security apparatus within Libya, civilian casualties have been rampant and are rarely investigated. As noted in the U.S. State Department's 2019 Country Report on Human Rights Practices for Libya (Mar. 11, 2020):

> There were many reports of civilian casualties as result of the continuing hostilities. Shelling, gunfire, airstrikes, and unexploded ordnance killed more than a thousand persons, including civilians, during the year. Between January and October, the UN Office of the High Commissioner for Human Rights (OHCHR) documented the deaths of 218 civilians and the injury of 289 others. In July the World Health Organization estimated the number of deaths in broader Tripoli since April was 1,093, including 106 civilians, and 5,752 wounded, including 294 civilians.

Available at U.S. Department of State, *Libya 2019 Human Rights Report*, https://www.state.gov/reports/2019-country-reports-on-human-rights-practices/libya/ (last visited Feb. 23, 2024) attached hereto as PEX 39. Press reports and official international government experts identified the LNA and its aligned forces as being responsible for numerous airstrikes that killed civilians. *Id.*

Who was responsible for the extrajudicial killing of the Plaintiffs' family members cannot be disputed. There were no other military forces in or around their locations other than those under the control and command of the Defendant. The Plaintiffs' expert testified that the "siege and starvation of Ganfouda were a tactic ordered by the LNA command" and that those responsible were under the command and affiliated with the Defendant. PEX 23 at 46-48.

The Plaintiffs' expert further explained:

> The LNA's responsibility for the siege on the Ganfouda area from July 2016 until the full capture of the area in March 2017 has been widely documented by the UN and international human rights organizations. The LNA prevented all food and other essential supplies from reaching Ganfouda and cut off water and electricity from the area. A senior LNA officer, Col. Ahmed al-Areibi – then the military governor of Benghazi appointed by Chief of Staff Abderrazeq al-Nadhuri – engaged with the UN, non-governmental organizations and mediators on the Ganfouda siege. The LNA set conditions for the evacuation of Ganfouda residents, refusing to evacuate any males between ages 15 and 65. The BRSC demanded that residents be allowed to leave by boat for western Libya. In late August 2016, referring to Ganfouda, LNA official Belaid al-Sheikhi – Hifter's coordinator for tribal affairs – declared at a televised meeting that "no person aged above 14 will leave alive", adding that there was "no honorable Libyan woman" among those left in Ganfouda. In sum, the LNA's responsibility for siege warfare and starvation in Ganfouda is established beyond any doubt.

PEX 2 at ¶20. "The LNA's responsibility for the shelling and aerial bombardment of Ganfouda has also been extensively documented by UN bodies and human rights organizations." *Id.* at ¶21. Only the LNA forces could have been responsible for the specific atrocities, particularly given the long-distance shelling, PEX 23 at 54-55, and bombings from the air.[9] The Court can itself literally view the results of the actions of the Defendants' military forces:

> A video was posted online shortly after the civilians attempting to flee Ganfouda, including the Hamza Plaintiffs' brother, mother and sister, had been in killed. It shows LNA members walking amid numerous dead bodies, including the bodies of the Hamza Plaintiffs' brother and mother. LNA members desecrate the bodies with their feet, taunting and insulting the dead. One of the LNA members has been identified by the BBC as Zakariya Farkash, a member of the Saeqa Special Forces who also appeared on other videos showing LNA members desecrating dead bodies. The video strongly supports the allegation that LNA members killed the

---

[9] ███████████████████████████████ PEX 1 at 45. And it was widely known in Libya that only the LNA forces actually operated aircraft. Also, at Deposition of Ali Abdalla Hamza, he noted, "I wasn't in Libya, so it [the evidence of bombing] would have to be communications, and reports, and witnesses' statements, and the UN and others. So it's really, it's really multiple sources of information that I learned this from. For example, family's homes being bombed. It's not one or two or three or five families, it's pictures, it's videos, it is mothers, it's the UN statements, it's human rights statements." PEX 30 at 41.

victims whose bodies appear in the video. If they had been killed by the other side, LNA members would not have insulted the dead and desecrated their bodies.

PEX 2 at ¶23. The Plaintiffs themselves identified their loved ones in the video, and through conversations with individuals on the ground. Those statements also make it clear that the LNA was responsible:

> I saw it [witnessing the bombing and human rights abuses in Ganfouda] from the videos and pictures with my mom on the floor, on the ground, with the blood on her. And people from the LNA using language against her when she was over 70 and dead, and asking them to be burned, burned them, most of the LNA, who stayed LNA for multiple years after that. I've seen videos of my mom, you know, surrounded by LNA. I've seen videos of armed people in Ganfouda being surrounded by 10 to 20 LNA, and being cursed, and being thrown in the dump and garbage, without arms, unarmed, and then some were executed. I've seen these with my eyes. I've seen these with my eyes, and we have multiple evidence that. So now I stand corrected. Yes, I've seen multiple evidence confirming the allegations against Khalifa Hifter. I've seen multiple evidence with my eyes.

