**UNITED STATES DISTRICT COURT**
**EASTERN DISTRICT OF VIRGINIA**
**ALEXANDRIA DIVISION**

|  |  |  |
|---|---|---|
| ALI ABDALLA HAMZA *et al.* | ) | |
| | ) | |
| Plaintiffs, | ) | |
| | ) | CIVIL ACTION NO. 20-cv-01038 LMB-JFA |
| v. | ) | |
| | ) | |
| KHALIFA HIFTER, | ) | |
| | ) | |
| Defendant. | ) | |
| | ) | |

**MEMORANDUM OF LAW IN OPPOSITION TO**
**DEFENDANT'S MOTION FOR SUMMARY JUDGMENT**

The Parties have each filed respective Motions for Summary Judgment that in many ways passed as ships in the night. Plaintiffs supported their Motion ("Pls.' MSJ") with undisputed material facts and precedential legal analysis. (ECF 225 (redacted), 226 (unredacted, under seal)). Defendant Khalifa Hifter's ("Defendant") Motion ("Def.'s MSJ"), on the other hand, essentially simply recites the allegations in the record without much in the way of any admissible evidentiary support, or just offers conclusory legal arguments. Almost all of the "material" facts that Defendant relies on are disputed and/or supported solely by his self-serving testimony.

Accordingly, regardless of what might befall the Plaintiffs' competing Motion, the Defendant's Motion for Summary Judgment should respectfully be denied without hesitation.

**I.      APPLICABLE LEGAL STANDARDS**

Longstanding Fourth Circuit precedent holds that summary judgment is appropriate only when "there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." *Bostic v. Schaefer*, 760 F.3d 352, 370 (4th Cir. 2014) (citation and internal quotation marks omitted). In addition, "A dispute is genuine if a reasonable jury could return a

verdict for the nonmoving party." *Libertarian Party of Va. v. Judd*, 718 F.3d 308, 313 (4ᵗʰ Cir. 2013) (citation and internal quotation marks omitted). Further, "A fact is material if it might affect the outcome of the suit under the governing law." *Id*. (citation and internal quotation marks omitted).

Here, summary judgment should not be granted liberally or through the lens of what the Court believes might be the outcome. The burden on a party moving for summary judgment is significant. When evaluating a motion for summary judgment, "[Courts] are required to view the facts and all justifiable inferences arising therefrom in the light most favorable to the nonmoving party[.]" *Id*. at 312. In doing so, courts must not weigh evidence or make credibility determinations. *Mercantile Peninsula Bank v. French*, 499 F.3d 345, 352 (4th Cir. 2007). Under applicable precedent, "[C]ourts may not resolve genuine disputes of fact in favor of the party seeking summary judgment." *Jones v. Chandrasuwan*, 820 F.3d 685, 691 (4th Cir. 2016), *see also Tolan v. Cotton* 134 S.Ct. 1861, 1866, 188 L.Ed.2d 895 (2014) (per curiam).

## II.    RESPONSE TO UNDISPUTED MATERIAL FACTS

1.      Undisputed.

2.      Undisputed. Mr. Hifter is also a United Stated citizen. ECF 226-1, PEX 1, 30:2-4 (filed under seal).[1]

3.      Undisputed as to the first year but not the final year identified and disputed to the extent ███████████ calls for a legal conclusion.

4.      Undisputed.

---

[1] PEX refers to Plaintiffs' MSJ exhibits.

5.       Due to a formatting error, Defendant asserts two distinct paragraphs as Paragraph 5. Plaintiffs will address the first as Paragraph 5A, and the second as Paragraph 5B:

**Paragraph 5A**: Undisputed that Defendant owns property in Virginia. ECF 232 at 22. The remainder of this assertion recounts legal conclusions or are not a material fact. ECF 226-1, PEX 1, 39:17-19 (filed under seal). ECF 232, Def.'s St. of Fact, ¶5B.

**Paragraph 5B**: Plaintiffs dispute the assertion that the Defendant does not ████

████████████████████████████████████████

████████████████████████████████████████

████████████████████████████████████████

████████████████████████████████████████

ECF 226-1, PEX 1, 39:17-19 (filed under seal). ECF 232, Def.'s St. of Fact, ¶5.

6.       Undisputed that "Operation Dignity" actually occurred, but the remaining assertions and characterizations are disputed. ECF 225-11, PEX 8; ECF 225-12, PEX 9; ECF 225-13, PEX 10; ECF 225-14, PEX 11; ECF 225-2, PEX 2, §1 ¶8 p.3.

7.       Undisputed.

8.       Undisputed and this is publicly available information which appears on the Defendant's Wikipedia page that should not be kept under seal.

9.       Undisputed.

10.      Disputed to the extent he is not precluded from being considered their actual or apparent agent. ECF 225-26, PEX 23, 46-49.

11.      Disputed and evidence relied on is not sufficient to establish as a matter of law. ECF 226-8, page 6, Def.'s Resp. to Interrog. No. 12 (filed under seal).

12.     Disputed and the evidence relied on is not sufficient to establish as a matter of law. ECF 225-26, PEX 23, 52:1-18.

13.     Disputed and evidence relied on is not sufficient to establish this fact as a matter of law. ECF 225-23 – ECF 225-24, PEX 20 – 21; ECF 225-27, 24.

14.     Disputed and evidence relied on is not sufficient to establish this as a matter of law concerning the Plaintiffs' claims. *See* Decl. of Expert Wolfram Lacher, ¶ 11, 14, attached hereto as Exhibit A. ECF 225-43, PEX 40 at 11-12.

15.     Disputed, not material, and evidence relied on is not sufficient to establish as a matter of law so as to preclude Plaintiffs' claims. Ex. A, ¶ 6.

16.     Disputed and not sufficient to establish asserted information is true as a matter of law. Ex. A, ¶ 5.

17.     Disputed and evidence relied on is not sufficient to establish as a matter of law so as to preclude Plaintiffs' claims.

18.     Undisputed.

19.     Undisputed, but neither material nor sufficient to defeat Plaintiffs' specific factual claims.

20.     Disputed. Evidence relied on is not sufficient to establish as a matter of law and assertion is neither material nor sufficient to defeat Plaintiffs' specific factual claims. PEX 2 at ¶23, PEX 30 at 43-44; 51-52.

21.     Disputed and neither material nor sufficient to defeat Plaintiffs' specific factual claims. ECF 226 at 8 (filed under seal); ECF 225-2, PEX 2 at 5, ¶20-22; ECF 225-23, PEX 20; ECF 225-10, PEX 7.

22.     Disputed. ECF 225-2, PEX 2 at §3, ¶16, p. 6. ECF 225-28, PEX 25; ECF 225-29, PEX 26.

23.     Disputed. ECF 225 11-12; ECF 225-4, PEX 4 at 44, 47, 52, 55, 57, 60-61.

## III.   <u>ARGUMENT</u>

The Defendant admits that the Torture Victim Prevention Act ("TVPA"), 28 U.S.C. §1350 note, can provide a basis for relief where a Plaintiff articulates a cause of action for torture or extrajudicial killing, as defined therein. Specifically, the statute imposes liability upon:

> (a) ... An individual who, under actual or apparent authority, or color of law, of any foreign nation—
> (1) subjects an individual to torture shall, in a civil action, be liable for damages to that individual; <u>or</u> [emphasis supplied]
> (2) subjects an individual to extrajudicial killing shall, in a civil action, be liable for damages to the individual's legal representative, or to any person who may be a claimant in an action for wrongful death.