PEX 30 at 43-44.

> There were no armed forces that roam the streets [of Ganfouda] freely within Hifter's territory if they are not aligned or hired by the LNA. So talking about those militia who parade with the human bodies, those militia who burned the remains of human bodies, those militia who even attack my mom verbally while she was laying down on the floor dead, those militia who took gold from women when they were prisoners and their husband and their children were killed beside them, those militia wear the fatigue of the LNA, they continue to work with Hifter in Benghazi, they working with Hiften over Ghana [sic], that went with Hifter to Tripoli. So really to see attorneys talking about those militia who are armed and roaming freely and imprisoning people, and to give the impression that those are a separate group to Hifter, that is offensive to human values and to human life.

*Id.* at 51-52.

> The video of the Human Rights Watch, Amnesty International, people who reported to the ICC, and eyewitnesses in the families who survived…Many of them [individuals in the videos' were wearing the military clothes of the LNA. Many of them were with the weapons. Many of them were in the streets freely after that, and LNA was celebrating after that. And persons who were shown in those videos are known LNA members for a long time after that…I identify them [the soldiers] by allegiance to Hifter, and they can do anything as long as it's in line with his rule. That's the identity.

23

*Id*. at 79-80.

> We saw a lot of video footage depicting the killing of my mother and my family members, and the horrible actions performed by Hifter's militias over their dead bodies.

PEX 31 at 25-26.

> I heard a lot of fighting events happening, and I saw in the videos, in the media, I saw Al-Werfalli, who is, as I mentioned, was my neighbor, coming from the same neighborhood where I used to lived… We learned of the crime [the death of Plaintiff Hamza's mother] only when we saw the videos.

*Id*. at 28-29.

> [W]hat I can recollect from 2017 that his [the Defendant] army was killing innocent people, killing families and killing unarmed people, civilians in that area [Ganfouda].

PEX 4 at 15.

> What I can describe is that there was a siege, families were captured without any way to leave. We couldn't get out, either through the land or through the sea. There was no safe passage for civilian families. There was a lot of air bombing, kid, women, elderly were killed. There was hunger, or not have access to water or food. We were not allowed to live a decent life. It was like the area was turned into a graveyard.

*Id*. at 16.

> Yes [when asked about airstrikes] I saw an explosion of, of a bomb right in front of me. Me and my children, we saw that…The only side that had airplanes was Hifter's side. The other side did not have access to any air force.

*Id*. at 20.[10]

> What I remember also that I heard one of the soldiers as they were shooting at us, telling his commander, sir, those are women and the commander answering him, do not stop shooting, do not stop fire.

*Id*. at 24.

---

[10] ██████████████████████████████████████████████ PEX 5 at 233.

On March 18, 2017, it was two months after the death of my children. We were still under siege. We had to find refuge in two buildings that were called the number 12 construction building, because they were unfinished, like a construction zone. There was no access to water. There was no facilities, no access to food. So it was myself, my husband and my little daughter, and some other families, we were trying to hide in those buildings. It was one of the hardest times in my life. There was a lot of despair. We were eating grass. We were drinking water from the sea. We were praying for the rain to come down so we could have some fresh water to drink. People were dying around us from hunger. People were getting sick. My daughter was sick. She was not able to walk. We had to carry her. And then we decided that we have to – we have to leave. We can't stay there any more, because it's a matter of death or life. So we gathered ourselves with other families and we decided to leave on that date, on the 18th. As we tried to get out of the area, we approached the neighboring location, shelling started on us, bombing from all directions. Bullets, some of the people who were riding with us in the car, they died; some people got injured. I was telling my husband, let's get out—lets get out of the car and just run. And finally, my husband agreed. He was getting out of the car and he was trying to help me get out and carry my daughter, when a bullet injured him in his left arm and left shoulder. Nevertheless, he continued carrying my daughter and we ran away and we were walking and hiding for approximately two days until finally we were captured by Hifter forces and they imprisoned us.

*Id*. at 42-44.

Even the State Department highlighted these atrocities when it noted that Amnesty International "stated that as LNA forces ended a multi-year military blockade of the Ganfouda neighborhood of southwest Benghazi, LNA forces killed and beat civilians and summarily executed and desecrated bodies of opposition fighters." PEX 36 at 13.