*Id*. at § 2(a)(2).

In considering the statute for this matter, the use of the disjunctive appears to create two separate causes of action. One for torture, and one for extrajudicial killing. The TVPA defines "torture" as "any act, directed against an individual in the offender's custody or physical control, by which severe pain or suffering (other than pain or suffering arising only from or inherent in, or incidental to, lawful sanctions), whether physical or mental, is intentionally inflicted on that individual" for a variety of specified purposes)"; *Suhail Najim Abdullah Al Shimari v. CACI Premier Tech., Inc*., 300 F. Supp. 3d 758, 778 (E.D. Va. 2018) (Brinkema, J.).[2]

---

[2] TVPA defines "extrajudicial killing" as "a deliberated killing not authorized by a previous judgment pronounced by a regularly constituted court affording all the judicial guarantees which are recognized as indispensable by civilized peoples. Such term, however, does not include any such killing that, under international law, is lawfully carried out under the authority of a foreign nation." *Id*. §3(a).

A.      **Plaintiffs Have Standing to Bring this Action.**

1.      **Plaintiffs may be beneficiaries from claims or claimants in an action for wrongful death under Virginia law.**

Assuming, without conceding, that Virginia's wrongful death statute is relevant to the inquiry, the Defendant improperly conflates standing to bring a wrongful death action pursuant to Virginia's wrongful death statute, with standing to bring a TVPA claim. While a personal representative of an estate would be able to sustain a claim under the TVPA, that is not the only person who may do so. Under the plain language of the TVPA, "any person who may be a claimant in an action for wrongful death" can receive damages under the TVPA specifically. This language should be construed to include the Plaintiffs. Had Congress intended to narrowly restrict recovery to only those officially recognized estate representatives, then this other provision concerning claimants would not be needed. By referencing both "individual's legal representative, or any person who may be a claimant in an action for wrongful death" the statute clearly permits recovery in either situation.

When construing Virginia's wrongful death statute along with the TVPA, the plain language of "any person who may be a claimant in an action for wrongful death" is a broader category of people than only those duly authorized estate representatives. Under relevant law, siblings and parents and children may all be considered possible "claimants" in an action for wrongful death, and are beneficiaries entitled to damages under that statute. *See* Virginia Code §8.01-53(A) which calls for distributions for wrongful death proceeds to surviving spouses, children, parents, siblings, or other relatives. Thus, under Virginia law, depending on the circumstances of a given family, many different relatives could be claimants/beneficiaries in a wrongful death action.

> ### 2.   Plaintiffs Have Identified Sufficient Evidence of the Extrajudicial Killing of their Family Members to Survive Summary Judgment.

Defendant's self-serving testimony that he was not responsible for the deaths of the Plaintiffs' family members is not sufficient to prove as a matter of law that he was not responsible for their deaths. Indeed, the Plaintiffs have presented sufficient evidence of command responsibility and Defendant exerted actual and apparent authority over the territory where the Plaintiffs' family members were killed. ECF 225 at 6, ¶¶20-25.

The Defendant relies on *Mamani v. Sanchez Bustamante*, 968 F.3d 1216 (11th Cir. 2020), and seeks to distinguish it from the instant case because there was an official order to kill civilians in that example. *Mamani* involved an action brought by victims' relatives against Bolivia's former president and minister of defense, and sought compensatory and punitive damages under TVPA and state law. In evaluating the question whether persons killed during time of civil unrest in Bolivia were victims of deliberated killings by members of Bolivian military, as required for claim of extrajudicial killing under the TVPA, the Court decided such an inquiry was for a jury to decide. Here, Plaintiffs have provided undisputed facts supporting Defendant's actual and apparent authority over the extrajudicial killings at issue, and even if the Court concludes separately that they have not, given the disputed facts surrounding the deaths of the Plaintiffs' family members, the Defendant is not entitled to summary judgment and the claims concerning extrajudicial killing should go to a jury. *See id.*

### B.   This Court Has Subject Matter Jurisdiction and Personal Jurisdiction Over the Defendant.

The Court has subject matter jurisdiction to hear these claims pursuant to the TVPA, a federal statute that expressly creates a civil action for the claims the Plaintiffs assert here. This Court can consider these claims as they raise a federal question within the meaning of

28 U.S.C. § 1331. This Court has previously held, and the Fourth Circuit has confirmed, the extraterritorial reach of the TVPA in *Warfaa v. Ali*, 33 F. Supp. 3d 653, 659 (E.D. Va. 2014) (Brinkema, J.), aff'd, 811 F.3d 653 (4th Cir. 2016):

> [T]here are strong indications that the TVPA was intended to have extraterritorial application. The language of the TVPA, which creates civil liability for extrajudicial killing and torture carried out by an individual with "actual or apparent authority, or color of law, of any foreign nation," naturally contemplates conduct occurring in the territory of a foreign sovereign. 28 U.S.C. § 1350 note. Moreover, the Supreme Court did not purport to curb the extraterritorial reach of the TVPA in *Kiobel. See* 133 S.Ct. at 1669 (noting that the TVPA addresses "human rights abuses committed abroad" (Kennedy, J., concurring); *see also Chowdhury v. Worldtel Bangladesh Holding, Ltd.*, 746 F.3d 42, 51 (2d Cir.2014) (concluding that there was "no bar on the basis of extraterritoriality to [the plaintiff's] TVPA claim").

Under controlling precedent in this Circuit, the plain language of the statute, and any fair reading of the purpose of the TVPA, this Court has subject matter jurisdiction.

In addition, this Court has personal jurisdiction over the Defendant, who is a citizen of the United States, and a property owner in this District. The Defendant has fully – albeit at times under threat of default – participated in this case, and taken discovery from the Plaintiffs in three separate lawsuits over a period of several years. Given these circumstances, a finding of personal jurisdiction is more than appropriate here.

The requirement of personal jurisdiction can be waived by appearance or failure to make a timely objection. *Ins. Corp. v. Compagnie des Bauxites de Guinee*, 456 U.S. 694, 703 (1982). Under relevant precedent, "Waiver is clearly made where a defendant makes an appearance before a court to deny allegations of a complaint, but fails to make personal jurisdiction objections at that time." *Foster v. Arletty 3 Sarl*, 278 F.3d 409, 414 (4th Cir. 2002). In addition, "Waiver can also be made where conduct in litigation demonstrates consent to a court's jurisdiction, even where a party has made a timely objection." *See, e.g.*, *Continental Bank, N.A. v. Meyer*, 10 F.3d 1293, 1297

(7th Cir. 1993) (finding waiver where defendants had actively participated in litigating merits of lawsuit for two and a half years despite pleading defense in their Answer).