The unlawful actions of the Defendant's military forces were repeated occurrences for years in Libya. The following year the State Department noted that:

The LNA, under Khalifa Haftar, continued attacks by ground and air forces against opponents in Derna, including terrorists belonging to or affiliated with ISIS. While casualty numbers were uncertain, reports from media and NGOs estimated that the LNA's campaigns resulted in hundreds of dead and thousands injured, including civilians, since it began in 2014.

*See* U.S. Department of State, *Libya 2018 Human Rights Report* (Mar. 13, 2019), *https://www.state.gov/wp-content/uploads/2019/03/LIBYA-2018-HUMAN-RIGHTS-*

*REPORT.pdf*, at 11, attached hereto as PEX 40. Additionally, "[f]orces aligned with both the GNA and its opponents were responsible for the disappearance of civilians in conflict areas, although few details were known." *Id*. at 12.

None of the Plaintiffs' family members were armed, nor is there any evidence that they posed a threat to the Defendants' armed forces, who aimed at or targeted each individual victim and other civilians around the time of the incidents. There is no evidence that the Defendant can or will provide that will show his forces were in imminent danger, or any danger, when they fired upon and unlawfully killed the Plaintiffs' family members.

> iii. **The Defendant Failed to Take All Necessary and Reasonable Measures to Prevent His Forces from Committing Human Rights Abuses, to Include Extrajudicial Killing, and Punish the Human Rights Abusers.**

Despite testifying under oath that the ███████████████████████████████████

████████ PEX 1 at 58, the Defendant's actions did not mirror or exceed his words. The Plaintiffs' expert testified that in reviewing the actions of the LNA in the aftermath of the atrocities he "did research on whether anything followed these statements and didn't find anything. PEX 23 at 40 (The statement referred to those made by Wanis Bukhamada and which were widely promoted by Libyan media that supports the Defendant). And it fits in with a more general pattern with regard to the LNA of no actions being taken against war criminals." PEX 23 at 41. *See also id..* at 51 ("there are no known cases 18 of Haftar or the LNA command prosecuting LNA members for war crimes."). ████████████████████████████████████████ PEX 1 at

72-73 ████████████████████████████████████████████████████

████████

**B.**     **There Are No Available or Adequate Remedies in Libya for Plaintiffs to Exhaust.**

The Plaintiffs easily meet the TVPA's exhaustion requirement as there is no functioning legal system within Libya that could address any issues surrounding the Defendant's unlawful actions. ECF No. 8, ¶209.

The most recent assessment issued by the U.S. Department of State on Libya notes that even in the best areas, which were those maintained by the recognized government of Libya that the "government generally did not respect judicial independence and impartiality." *See* U.S. Department of State, *2022 Country Report for Human Rights Practices for Libya* (Mar. 20, 2023), at https://www.state.gov/reports/2022-country-reports-on-human-rights-practices/libya#, *at 12,* attached hereto as PEX 41.[11] Notably, "civilian and military courts operated sporadically depending on local security conditions. Court proceedings were limited in areas still recovering from previous fighting and in the country's south." *Id*. at 12-13. Plaintiff Abdalhalem Hamza testified that he could not currently file a claim in Libyan courts because they are "weak." *See* PEX 31, 41:2-17. More importantly, in LNA controlled areas "military judicial authorities tried cases normally under the jurisdiction of civilian courts" and these "trials did not meet international standards." PEX 41 at 13. *See also* Freedom House, "Freedom in the World 2019", https://freedomhouse.org/country/libya/freedom-world/2019 (last visited Feb. 23, 2023), attached hereto as PEX 42, ("right of citizens to a fair trial and due process has been challenged by the

---

[11] Statements issued by government agencies such as the State Department are admissible under the Federal Rules of Evidence's hearsay exception for public documents. Fed. R. Evid. 803(8). See *e.g., Baarbe v. Syrian Arab Republic*, No. 5:20-CV-230-BO, 2023 WL 4236184 (E.D.N.C. June 28, 2023). Indeed, U.S. State Department Country Reports concerning the fairness and availability of the Liberian judicial system during a time of civil war were deemed admissible in similar civil proceedings. *Bridgeway Corp. v. Citibank*, 201 F.3d 134 (2d Cir. 2000).

continued interference of armed groups and inability to access lawyers and court documents"). There were no available legal remedies for the Plaintiffs or their remaining family members to pursue in the Libyan judicial system. As the State Department made clear:

> The 2011 Constitutional Declaration provides for the right of citizens to have recourse to the judiciary. The judicial system did not have the capacity to provide citizens with access to civil remedies for human rights abuses. The law provides for fact-finding, accountability, and reparations for victims but was not implemented. Courts did process civil, administrative, family, commercial, and land and property law matters. Lack of security and intimidation by armed groups challenged the ability of authorities to enforce judgements.