> **1.      The Defendant Has Repeatedly Failed To Demonstrate He Is Entitled To Head Of State Immunity.**

In an all-out Hail Mary, the Defendant, who is considered by many in the international community to be a warlord,[3] seeks to self-invoke Head of State immunity to evade liability. Def.'s MSJ at 15-18. "Head of state immunity is a doctrine of customary international law" pursuant to which an incumbent "head of state is immune from the jurisdiction of a foreign state's courts." *In re Grand Jury Proceedings*, 817 F.2d 1108, 1110 (4th Cir. 1987). While the Plaintiffs do not dispute that an individual can be immune under the TVPA if head of state immunity exists, *see Manoharan v. Rajapaksa*, 711 F.3d 178, 180 (D.C. Cir. 2013), *citing* H.R. REP. NO. 102-367, at 5 (1991) ("[N]othing in the TVPA overrides the doctrines of diplomatic and head of state immunity."), this Defendant has no authority or factual predicate to claim it.

This is not a new issue for this Court. On no less than two previous occasions the Defendant has sought to claim Head of State immunity in this litigation. Twice this Court invited the U.S. Department of State to weigh in on the issue. Twice the U.S. Government affirmatively declined to do so. ECF 37. That said, the conversation does not necessarily stop there, and this Court does have the "authority to decide for itself whether all the requisites for such immunity existed." *Samantar v. Yousuf*, 560 U.S. 305, 312 (2010) (citations omitted). In making that decision, a

---

[3] *See e.g.*, Guardian, "Libyan warlord could plunge Sudan into a drawn-out 'nightmare' conflict," April 23, 2023, at *https://www.theguardian.com/world/ 2023/apr/23/libyan-warlord-could-plunge-sudan-into-a-drawn-out-nightmare-conflict*; and The New Arab, "UN urges Libyan warlord Khalifa Haftar to stop evicting residents and demolishing homes in Benghazi," September 5, 2023, at *https://www.newarab.com/news/un-urges-libyan-warlord-haftar-stop-demolishing-homes*.

district court can inquire "whether the ground of immunity is one which it is the established policy of the [State Department] to recognize." *Id*. (citations omitted). Although cases involving individual foreign officials as defendants are rare, the same two-step procedure was typically followed when a foreign official asserted immunity. *Id*. (citations omitted).

The Defendant largely relies upon *Doe v. Buratai*, 318 F. Supp. 3d 218 (D.D.C. 2018), where Head of State immunity was conferred on Nigerian government officials facing a TVPA action. But there, the "Federal Republic of Nigeria clearly and emphatically stated that this suit challenges the defendants' "authorized official actions," which the defendants "performed in an official capacity" and which "are attributable to the Government of Nigeria." *Id*. at 232. The Court emphasized a fatal distinction in noting that "the Nigerian government authorized and ratified the defendants' alleged actions. And although the crimes alleged are horrendous, it is not the Court's role to probe the sincerity, truth, or ethics of Nigeria's decision to embrace its officials' actions as its own." *Id. See also Dogan v. Barak*, No. 15-cv-8130, 2016 U.S. Dist. LEXIS 142055, 2016 WL 6024416, at *9 (C.D. Cal. Oct. 13, 2016), *appeal filed*, No. 16-56704 (9th Cir. Nov. 14, 2016) (concluding conduct-based foreign-official immunity is available "where the sovereign state officially acknowledges and embraces the official's acts").

To be clear, there is no formal invocation of Head of State immunity before this Court. No official documentation has been submitted from anyone claiming to represent the Libyan Government, nor is there even any formal assertion by the Defendant himself. Instead, all this Court has before it are legal arguments proffered by counsel. That is not how the delicate balance in determining Head of State immunity works. *See e.g.*, *Buratai*, 318 F. Supp. 3d at 224 (Nigeria, through its D.C. Embassy, formally transmitted diplomatic note to State Department requesting immunity). Nor, in any event, is someone who does not even represent a government recognized

by the United States, such as this Defendant, entitled to invoke Head of State immunity. *See Yousuf v. Samantar*, 699 F.3d 763, 767 (4th Cir. 2012) (State Department noted claim for immunity was undermined by fact defendant "is a former official of a state with no currently recognized government to request immunity on his behalf").[4]

Defendant's legal arguments appear to be an attempt to argue that he is either the Head of State, and therefore immune, or not the Head of State, and therefore beyond the reach of the TVPA. Of course, that is not how the TVPA is structured, else no one could ever be liable under the TVPA. The fact that Defendant is not entitled to Head of State immunity does not mean the Defendant cannot have acted under color of law and be liable under the TVPA. As the Defendant's own legal authority states, the TVPA "still imposes liability on officials who torture or kill under 'actual' authority, 'apparent' authority, or 'color of law' of a foreign nation *and* are unable to invoke foreign-official immunity, *i.e.*, "officials whose acts, while technically performed in an official capacity, are clearly not acknowledged or condoned by the foreign sovereign." *Buratai*, 318 F. Supp. 3d at 237-38, *citing Dogan*, 2016 U.S. Dist. LEXIS 142055, 2016 WL 6024416, at *12.

Even if somehow the Defendant could escape the arguments above, his conduct at issue are *jus cogens* violations.[5] ECF 8, ¶8. The Defendant properly raises to the Court's attention that

---

[4] The State Department, when it informed this Court that Head of State immunity did not exist for Samantar, also noted that "U.S. residents like Samantar who enjoy the protections of U.S. law ordinarily should be subject to the jurisdiction of the courts". *Samantar*, 699 F.3d at 777. Here the case is even stronger. The Defendant is a U.S. citizen, *see* ECF 226-1, PEX 1 at 26 (filed under seal), deriving all benefits that flow therefrom and continues to own property in this very jurisdiction. Def.'s MSJ at 14.

[5] A *jus cogens* norm, also known as a "peremptory norm of general international law," can be defined as "a norm accepted and recognized by the international community of States as a whole as a norm from which no derogation is permitted and which can be modified only by a subsequent norm of general international law having the same character." *Samantar*, 699 F.3d at 777, *citing Vienna Convention on the Law of Treaties* art. 53, May 23, 1969, 1155 U.N.T.S. 331.

the Fourth Circuit in *Samantar* held that there is a *jus cogens* exception to foreign official immunity, such as Head of State, and rightfully acknowledges this constitutes binding precedent. Def.'s MSJ at 17. The extent to which the Defendant disagrees with that decision is irrelevant before this Court and can be addressed in a future appeal if such is pursued, but for now it requires dismissal of his self-serving invocation of immunity.

Because this Court does not face the usual risk of offending a foreign nation by exercising jurisdiction over the Defendant, *see Samantar*, 699 F.3d at 777, and given this case involves *jus cogens* crimes, it should respectfully reject his invalid claim to Head of State immunity.