PEX 41 at 14). *See also* Hanan Salah, "Justice Delayed, In Libya" (Sept. 11, 2019), at https://www.hrw.org/news/2019/09/11/justice-delayed-libya, attached hereto as PEX 43, ("Few cases have been heard by civil and military courts in Libya. The post-Gaddafi interim government, strongly supported by the UN and western governments, did not prioritize a functioning justice system.").

There exists limited control by any functioning, stable governing institutions across the country. The lack of political stability has led to security incidents and protests throughout Libya against the continued political deadlock, lack of basic service provision and corruption. *See e.g.* HM Government, *Foreign Travel Advice: Libya* https://www.gov.uk/foreign-travel-advice/libya/safety-and-security#:~:text= The%20political%20situation%20in%20Libya,an%20estimated%201%2C000%20civilian%20ca sualties (last visited Feb. 23, 2024) (current UK travel advisory), attached hereto as PEX 44**.** There is no indication anything will improve soon. In fact, the *Human Freedom Index*, which includes assessing the rule of law, ranks Libya near the bottom of world freedom at 152/165 globally. *See* Ian Vásquez, Fred McMahon, Ryan Murphy, and Guillermina Sutter Schneider, *The Human Freedom Index 2023: A Global Measurement of Personal, Civil, and Economic Freedom*,

https://www.cato.org/sites/cato.org/files/2023-12/human-freedom-index-2023-full-revised.pdf

(last visited Feb. 23, 2024)attached hereto as PEX 45. Due to years of conflict, a weak judicial

system, and legal ambiguity regarding amnesty for revolutionary forces, authorities have made no

appreciable progress in resolving high-profile cases. *See* U.S. Department of State, *2021 Country*

*Report for Human Rights Practices for Libya,* https://www.state.gov/reports/2021-country-

reports-on-human-rights-practices/libya, (last visited Feb. 23, 2024),at 6, attached hereto as PEX

46. In the absence of effective judicial and security apparatus, most killings are not investigated.

*See* U.S. Department of State, *2020 Country Report for Human Rights Practices for Libya*,

https://www.state.gov/reports/2020-country-reports-on-human-rights-practices/libya/ (last visited

Feb. 23, 2024), at 5, attached hereto as PEX 47. Under the undisputed facts here, Libyan courts

are not a forum which can provide any Plaintiff in this case with "adequate and available

remedies." 28 U.S.C. § 1350 (codified at note). *Boniface v. Viliena*, 338 F. Supp. 3d 50, 64 (D.

Mass. 2018).[12]

### III.    <u>CONCLUSION</u>

For the reasons stated here, Plaintiffs respectfully ask the Court to grant their Motion for

Summary Judgment and award them damages in an amount to be determined at trial.

---

[12] Under relevant case law, the Defendant "…has the burden of raising the nonexhaustion of remedies as an affirmative defense and must show that domestic remedies exist that the claimant did not use." If the defendant makes "…a showing of remedies abroad which have not been exhausted, the burden shifts to the plaintiff to rebut by showing that the local remedies were ineffective, unobtainable, unduly prolonged, inadequate, or obviously futile. The ultimate burden of proof and persuasion on the issue of exhaustion of remedies, however, lies with the defendant." *Jean v. Dorelien*, 431 F.3d 776, 781 (11th Cir. 2005).

Date: February 23, 2024     Respectfully Submitted,

          */s/ Thomas M. Craig*
          Thomas M. Craig, (VSB #58063)
          Grace H. Williams (VSB # 88103)
          **Fluet**
          1751 Pinnacle Drive, Suite 1000
          Tysons, Virginia 22102
          T: (703) 590-1234 | F: (703) 590-0366 fax
          tcraig@fluet.law
          gwilliams@fluet.law

          Mark S. Zaid (*pro hac vice*)
          **Mark S. Zaid, P.C.**
          1250 Connecticut Avenue, N.W.
          Suite 700
          Washington, D.C. 20036
          T: (202) 498-0011 | F: (202) 330-5610
          Mark@MarkZaid.com


          Matthew Jury (*pro hac vice*)
          84 Brook Street
          London W1K 5EH
          UNITED KINGDOM
          T: +44 (0) 20 7096-3767
          Matthew.Jury@mccue-law.com

          *Counsel for Plaintiffs*


## CERTIFICATE OF SERVICE

I hereby certify that on February 23, 2024, I electronically filed the foregoing with the Clerk of the Court using the CM/ECF system, which will send a notification of such filing to counsel of record for all parties.

          */s/ Thomas M. Craig*
          Thomas M. Craig, Esq.