> **2.  The Plaintiffs Have Identified Through Deposition Testimony And Admissible Reports Evidence Of Deliberate And Extrajudicial Killings Of Their Family Members Which Create Liability Given Defendant's Command Responsibility Of The Perpetrators As Recognized Under United States And International Law.**

The Defendant, as a military leader and in command of the Libyan National Army ("LNA"), murdered, or as more properly termed under international law, committed the extrajudicial killing as well as torture of, the Plaintiffs' family members. Brazenly, the Defendant claims that the Plaintiffs "do not present any evidence that the LNA or Mr. Hifter undertook the killings with consideration and purpose." Def.'s MSJ at 9. While the Plaintiffs believe the law and the facts are quite to the contrary, as demonstrated by their competing MSJ, at a minimum it means disputes issues of fact exist requiring denial of the Defendant's MSJ.

As recognized by this Court in *Bashe Abdi Yousuf v. Mohamed Ali Samantar*, 2012 U.S. Dist. LEXIS 122403 (E.D. Va. Aug 28, 2012) (Brinkema, J.), for command responsibility to apply, three elements must be established:

> (1) [A] superior-subordinate relationship between the defendant/military commander and the person or persons who committed human rights abuses; (2) the defendant/military commander knew, or should have known, in light of the circumstances at the time, that subordinates had committed, were committing, or

12

were about to commit human rights abuses; and (3) the defendant/military commander failed to take all necessary and reasonable measures to prevent human rights abuses and punish human rights abusers.

*Id.* at *31-32, *quoting Chavez v. Carranza*, 559 F.3d 486, 499 (6th Cir. 2009), *citing Ford v. Garcia*, 289 F.3d 1283, 1288 (11th Cir. 2002); *see also Hilao v. Estate of Marcos*, 103 F.3d 767, 776-79 (9th Cir. 1996)(same); *see generally Doe v. Qi*, 349 F. Supp. 2d 1258, 1329 (N.D. Cal. 2004)("The principle of command responsibility that holds a superior responsible for the actions of subordinates appears to be well accepted in U.S. and international law in connection with acts committed in wartime . . . ."), *citing In re Yamashita*, 327 U.S. 1, 14-16 (1946).

The command responsibility doctrine imposes liability upon civilian and military commanders for the unlawful acts of their subordinates, even if that commander "[n]either committed [n]or directed the commission of such acts." *Id. See also Garcia*, 289 F.3d at 1286 (command responsibility doctrine "makes a commander liable for acts of his subordinates, even where the commander did not order those acts, when certain elements are met."). As the Supreme Court explained, civilian populations would face an increased risk of harm "if the commander of an invading army could with impunity neglect to take reasonable measures for their protection." *In re Yamashita*, 327 U.S. at 15.

In recognizing the doctrine, this Court noted "the *Chavez* test accords with the legislative history of the TVPA, which explains that 'higher official need not have personally . . . ordered the abuses in order to be held liable.'" *Samantar*, 2012 U.S. Dist. LEXIS 12, *32, *citing* S. Rep. No. 102-249, at 9 (1991). Rather, "[u]nder international law, responsibility for torture, summary execution, or disappearances extends beyond the person or persons who actually committed those acts — anyone with higher authority who authorized, tolerated or knowingly ignored those acts is liable for them." *Id*.

Sadly, the legal issue of command responsibility continues to be judicially addressed in the present day. In the years since atrocities of the 1980s-90s, the International Tribunals for Rwanda and the former Yugoslavia have repeatedly applied the doctrine of command responsibility and accepted that effective control of a commander over his troops is required before liability will be imposed. The consensus is that "the concept of effective *control* over a subordinate – in the sense of a material ability to prevent or punish criminal conduct, however that control is exercised – is the threshold to be reached in establishing a superior- subordinate relationship." *Prosecutor v. Delalic* (Appeals Chamber ICTY, Feb. 20, 2001) ¶256; *accord id.* at ¶266; *Prosecutor v. Aleksovski*, Judgment (Appeals Chamber ICTY, Mar. 24, 2000) ¶76; *Prosecutor v. Blaskic*, Judgment (Trial Chamber ICTY, Mar. 3, 2000) ¶¶295, 302 ("Proof is required that the superior has effective control over the persons committing the violations of international humanitarian law in question, that is, has the material ability to prevent the crimes and to punish the perpetrators thereof."); *Prosecutor v. Kayishema*, Judgment (Trial Chamber ICTR, May 21, 1999) ¶229 ("material ability to control the actions of subordinates is the touchstone of individual responsibility under Article 6(3)"); *Prosecutor v. Delalic*, Judgment (Trial Chamber ICTY, Nov. 16, 1998) ¶¶ 377, 378; *Prosecutor v. Akayesu*, Judgment (Trial Chamber 1, ICTR, Sept. 2, 1998) ¶491.[6] *See also Doe v. Drummond Co.*, 782 F.3d 576, 610 (11th Cir. 2015) (command responsibility doctrine "is available if the requisite degree of responsibility, authority, and control

---

[6] ICTR and ICTY Judgment lists are available at each respective Tribunal website, which was last visited February 23, 2024, at *https://www.icty.org/en/cases/judgement-list* (for ICTY) and *https://unictr.irmct.org/en/cases/trial-judgements* (for ICTR). A foreign judgment that shows no sign of being unreliable should be admitted under public-records exception to the hearsay rule, unless it appears to lack trustworthiness. The burden is on the party opposing its admission to show lack of trustworthiness. *U.S. v. Garland*, 991 F.2d 328, 335(6th Cir. 1993).

is present to support liability."). Of course, for more than a century our courts have considered that "international law is part of our law." *The Paquette Habana*, 175 U.S. 677, 700 (1900).

A showing of a defendant's actual ability to control guilty troops is required as part of the plaintiff's burden under the superior-subordinate prong of command responsibility, whether the plaintiff attempts to assert liability under a theory of *de facto*[7] or *de jure*[8] authority. *See Delalic*, P 196 ("Effective control has been accepted, including in the jurisprudence of the Tribunal, as a standard for the purposes of determining superior responsibility. . . The showing of effective control is required in cases involving both *de jure* and *de facto* superiors.").

As the Eleventh Circuit adopted in *Garcia*, "*Delalic* indicates that *de jure* authority of a commander over the troops who perpetrated the underlying crime is prima facie evidence of effective control, which accordingly can be rebutted only by the defense putting forth evidence to the finder of fact that the defendant lacked this effective control." *Garcia*, 289 F.3d at 1291. *See* Black's Law Dictionary (7th ed. 1999) 579 (defining prima facie evidence as "evidence that will

------

[7]A *de facto* superior-subordinate relationship exists under the command responsibility doctrine when "one party—the superior—has acquired over one or more people enough authority to prevent them from committing crimes or to punish them when they have done so." ECF 225-35, PEX 32, 142-43. "A de facto superior must be (1) "cognizant of his position vis-à-vis other persons whose conduct he is responsible for," and (2) "aware of the duties which his relationship with another person, or group of persons, implied for him (in particular, a duty to prevent and punish crimes) and must have accepted this role and responsibility, albeit implicitly.*" Id.* at 145.

[8]A *de jure* superior-subordinate relationship exists for purposes of the command responsibility doctrine when "the superior has been appointed, elected or otherwise assigned to a position of authority for the purpose of commanding or leading other persons who are thereby to be legally considered his subordinates." A formal title or position of authority is insufficient to establish a superior subordinate relationship; rather, "any inference concerning the relationship of subordination" must be "accompanied by the powers and authority normally attached to such a role." *Id.* at 141. A defendant in a position of de jure authority exercises effective control over his subordinates when he "was effectively able to enforce his legal authority through the exercise of his legal powers over the perpetrators." *Id.* at 174.

establish a fact or sustain a judgment unless contrary evidence is produced"). The Defendant claims repeatedly neither he nor his forces had anything to do with any atrocities perpetrated against the Plaintiffs and their family members. Def.'s MSJ at 22-26. Whether the Plaintiffs can prove the Defendant's culpability is to be determined, but what should be clear is that the Plaintiffs can demonstrate disputed material facts existing denying him entitlement to summary judgment.

### C.     The Defendant Held Command Responsibility Over The LNA.

The Defendant, through his military forces, committed the extrajudicial killing of the Plaintiffs' loved ones. ECF 8, ¶208. Extrajudicial killing has long been condemned by international law. *See Doe I v. UNOCAL Corp.*, 395 F.3d 932, 959 (9th Cir. 2002); *Presbyterian Church of Sudan v. Talisman Energy, Inc.*, 244 F. Supp. 2d 289, 345 (S.D.N.Y. 2003).

The Defendant claims that the Plaintiffs have presented no evidence that LNA soldiers were acting under official orders connected to him, Def's MSJ at 23, but he has conceded to this Court, both through his legal filings and in his sworn depositions, that he "is the commander of an army in Libya which is in ongoing civil war." ECF 14. Of particular value are the acknowledged admissions he has made, which the Plaintiffs cited to in their MSJ. *See* Pls.' MSJ at 17. These facts are also supported by the uncontested expert evidence adduced by the Plaintiffs. *Id*. at 18.

Accordingly, while the Plaintiffs believe there should be no doubt in the Court's mind as to the role of the Defendant as the commander of the LNA to permit summary judgment in their favor, at a minimum they have respectfully demonstrated that material facts remain in dispute thereby requiring denial of the Defendant's MSJ. The Defendant was in 2017, when the Plaintiffs' family members were murdered, and still is now, in full control of the LNA, and therefore, by definition, a superior-subordinate relationship existed, and still exists, between the Defendant and the LNA forces who committed the extrajudicial killings at issue here. *Id. See also* Undisputed

facts asserted in Def's MSJ, ECF 232 at ¶8 (filed under seal), and ECF 232-2, Defendant's Ex. B (filed under seal).

### D.   The Defendant Acknowledged He and His Military Forces Were Aware of Their International Law Obligations and Prohibitions.

The Defendant testified repeatedly under oath on this issue and undermines his own arguments that summary judgment is deserving. Defendant's Exhibit B; ECF 232-1 at 19; and ECF 226-8, PEX 1, 5, 6A, 6B, 6C, 6D (filed under seal).[9] He also submitted written discovery responses that equally undermines his position. ECF 226-8. Despite these acknowledgments, no one under the Defendant's command has ever been held accountable for, much less had charges filed against them by the Defendant, with respect to the murder of the Plaintiffs' family members or concerning any other atrocities alleged to have been committed by the LNA. Ex. A. International efforts to seek accountability and justice for atrocities committed by LNA forces have been completely thwarted by the Defendant and his allies. ECF 225-38, PEX 35.

For example, Al-Werfalli, under the command and control of the Defendant, is alleged to have directly committed and ordered the murders of at least 33 persons in seven incidents in Benghazi and the surrounding areas. The crimes are alleged to have taken place on or before June 3, 2016, until on or about July 17, 2017. *See* ECF 225-39, PEX 36. The Defendant declined to comply with international law and turn his subordinate over to the International Criminal Court or prosecute him nationally. *See* ECF 225-40, PEX 37 (noting Al-Werfalli to be in LNA custody). Al-Werfalli is now dead and proceedings terminated June 15, 2022. The International Criminal

---

[9] Although the Defendant's depositions were conducted through a certified Arabic translator, the Defendant, who lived in the United States for decades, often answered questions in English, even before the question had been translated. At no time did the Defendant remark he did not understand or comprehend a question or the substance that was being discussed.

Court, Office of the Prosecutor released a public notice of his death on June 20, 2022, without justice or accountability ever having been attained. *See* ECF 225-41, PEX 38.

> **1.     The Defendant Knew, Or Should Have Known, in Light of the Circumstances at the Time, That his Subordinates had Committed, Were Committing, or Were About to Commit Human Rights Abuses to Include the Extrajudicial Killing of the Plaintiffs' Family Members.**

In the absence of an effective judicial and security apparatus within Libya, civilian casualties have been rampant and are rarely investigated. As noted in the U.S. State Department's 2019 Country Report on Human Rights Practices for Libya (Mar. 11, 2020):

> There were many reports of civilian casualties as result of the continuing hostilities. Shelling, gunfire, airstrikes, and unexploded ordnance killed more than a thousand persons, including civilians, during the year. Between January and October, the UN Office of the High Commissioner for Human Rights (OHCHR) documented the deaths of 218 civilians and the injury of 289 others. In July the World Health Organization estimated the number of deaths in broader Tripoli since April was 1,093, including 106 civilians, and 5,752 wounded, including 294 civilians.

*See* ECF 225-42, PEX 39. Press reports and official international government experts identified the LNA and its aligned forces as being responsible for numerous airstrikes that killed civilians. *Id*.

That Defendant and the forces under his control were responsible for the extrajudicial killing of the Plaintiffs' family members cannot be disputed. There were no other military forces in or around their locations which could reasonably be responsible other than those under the control and command of the Defendant. The Plaintiffs' expert testified that the "siege and starvation of Ganfouda were a tactic ordered by the LNA command" and that those responsible were under the command and affiliated with the Defendant. ECF 225-2, PEX 2 at ¶20; ECF 225-26, PEX 23 at 46-48. "The LNA's responsibility for the shelling and aerial bombardment of Ganfouda has also been extensively documented by UN bodies and human rights organizations." ECF 225-2, PEX 2 at ¶21. Only the LNA forces could have been responsible for the specific

18

atrocities, particularly given the long-distance shelling, ECF 225-26, PEX 23 at 54-55, and

bombings from the air.[10] Indeed, the Defendant himself testified that ███████████████ ██████████████████████████████████████████████████████████████████████ ECF

226-1, PEX 1 at 84:17 – 86:5 (filed under seal); ECF 232-1 (14:6 – 15:2).

The Court can itself literally view the results of the actions of the Defendants' military

forces:

> A video was posted online shortly after the civilians attempting to flee Ganfouda,
> including the Hamza Plaintiffs' brother, mother and sister, had been in killed. It
> shows LNA members walking amid numerous dead bodies, including the bodies of
> the Hamza Plaintiffs' brother and mother. LNA members desecrate the bodies with
> their feet, taunting and insulting the dead. One of the LNA members has been
> identified by the BBC as Zakariya Farkash, a member of the Saeqa Special Forces
> who also appeared on other videos showing LNA members desecrating dead
> bodies. The video strongly supports the allegation that LNA members killed the
> victims whose bodies appear in the video. If they had been killed by the other side,
> LNA members would not have insulted the dead and desecrated their bodies.

ECF 225-2, PEX 2 at ¶23. The Plaintiffs themselves identified their loved ones in the video, and

through conversations with individuals on the ground. Those statements also make it clear that the

LNA was responsible:

> I saw it [witnessing the bombing and human rights abuses in Ganfouda] from the
> videos and pictures with my mom on the floor, on the ground, with the blood on
> her. And people from the LNA using language against her when she was over 70
> and dead, and asking them to be burned, burned them, most of the LNA, who stayed
> LNA for multiple years after that. I've seen videos of my mom, you know,
> surrounded by LNA. I've seen videos of armed people in Ganfouda being
> surrounded by 10 to 20 LNA, and being cursed, and being thrown in the dump and
> garbage, without arms, unarmed, and then some were executed. I've seen these with

---

[10]It was widely known in Libya that only the LNA forces actually operated aircraft. Also, at
Deposition of Ali Abdalla Hamza, he noted, "I wasn't in Libya, so it [the evidence of bombing]
would have to be communications, and reports, and witnesses' statements, and the UN and others.
So it's really, it's really multiple sources of information that I learned this from. For example,
family's homes being bombed. It's not one or two or three or five families, it's pictures, it's videos,
it is mothers, it's the UN statements, it's human rights statements." ECF 225-33, PEX 30 at 41.
*See also* ECF 226-1, PEX 1 at 45 (filed under seal).

my eyes. I've seen these with my eyes, and we have multiple evidence that. So now I stand corrected. Yes, I've seen multiple evidence confirming the allegations against Khalifa Hifter. I've seen multiple evidence with my eyes.

ECF 225-33, PEX 30 at 43-44.

There were no armed forces that roam the streets [of Ganfouda] freely within Hifter's territory if they are not aligned or hired by the LNA. So talking about those militia who parade with the human bodies, those militia who burned the remains of human bodies, those militia who even attack my mom verbally while she was laying down on the floor dead, those militia who took gold from women when they were prisoners and their husband and their children were killed beside them, those militia wear the fatigue of the LNA, they continue to work with Hifter in Benghazi, they working with Hiften over Ghana [sic], that went with Hifter to Tripoli. So really to see attorneys talking about those militia who are armed and roaming freely and imprisoning people, and to give the impression that those are a separate group to Hifter, that is offensive to human values and to human life.

*Id*. at 51-52.

The video of the Human Rights Watch, Amnesty International, people who reported to the ICC, and eyewitnesses in the families who survived…Many of them [individuals in the videos' were wearing the military clothes of the LNA. Many of them were with the weapons. Many of them were in the streets freely after that, and LNA was celebrating after that. And persons who were shown in those videos are known LNA members for a long time after that…I identify them [the soldiers] by allegiance to Hifter, and they can do anything as long as it's in line with his rule. That's the identity.

*Id*. at 79-80.

We saw a lot of video footage depicting the killing of my mother and my family members, and the horrible actions performed by Hifter's militias over their dead bodies.

ECF 225-34, PEX 31 at 25-26.

I heard a lot of fighting events happening, and I saw in the videos, in the media, I saw Al-Werfalli, who is, as I mentioned, was my neighbor, coming from the same neighborhood where I used to lived… We learned of the crime [the death of Plaintiff Hamza's mother] only when we saw the videos.

*Id*. at 28-29.

> [W]hat I can recollect from 2017 that his [the Defendant] army was killing innocent people, killing families and killing unarmed people, civilians in that area [Ganfouda].

ECF 225-4, PEX 4 at 15.

> What I can describe is that there was a siege, families were captured without any way to leave. We couldn't get out, either through the land or through the sea. There was no safe passage for civilian families. There was a lot of air bombing, kid, women, elderly were killed. There was hunger, or not have access to water or food. We were not allowed to live a decent life. It was like the area was turned into a graveyard.

*Id*. at 16.

> Yes [when asked about airstrikes] I saw an explosion of, of a bomb right in front of me. Me and my children, we saw that…The only side that had airplanes was Hifter's side. The other side did not have access to any air force.

*Id*. at 20. *See also* ECF 226-2, PEX 5 at 233 (filed under seal).

> What I remember also that I heard one of the soldiers as they were shooting at us, telling his commander, sir, those are women and the commander answering him, do not stop shooting, do not stop fire.

ECF 225-4, PEX 4 at 24.

> On March 18, 2017, it was two months after the death of my children. We were still under siege. We had to find refuge in two buildings that were called the number 12 construction building, because they were unfinished, like a construction zone. There was no access to water. There was no facilities, no access to food. So it was myself, my husband and my little daughter, and some other families, we were trying to hide in those buildings. It was one of the hardest times in my life. There was a lot of despair. We were eating grass. We were drinking water from the sea. We were praying for the rain to come down so we could have some fresh water to drink. People were dying around us from hunger. People were getting sick. My daughter was sick. She was not able to walk. We had to carry her. And then we decided that we have to – we have to leave. We can't stay there any more, because it's a matter of death or life. So we gathered ourselves with other families and we decided to leave on that date, on the 18th. As we tried to get out of the area, we approached the neighboring location, shelling started on us, bombing from all directions. Bullets, some of the people who were riding with us in the car, they died; some people got injured. I was telling my husband, let's get out—lets get out of the car and just run. And finally, my husband agreed. He was getting out of the car and he was trying to help me get out and carry my daughter, when a bullet injured him in his left arm and left shoulder. Nevertheless, he continued carrying my daughter and we ran

away and we were walking and hiding for approximately two days until finally we were captured by Hifter forces and they imprisoned us.

*Id*. at 42-44.

Even the State Department highlighted these atrocities when it noted that Amnesty International "stated that as LNA forces ended a multi-year military blockade of the Ganfouda neighborhood of southwest Benghazi, LNA forces killed and beat civilians and summarily executed and desecrated bodies of opposition fighters." ECF 225-39, PEX 36 at 13.

The unlawful actions of the Defendant's military forces were repeated occurrences for years in Libya. The following year the State Department noted that:

> The LNA, under Khalifa Haftar, continued attacks by ground and air forces against opponents in Derna, including terrorists belonging to or affiliated with ISIS. While casualty numbers were uncertain, reports from media and NGOs estimated that the LNA's campaigns resulted in hundreds of dead and thousands injured, including civilians, since it began in 2014.

*See* ECF 225-43, PEX 40 at 11. Additionally, "[f]orces aligned with both the GNA and its opponents were responsible for the disappearance of civilians in conflict areas, although few details were known." *Id*. at 12. None of the Plaintiffs' family members were armed, nor is there any evidence that they posed a threat to the Defendants' armed forces, who aimed at or targeted each individual victim and other civilians around the time of the incidents. The Defendant can deny all of the above as loud as he can, but it will not turn these material facts into ones that are undisputed and allow him to obtain summary judgment.

> **2.**  **The Defendant Failed to Take All Necessary and Reasonable Measures to Prevent His Forces from Committing Human Rights Abuses, to Include Extrajudicial Killing, and Punish the Human Rights Abusers.**

The Defendant claims that there is no evidence he "ordered, endorsed, or failed to take necessary measures to prevent the alleged killings." Def's MSJ at 25-26. In his view, all the

Plaintiffs have done is "presented nothing more than mere speculation." *Id*. at 26. While the Defendant may disagree with the evidence, the Plaintiffs have presented it.

In addition to the information cited above, the Plaintiffs' expert testified that in reviewing the actions of the LNA in the aftermath of the atrocities he "did research on whether anything followed these statements and didn't find anything." ECF 225-26, PEX 23 at 40 (The statement referred to those made by Wanis Bukhamada and which were widely promoted by Libyan media that supports the Defendant). And it fits in with a more general pattern with regard to the LNA of no actions being taken against war criminals." *Id*. at 41. *See also id.* at 51 ("there are no known cases of Haftar or the LNA command prosecuting LNA members for war crimes."). This evidence demonstrates disputed material facts and prevents the Defendant from receiving summary judgment.

**E.      The Plaintiffs Have Constructively Exhausted Administrative Remedies In Libya As None Reliably Or Objectively Exist For These Purposes.**

The Defendant wishes for this Court to believe the Plaintiffs have failed to meet the TVPA's exhaustion requirement while also acknowledging he bears the initial burden of proof for such an affirmative defense. Def's MSJ at 18.[11] Defendant asserts, without the required evidentiary backing, that the court system of war-torn Libya, and especially the Benghazi area where the atrocities occurred and some of the Plaintiffs reside, and where he still retains tight control, has

---

[11] Under relevant case law, the Defendant "…has the burden of raising the nonexhaustion of remedies as an affirmative defense and must show that domestic remedies exist that the claimant did not use." If the defendant makes "…a showing of remedies abroad which have not been exhausted, the burden shifts to the plaintiff to rebut by showing that the local remedies were ineffective, unobtainable, unduly prolonged, inadequate, or obviously futile. The ultimate burden of proof and persuasion on the issue of exhaustion of remedies, however, lies with the defendant." *Jean v. Dorelien*, 431 F.3d 776, 781 (11th Cir. 2005).

largely been for years and remains functioning. *Id.* at 19. As support for his asserted "undisputed evidence", the Defendant offers the declaration of Fathi Younis Toomi, who is identified as a legal Adviser to the Prime Minister and the Minister of Planning and Finance of the Libyan Government in Benghazi. Def's MSJ at Ex. D, ¶5. This is the first time in the course of this litigation that any such evidence or testimony has been provided by the Defendant, or that this witness has been identified as possessing relevant evidence despite this issue having existed from the outset of this case.

> **1.    The Defendant's Alleged Expert Declaration Is Untimely, Was Never Identified Previously As Part of Discovery And Should Be Stricken In Its Entirety.**

The Plaintiffs oppose consideration of the Defendant's Declaration from Fathi Younis Toomi, (the "Declaration") who is apparently proffered as an expert witness to opine on the accessibility and operations of the Libyan court system. ECF 232-4. The Declaration should be struck from the record as it is untimely, and the Court already specifically denied the Defendant's request for late designation of an expert witness. ECF 208. Allowing the Declaration at this stage of the proceedings would severely prejudice the Plaintiffs, as further addressed below.

First, the Declaration is untimely under Fed. R. Civ. P. 26(a)(2)(D) and this Court's Scheduling Order, and substantively deficient under Fed. R. Civ. P. 26(a)(2)(B) for not including required information.[12] As previously stated, the Defendant sought to re-open discovery, in part,

---

[12] To comply, any proffered report must contain (i) a complete statement of all opinions the witness will express and the basis and reasons for them; (ii) the facts or data considered by the witness in forming them; (iii) any exhibits that will be used to summarize or support them; (iv) the witness's qualifications, including a list of all publications authored in the previous 10 years; (v) a list of all other cases in which, during the previous 4 years, the witness testified as an expert at trial or by deposition; and (vi) a statement of the compensation to be paid for the study and testimony in the case. The Declaration appears not to contain (iv) through (vi) or address those areas with any

to present expert witness testimony *on this precise issue* "an additional witness on the Libyan legal system." In his prior Motion to modify the scheduling order and supporting memorandum (ECF 203, 203-1), and Plaintiffs' responses, the Parties addressed, at length, the history of discovery in this matter. The Plaintiffs timely served their expert report in fall of 2021, and the Defendant's response would have been due that same year. Now, over two years later, the Defendant nevertheless seeks to improperly introduce the expert testimony anyway. The Declaration contains both facts and opinion concerning the status of the Libyan courts. ECF 232-4. That the Defendant was placed on notice that such testimony was going to be relevant is clear. In fact, the Court stated at a hearing on October 9, 2020, that the operational adequacy of the Libyan courts, of lack thereof, was at issue. ECF 44 at 35:12-17.[13] But this is now too late.

Second, the Defendant sought leave to include expert witness opinion testimony, and the Court already considered and *rejected* this request in its Order on November 17, 2023. ECF 208. ("Defendant's request for late designation of expert witnesses is denied"). Obvious disregard for the Court's November 17, 2023, Order alone justifies exclusion of the Declaration.

Finally, the prejudice to the Plaintiffs to address testimony proffered years beyond the close of discovery is significant. As previously stated, "On March 22, 2022, discovery was extended to June 10, 2022, but the Joint Proposed Amended Discovery Plan, signed by Defendant's counsel, expressly noted that expert discovery had concluded *without identifying an expert*. Dkt. # 108,

---

specificity. To the degree the Defendant proffers the evidence as factual testimony, it was also provided subsequent to the close of discovery in this matter, which occurred in June 2022.

[13] The Defendant was on notice of the need for evidence in this area and never obtained it. The Court acknowledged the Libyan courts were compromised and that evidence surrounding their status indicated: "I think given what I've got before me at this point, I'm satisfied that there's enough evidence that the functioning of the Libyan courts will not be sufficient to give them an – a fair opportunity to raise these issues there. So I'm not going to change my view at this point." ECF 44 at 35.

109." ECF 205. To permit the factual analysis and opinions concerning the functioning of the Libyan courts at this late stage, when the deadline for disclosure is years in the past, and after the Defendant already affirmatively declined to identify an expert, then sought leave to change his position which was denied, would obviously prejudice the Plaintiffs here. The Defendant provides no justification for this late submission. The Plaintiffs have waited years and dealt with many examples of the Defendant's dilatory behavior. This latest disregard for Court imposed deadlines and the rules in this jurisdiction should be rejected, and the Declaration should be struck.[14]

### 2. All Available And Reliable Evidence Indicates The Libyan Court System Is Constructively Unavailable For The Plaintiffs To Utilize.

The Plaintiffs' expert, Wolfram Lacher, who was properly identified as a witness, timely submitted an expert report, and was deposed by the Defendant, has further addressed this specific issue to demonstrate that Libya's judiciary, especially in the Benghazi area controlled by the Defendant, does not offer any viable mechanism for the Plaintiffs to rely upon. *See* Ex. A.

---

[14] Additionally, under Fed. Civ. P 37(c)(1), a party who fails to properly designate an expert witness as required by Rule 26(a) may not use the expert at trial, "unless the failure was substantially justified or harmless." Fed. R. Civ. P. 37(c)(1). The party facing a sanction of exclusion or other sanction carries the burden of showing that the failure to comply with Rule 26(a) was either substantially justified or harmless. *Carr v. Deeds*, 453 F.3d 593, 603 (4th Cir. 2006). The Defendant has provided no reasons the late disclosure was justified or harmless. As the Fourth Circuit has stated, "Rule 26 disclosures are often the centerpiece of discovery in litigation that uses expert witnesses. A party that fails to provide these disclosures unfairly inhibits its opponent's ability to properly prepare, unnecessarily prolongs litigation, and undermines the district court's management of the case. For this reason, "[w]e give particularly wide latitude to the district court's discretion to issue sanctions under Rule 37(c)(1)". *Id*. at 604, *quoting Saudi v. Northrop Grumman Corp*., 427 F.3d 271, 278–79 (4th Cir. 2005) (emphasis added). Courts often exclude untimely expert reports. *See Campbell v. United States,* 470 F. App'x 153 (4th Cir. 2012) (Administrator of patient's estate failure to present medical expert testimony on applicable standard of care and causation precluded administrator from establishing prima facie case of wrongful death premised on medical malpractice under Virginia law).

The Plaintiffs, however, can also independently rely upon the pronouncements of various reliable governmental and non-governmental reports as well. For example, the most recent assessment issued by the U.S. Department of State on Libya notes that even in the best areas, which were those maintained by the recognized government of Libya (which is not the Defendant or his military forces) that the "government generally did not respect judicial independence and impartiality." *See* ECF 225-44, PEX 41, at 12.[15] Notably, "civilian and military courts operated sporadically depending on local security conditions. Court proceedings were limited in areas still recovering from previous fighting and in the country's south." *Id*. at 12-13. Plaintiff Abdalhalem Hamza testified that he could not currently file a claim in Libyan courts because they are "weak." ECF 225-34, PEX 31, 41:2-17. More importantly, in LNA controlled areas "military judicial authorities tried cases normally under the jurisdiction of civilian courts" and these "trials did not meet international standards." ECF 225-44, PEX 41 at 13. *See also* ECF 225-45, PEX 42, ("right of citizens to a fair trial and due process has been challenged by the continued interference of armed groups and inability to access lawyers and court documents"). There were no available legal remedies for the Plaintiffs or their remaining family members to pursue in the Libyan judicial system. As the State Department made clear:

> The 2011 Constitutional Declaration provides for the right of citizens to have recourse to the judiciary. The judicial system did not have the capacity to provide citizens with access to civil remedies for human rights abuses. The law provides for fact-finding, accountability, and reparations for victims but was not implemented. Courts did process civil, administrative, family, commercial, and land and property

---

[15] Statements issued by government agencies such as the State Department are admissible under the Federal Rules of Evidence's hearsay exception for public documents. Fed. R. Evid. 803(8). See *e.g., Baarbe v. Syrian Arab Republic*, No. 5:20-CV-230-BO, 2023 WL 4236184 (E.D.N.C. June 28, 2023). Indeed, U.S. State Department Country Reports concerning the fairness and availability of the Liberian judicial system during a time of civil war were deemed admissible in similar civil proceedings. *Bridgeway Corp. v. Citibank*, 201 F.3d 134 (2d Cir. 2000).

law matters. Lack of security and intimidation by armed groups challenged the
ability of authorities to enforce judgements.

ECF 225-44, PEX 41 at 14. *See also* ECF 225-46, PEX 43 ("Few cases have been heard by civil

and military courts in Libya. The post-Gaddafi interim government, strongly supported by the UN

and western governments, did not prioritize a functioning justice system.").

There exists limited control by any functioning, stable governing institutions across the

country. The lack of political stability has led to security incidents and protests throughout Libya

against the continued political deadlock, lack of basic service provision and corruption. ECF 225-

47, PEX 44. There is no indication anything will improve soon. In fact, the *Human Freedom Index*,

which includes assessing the rule of law, ranks Libya near the bottom of world freedom at 152/165

globally. *See* ECF 225-48, PEX 45. Due to years of conflict, a weak judicial system, and legal

ambiguity regarding amnesty for revolutionary forces, authorities have made no appreciable

progress in resolving high-profile cases. ECF 225-49, at PEX 46. In the absence of effective

judicial and security apparatus, most killings are not investigated. *See* ECF 225-50, PEX 47 at 5.

Given the facts above, Libyan courts are not a forum which can provide any Plaintiff in

this case with "adequate and available remedies." 28 U.S.C. § 1350 (codified at note).

*Boniface v. Viliena*, 338 F. Supp. 3d 50, 64 (D. Mass. 2018). At a minimum the Plaintiffs have

respectfully demonstrated this is a disputed material fact thereby requiring the Defendant's

affirmative defense to be rejected.

## IV.    <u>CONCLUSION</u>

For the reasons stated here, Plaintiffs respectfully ask the Court to deny Defendant's

Motion for Summary Judgment.

Date: March 22, 2024                    Respectfully Submitted,

                                        */s/ Thomas M. Craig*
                                        Thomas M. Craig, (VSB #58063)
                                        Grace H. Williams (VSB # 88103)
                                        Fluet
                                        1751 Pinnacle Drive, Suite 1000
                                        Tysons, Virginia 22102
                                        T: (703) 590-1234 | F: (703) 590-0366 fax
                                        tcraig@fluet.law
                                        gwilliams@fluet.law

                                        Mark S. Zaid (*pro hac vice*)
                                        Mark S. Zaid, P.C.
                                        1250 Connecticut Avenue, N.W.
                                        Suite 700
                                        Washington, D.C. 20036
                                        T: (202) 498-0011 | F: (202) 330-5610
                                        Mark@MarkZaid.com

                                        Matthew Jury (*pro hac vice*)
                                        84 Brook Street
                                        London W1K 5EH
                                        UNITED KINGDOM
                                        T: +44 (0) 20 7096-3767
                                        Matthew.Jury@mccue-law.com

                                        *Counsel for Plaintiffs*

**<u>CERTIFICATE OF SERVICE</u>**

I hereby certify that on March 22, 2024, I electronically filed the foregoing with the Clerk of the Court using the CM/ECF system, which will send a notification of such filing to counsel of record for all parties.

<u>*/s/ Thomas M. Craig*</u>
Thomas M. Craig, Esq.